## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                    **Case No.: 8:22-cr-00369-KKM-AAS**

**EMMANUEL AYALA**

_____/

### DEFENDANT'S AS-APPLIED CHALLENGE TO THE CONSTITUTIONALITY OF 18 U.S.C. § 930 AND MOTION TO DISMISS THE INDICTMENT

The Defendant, Emmanuel Ayala, by and through his attorney, pursuant to the Second Amendment to the United States Constitution, the Fourth Amendment, the Due Process Clause of the Fifth Amendment, and Federal Rule of Criminal Procedure 12(b) moves to: (1) challenge the constitutionality of section 930, Title 18 of the United States Code, as applied to him; and (2) dismiss Counts One and Two of the Indictment.

### INTRODUCTION

On September 14, 2022, Mr. Ayala was working as a semi-truck driver for the United States Postal Service delivering parcels. He has the lawful right to possess a concealed firearm and has a security license under Florida law. He was accosted and tackled in and around the post office parking lot by unknown agents from the Office of Inspector General who hadn't identified themselves or

1

stated their business with him; he fled instinctively in fear of being kidnapped by these unknown persons.

Section 930, Title 18 of the United States Code, is unconstitutional as applied to Mr. Ayala. Section 930(a) violates Mr. Ayala's constitutional right to carry a firearm for self-defense on the job because the Second Amendment's plain text protects his conduct, and the Government cannot prove a historical analog regulating the possession of firearms at post offices.

Additionally, section 930 violates Mr. Ayala's constitutional right to due process of law under the Fifth Amendment because the statute is vague and ambiguous. The statute as written doesn't put him on fair notice as to what is criminalized or who can be prosecuted. Moreover, he should be shielded from criminal prosecution because he qualifies as a section 930(d) person under the rule of lenity.

By extension, Mr. Ayala should not stand prosecution for violating section 111, Title 18 of the United States Code, because he resisted an unlawful arrest under the common law and under the Fourth Amendment; he fled out of sheer instinct and abject terror. The charges against him must be dismissed. The Court should consider the following facts and memorandum of law in support of Mr. Ayala's motion.

# FACTS

Mr. Ayala is a United States citizen and has been employed with USPS for about fourteen years as a semi-truck driver hauling packages and mail. He is a law-abiding citizen and is legally entitled to possess firearms under the Second Amendment. He is not, nor has he ever been deemed, a prohibited person from possessing firearms within the meaning of section 922(g), Title 18 of the United States Code. Notably, Mr. Ayala has a concealed weapons permit and a class "G" security license under Florida law pursuant to sections 790.06 and 493.6115, Florida Statutes (2022), respectively. He got these licenses to work as an armed security guard when he was sidelined from USPS due to a labor dispute. When that dispute passed, he was back to driving semi-trucks for USPS. Little did Mr. Ayala know that September 14, 2022, would be one of the worst days of his life.

The morning of September the fourteenth started off just like any other workday for Mr. Ayala. He works out of the post office located at 3501 Bessie Coleman Blvd Fl 3, Tampa, FL 33630. He parked his car a quarter-of-a-mile away at a designated parking lot just north of his workplace off Airport Service Road. He got out of his car, grabbed his red fanny pack, and swung it across his chest clipping it into place. Mr. Ayala always keeps his firearm, a Smith & Wesson 9mm, concealed inside his fanny pack.

He carries his gun primarily for self-defense while he's on the job and driving on the roadways. Most of the time he leaves his fanny pack and concealed firearm inside his parked car off site and grabs it after he picks up his semi-truck for his daily route. But from time to time, he carries his concealed firearm inside his fanny pack for extra protection on the short walk to work (it also cuts down on the extra trip it takes him to grab it from his car after he picks up his work truck).

That day, Mr. Ayala took his fanny pack and concealed weapon with him to his workplace. He walked from the Northern employee parking lot to his building with his fanny pack strapped across his chest. He entered through the metal turnstiles and walked inside the employee main entrance. He clocked in, exited the building, and made his way toward the work bay to pick up his clip board with the day's route and his assigned semi-tractor trailer. As he was walking towards his semi-truck, two strangers in plainclothes—a man and a woman—exited an unmarked black Dodge Caravan and walked towards Mr. Ayala. Unbeknownst to him, these strangers were agents with the USPS Office of Inspector General.

The agents never identified themselves as being affiliated with OIG, they never stated their business with Mr. Ayala, and they certainly never informed him that he was under investigation for committing any crimes on USPS

property. They were complete strangers to Mr. Ayala. Instead, the unknown man asked him if he was Emmanuel Ayala. Mr. Ayala hesitated for a moment. He didn't know who this man was but confirmed his identity with him anyway. After Mr. Ayala gave his name, the unknown woman went back towards the minivan, slid the door open forcefully, and got the handcuffs from out of the van.

The unidentified man then took Mr. Ayala's arm, placed it behind his back, and forcefully directed ushering him towards the passenger side of the minivan. Mr. Ayala peered inside the minivan and noticed, to his horror, that some of the passenger seats were missing. There was nothing but a bare floor inside.

Panic struck him. Fear instantly flooded in. And a choking sense of terror began to consume him. Mr. Ayala thought he was being taken.

The unknown man then tried to place the handcuffs on Mr. Ayala, but he managed to jerk his arm away in the nick of time. His fight-or-flight response kicked in. Mr. Ayala had to make a split-second decision: stand his ground or run. He chose without thinking. It was instinct. He ran for his life.

The strangers caught up to him and tackled him to the ground near the truck parking lot entrance. Mr. Ayala managed to get back up and ran out of the parking lot. He was tackled to the ground a second time and managed to break free. He ran south across Economy Parking Road and crossed the street heading

east onto oncoming traffic on Airport Service Road. He managed to escape into the safety of a parking garage at Tampa International Airport.

He ran into an elevator and tried to frantically close the doors behind him. Before the elevator doors could close shut, uniformed officers with the Tampa Police Department announced their presence, drew their weapons, and ordered Mr. Ayala to drop the firearm. "Drop the firearm?" he thought to himself. "This is what all this was about?", Mr. Ayala internalized. Only then did he realize that this whole ordeal was about his concealed weapon. He immediately unclipped his fanny pack. It fell to the ground. He stepped out of the elevator, was tackled to the ground by Tampa police officers, and was taken into custody.

Mr. Ayala was arrested and later charged in a two-count Indictment for possession of a firearm at a federal facility in violation of section 930, Title 18 of the United States Code, and for forcibly resisting arrest in violation of section 111, Title 18 of the United States Code. This as-applied motion challenging the constitutionality of the law prohibiting the possession of a firearm at a federal facility and seeking dismissal of both counts of the Indictment soon followed.

## MEMORANDUM OF LAW

Section 930 is unconstitutional as applied to Mr. Ayala because it infringes on his Second Amendment right to carry or possess a firearm for self-defense and because it violates his right to due process of law under the Fifth

Amendment. Count One of the Indictment must be dismissed on these constitutional grounds. Because of these constitutional violations, Mr. Ayala should not be prosecuted for resisting an unlawful arrest under section 111. Count Two must also be dismissed.

This memorandum of law is broken down into three parts. Part I analyzes the as-applied challenge on Second Amendment grounds. Next, Part II discusses the as-applied challenge on due process grounds under the Fifth Amendment. Lastly, Part III centers around the dismissal of the section 111 charge for resisting an unlawful arrest based on the deprivations of Mr. Ayala's constitutional rights.

I. **Section 930 is unconstitutional as applied to Mr. Ayala because it infringes on his Second Amendment right to carry or possess a firearm for self-defense.**

Section 930 infringes on Mr. Ayala's Second Amendment right to possess a concealed firearm and to protect himself when he's on the job. The issue as it relates to this Second Amendment as-applied challenge is whether a postal worker's right to lawfully carry a concealed firearm while on the job at his or her federal workplace can be stripped away and punished criminally under section 930. The Second Amendment's plain text and the facts of this case demand that the question presented be answered in the negative.

 "A well regulated militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. Const.

amend. II. The Second Amendment protects an individual's right to keep and bear arms for self-defense, both in and outside the home. *N.Y. State Rifle and Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122, 2125 (2022) (outside the home); *District of Columbia v. Heller*, 554 U.S. 570 (2008) (inside the home). "The Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense.' " *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635).

The Supreme Court recently cemented the government's burden of proof in firearm regulation cases: When an individual's conduct is covered under the Second Amendment's plain text, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. Justice Clarence Thomas, writing the majority opinion in *Bruen*, took the time to reiterate and detail the government's heavy burden of proof:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129–30 (citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10, (1961)).

The Second Amendment's plain text covers Mr. Ayala. First, he is among "the people" protected under the Second Amendment. He is an "ordinary, law abiding adult citizen[]." *Bruen*, 142 S. Ct. at 2134. He is not a convicted felon nor is he a person that is prohibited from possessing firearms under section 922(g), Title 18 of the United States Code. Moreover, he has a concealed weapons permit along with a security license under Florida law. Second, his conduct—carrying a firearm for self-defense outside the home—is protected by the amendment's plain text. *See id.* at 2134–35. Hence, Mr. Ayala was presumptively in lawful possession of a concealed firearm under the Second Amendment at his workplace.[1]

Because the plain text of the Second Amendment covers Mr. Ayala's conduct, the government must prove that section 930 is consistent with this Country's historical tradition of firearm regulation. Let's turn to the pertinent language of the criminal regulation at issue:

> **Possession of firearms and dangerous weapons in Federal facilities**
>
> (a) Except as provided in subsection (d), whoever knowingly *possesses or causes to be present* a firearm or other dangerous weapon in a Federal facility . . . , or attempts to do so, shall be fined under this title or imprisoned not more than 1 year, or both.

---

[1] Indeed, nothing in the Second Amendment makes a distinction between people who bear arms for self-defense in or out of work. *Cf. Bruen*, 132 S. Ct. at 2134 (noting the absence of a home/public distinction in the Second Amendment's text).

18 U.S.C. § 930 (emphasis added).

Only if the government proves that the regulation is consistent with the Nation's historical tradition of firearm regulation can this Court hold that Mr. Ayala's conduct fails to conform to the Second Amendment's "unqualified command." When the challenged regulation addresses a "general societal problem that has persisted since the 18th century," the Government must show "distinctly similar" historical regulations addressing that problem. *Id.* at 2131. Alternatively, when the regulation implicates "unprecedented societal concerns or dramatic technological changes" the Government must point to historical regulations that are "relevantly similar," at least in "how and why" they "burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. The relevant historical record is the founding era when the Second Amendment was adopted in 1791. *Id.* at 2136. And the Government must demonstrate a robust historical tradition of analogous firearms regulation and cannot make that showing with a handful of outliers. *Id.* at 2142, 2148 n.24, 2153. This Court must put the Government to task in answering this historical question. *Id.* at 2134.

The Government cannot meet its burden of showing a historical tradition of banning the possession of firearms for self-defense in post offices and their parking lots. Early America had a postal system. *See* Christina M. Bates, *From 34 Cents to 37 Cents: The Unconstitutionality of the Postal Monopoly*, 68 Mo. L. Rev. 123,

126–31 (Winter 2003) (discussing the history of the American postal system); *see also* U.S. Cont. art. I, § 8, cl. 7 (authorizing Congress "to establish Post Offices"). Yet the government did not ban firearms in all post offices and postal parking lots until 1972. *See* 39 C.F.R. § 232.1(l); D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 276 (2018). And section 930 was not enacted until 1988. *See* PL 100–690 (HR 5210), PL 100–690, November 18, 1988, 102 Stat 4181.

The Government may point to the so-called "sensitive places" doctrine articulated in *Heller*: "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." 554 U.S. 570, 626–27. But as *Bruen* recognized, the historical record reveals "relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." 142 S. Ct. at 2133. The "settled" sensitive places are "legislative assemblies, polling places, and courthouses." *Id.* By contrast, as explained above, post offices and post office parking lots were not places where the government traditionally disenfranchised the people of lawfully possessing firearms. And under *Bruen*, the Government cannot just claim that a particular location is a "sensitive place"—there must be a historical basis to claim so, or at least a historical regulation that is sufficiently analogous. *See id.* at 2133–34 (rejecting the government's effort to expand the

category of "sensitive places"). There is no such historical basis or analogous regulation here.

Because the government cannot prove that section 930—a criminal statute that specifically bans the possession of firearms for self-defense by all persons at federal facilities, including postal workers in employee parking lots—is rooted in this Country's history and tradition of firearm regulation, Mr. Ayala's conduct falls *inside* rather than outside the Second Amendment's edict: that the right of the people to keep and bear arms shall not be infringed. Section 930 is unconstitutional as applied to Mr. Ayala. Accordingly, Count One of the Indictment must be dismissed.

**II.    Section 930 is unconstitutionally vague as applied to Mr. Ayala under the Fifth Amendment's Due Process Clause. He did not have fair notice that his conduct was criminal. Moreover, he is immune from criminal prosecution under the rule of lenity.**

Mr. Ayala wasn't given fair notice under the Fifth Amendment's Due Process Clause that lawfully carrying a firearm on the job at the post office amounted to crime. The issue as it pertains to this as-applied Fifth Amendment challenge is whether section 930, being a vague and ambiguous statute, gives Mr. Ayala fair notice that his actions amounted to a crime.[2] The answer to the

---

[2] A statute can be facially void for vagueness even if it is not vague in all its applications. *Johnson v. United States*, 576 U.S. 591, 602–03 (2015). Mr. Ayala maintains that he may bring a facial vagueness challenge without first showing that section 930 is unconstitutionally vague as

question presented is self-evident: ambiguous statutes that don't provide the accused with fair notice are void.

"A criminal statute is unconstitutionally vague in violation of the Fifth Amendment due process clause if it 'fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement.' " *United States v. Turner*, 842 F. 3d 602, 604 (8th Cir. 2016) (quoting *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015)). "Vague laws contravene the first essential of due process of law that statues must give people of common intelligence fair notice of what the law demands of them." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) (internal quotations and citations omitted).

When it comes to analyzing the due process considerations apparent in Mr. Ayala's case, here are the relevant portions of the criminal statute at play:

**Possession of firearms and dangerous weapons in Federal facilities**

(a) *Except as provided in subsection (d)*, whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal

---

applied to him. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1214 n.3 (2018); *Johnson*, 576 U.S. 591, 602–03. However, he acknowledges Eleventh Circuit cases prior to *Johnson* and *Dimaya* hold that vagueness challenges must be evaluated in light of the facts of the case at hand. *See United States v. Marte*, 356 F. 3d 1336, 1342 (11th Cir. 2004) (citing *United States v. Fisher*, 289 F. 3d 1329, 1333 (11th Cir. 2002)). He respectfully submits that *Johnson* and *Dimaya* undermine *Marte* to the point of abrogation. In any event, to the extent the Court needs additional factual development to decide Mr. Ayala's as-applied and/or facial challenges to section 930, Mr. Ayala requests an evidentiary hearing and/or an opportunity to preserve and renew this Motion after evidence is presented at trial.

facility . . . , or attempts to do so, shall be fined under this title or imprisoned not more than 1 year, or both.

. . .

(d) *Subsection (a) shall not apply to* —
    (1) the lawful performance of official duties by an officer, agent, or employee of the United States, a State, or a political subdivision thereof, who is authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of law;
    (2) *the possession of a firearm* or other dangerous weapon *by a Federal official* or a member of the Armed Forces *if such possession is authorized by law*; or
    (3) *the lawful carrying of firearms* or other dangerous weapons in a Federal facility *incident to hunting or other lawful purposes*.

. . .

(g) As used in this section:
    (1) The term "Federal facility" means a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties.
    (2) The term "dangerous weapon" means a weapon, device, instrument, material, or substance, animate or inanimate, that is used for, or is readily capable of, causing death or serious bodily injury, except that such term does not include a pocket knife with a blade of less than 2 ½ inches in length.

18 U.S.C. § 930 (emphasis added).

A plain reading of section 930 totally exempts persons under subsection (d) from criminal prosecution for possessing a firearm in a federal facility. Said another way, section 930(d) persons are criminally immune from section 930(a) prosecutions. What is less clear, however, is who falls within section 930(d)'s protections. How can the law as written give Mr. Ayala and others who are similarly situated fair notice that their conduct of possessing a concealed firearm

at a post office is criminal? Or that they might belong to a class of persons immune from criminal prosecution? The law can't. It doesn't. It's void.

There's a sub-issue as it relates to due process: whether Mr. Ayala belongs to a category of persons who are immune from prosecution under the rule of lenity. The answer to this sub-issue is clear: vague exclusions to criminal prosecution should favor the accused under principles of lenity. He ought to qualify as a member of the category of persons immune from criminal prosecution under section 930(d) because the exclusion is ambiguous.

The rule of lenity dictates that vague and ambiguous statutes favor the accused:

> [T]he rule of lenity[ ] teach[es] that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor. And much like the vagueness doctrine, it is founded on "the tenderness of the law for the rights of individuals" to fair notice of the law "and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department."

*Davis*, 139 S. Ct. at 2333 (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) (Marshall, C.J.) and *United States v. Lanier*, 520 U.S. 259, 265–267, and n.6 (1997)).

Section 930(d)(1) looks pretty clear on its face—law enforcement officers and agents are the types of people exempt from criminal prosecution. But section 930(d)(2) persons isn't as clear. It's self-evident who members of the Armed Forces are in subsection (d)(2). But who's a "federal official"? Are "federal

15

officials" separate and distinct from federal employees? Are they one in the same? Are all federal employees "federal officials" and vice versa? Which of these terms nestles neatly into the other? Do they even nestle into each other at all? How do we know who is who in this Russian nesting doll conundrum?

Section 930(d)(2) exempts members of the Armed Forces and "federal officials"—whoever they are—from criminal prosecution, allowing them to possess firearms "if such possession is authorized by law." But authorized by which law? State law? Federal law? Tribal law? All of the above? Importantly, the terms "federal official" and "federal employee" are not defined under section 930(g). Moreover, these phrases are undefined in section 921, Title 18 of the United States Code (the definitions section of Chapter 44). In fact, Chapter 44, which governs firearms, is entirely devoid of any definitions for the terms "federal official" or "federal employee." The same is true for the phrases "authorized by law" and "other lawful purposes" in sections 930(d)(2) and (d)(3), respectively.

Lastly, section 930(d)(3) doesn't revolve around a distinct group of people like subsections(d)(1) and (d)(2) do. Rather, section 930(d)(3) is written in the passive voice. It describes an amorphous and broad category of somebodies who can lawfully carry firearms. So, who belongs in (d)(3)? Section 930(d)(3) includes those who can lawfully carry firearms: (a) incident to hunting; or (b) *incident to*

*other lawful purposes*. Therein lies the ambiguity of the class of persons exempt from criminal prosecution under sections 930(d)(2) and (d)(3).

How then can Mr. Ayala have fair notice that section 930 applies to him at all? Or that he is *not* exempt from criminal prosecution? After all, he's a federal employee who works for USPS. Does that also make him a "federal official" under section 930(d)(2)? Or is it the other way around? He could very well be considered a "federal official" since that term is undefined under the law. Does it depend on the person's subjective belief that he or she is a "federal official"? Or is it an objective standard whether they are or aren't a "federal official"? Just as important, Mr. Ayala was authorized by Florida law to carry a concealed weapons permit and has a security license. So, he could be a person—or thought he was a person—who is exempt from prosecution under section 930(d)(2) because he's a federal official authorized by law to possess a concealed firearm.

And if Mr. Ayala fits within the category of persons in section 930(d)(2), then he most certainly fits the bill of a section 930(d)(3) person. People under section 930(d)(3) are even broader in scope than those in (d)(2). Invariably, it must include Mr. Ayala: a law-abiding citizen with his Second Amendment rights intact, who possesses his firearm for a lawful purpose—for purposes of self-defense outside the home.

As applied to Mr. Ayala, section 930 is void for vagueness under the Due Process Clause of the Fifth Amendment. Even if there was any ambiguity as to whether he falls within the category of persons described in sections 930(d)(2) and (d)(3), then the rule of lenity instructs us that the ambiguity falls in Mr. Ayala's favor. The tie, so to speak, goes to the runner. Hence, he is immune from prosecution. Count One must therefore be dismissed. But Mr. Ayala's right to due process of law and his right to possess firearms for self-defense aren't the only rights at issue. He faces prosecution for resisting what can only be considered an unlawful arrest.

III.    **Mr. Ayala lawfully evaded an illegal arrest and should not face prosecution under section 111 given the totality of the circumstances and the constitutional deprivations as applied to him.**

Admittedly there is scant legal support in the Eleventh Circuit for the proposition that Mr. Ayala shouldn't face criminal prosecution for resisting or impeding the unknown agents' arrest in this case. However, the constitutional deprivations of his Fourth and Fifth Amendment rights as applied to Mr. Ayala and the totality of the circumstances surrounding his arrest are downright concerning at best and completely horrifying at worst.

"One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases." *United States v. Di Re*, 332 U.S. 581, 594 (1948). "If the officer had no right to arrest, the other party might resist

the illegal attempt to arrest him, using no more force than was absolutely necessary to repel the assault constituting the attempt to arrest." *John Bad Elk v. United States*, 177 U.S. 529, 535 (1900). Mr. Ayala's case is "a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32 (1973).

But the common law right to resist an unlawful arrest has *nearly* been abolished in the Eleventh Circuit: "The common law recognized the right of a citizen to use reasonable force to resist an unlawful arrest. . . . The common-law rule, however, has been greatly eviscerated, if not virtually abolished, in this circuit." *United States v. Bailey*, 691 F. 2d 1009, 1018 (11th Cir. 1982) (citing *United States v. Danehy*, 680 F. 2d 1311, 1315–16 (11th Cir. 1982)). But the common law right to resist an unlawful arrest hasn't been *totally* abolished in this Circuit. Until that time comes, this is precisely the type of case where a person should have the common law right to resist an unlawful arrest and avoid criminal prosecution.[3]

The agents exercised poor professional judgment when they approached Mr. Ayala in the semi-truck parking lot. They did so without announcing

---

[3] *Cf. Bailey*, 691 F. 2d at 1018, n.9 ("We are not confronted here with any suggestion that agents Markonni and Dorsett intentionally provoked Bailey's flight or that the agents otherwise generated the second resisting arrest crime as a pretext to provide an independent, legitimate basis for the prior illegal arrest. *Of course, we would not tolerate that, and we are satisfied that courts will be alert to discern such abuses.*") (emphasis added).

themselves, without stating their purpose for talking to him, without informing him that he was suspected of possessing a firearm at a federal facility, and without telling him that he was under arrest for committing a crime while at work. He was illegally seized. The agents needed to have done better. And they knew or should have known to do all of these things and more. Someone could have gotten seriously injured, hurt, or killed that day. But thankfully Mr. Ayala exercised restraint and instinctively chose to flee, believing that he was being abducted by unknown individuals. He resisted an unlawful arrest. Count Two cannot stand.

## CONCLUSION

Enshrined in the Bill of Rights are bedrock principles in our constitutional form of government: that the right of the people to keep and bear arms shall not be infringed under the Second Amendment; and that the criminally accused are entitled to fair notice and due process of law under the Fifth Amendment. Mr. Ayala was deprived of each of these fundamental rights on that fateful September day.

Section 930 as applied to him is unconstitutional. His Second Amendment right to possess a firearm for self-defense on the job was infringed. Mr. Ayala is a law-abiding citizen with his Second Amendment rights intact. He's a person who could lawfully possess a firearm, he's a person who lawfully concealed his

firearm, and he's a person who carried his weapon for a lawful purpose—for self-defense. The government cannot prove that his conduct falls outside of the Second Amendment. He ought to have the constitutional right to keep a lawfully concealed firearm to protect himself when he's at work and not suffer any criminal liability.

Section 930 as applied to him is void for vagueness under the Fifth Amendment's Due Process Clause. Mr. Ayala is a person who was not on fair notice that his actions were criminal. It's unclear whether he is or isn't a section 930(d) person who is shielded from a section 930(a) prosecution. The rule of lenity instructs us that this ambiguity runs in Mr. Ayala's favor. He is therefore immune from criminal prosecution under sections 930(d)(2) and (d)(3).

And all things considered, Mr. Ayala should not be prosecuted for resisting arrest under section 111. He fled in fear from an untenable and unlawful arrest. His rights under the Second, Fourth, and Fifth Amendments were ultimately infringed. For the foregoing reasons, Counts One and Two of the Indictment must be dismissed.

A. FITZGERALD HALL, ESQ.
FEDERAL DEFENDER

*/s/ Stephen Consuegra*
Stephen Consuegra, Esq.
Florida Bar No. 105816
Assistant Federal Defender
400 N. Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone: (813) 228-2715
Facsimile: (813) 228-2562
E-mail: Stephen_Consuegra@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 5, 2023, a true and correct copy of the foregoing was furnished using the CM/ECF system with the Clerk of the Court, which will send notice of the electronic filing to the following:

Abigail King, AUSA

*/s/ Stephen Consuegra*
Stephen Consuegra, Esq.
Assistant Federal Defender
