UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 8:22-cr-369-KKM-AAS

EMMANUEL AYALA

## GOVERNMENT'S SUPPLEMENTAL BRIEF TO DEFENDANT'S MOTION TO DISMISS INDICTMENT

The United States of America, by Roger B. Handberg, United States Attorney for the Middle District of Florida, files this supplemental brief as ordered by the Court. *See* Doc. 26.

## Background and Introduction

The defendant, Emmanuel Ayala, has moved to dismiss charges that he possessed a firearm in a federal facility, in violation of 18 U.S.C. § 930, and that he resisted a federal officer, in violation of 18 U.S.C. § 111. *See* Doc. 23. The United States has opposed dismissal. *See* Doc. 25. This Court ordered supplemental briefing regarding the firearm charge. *See* Doc. 26.

Section 930 prohibits the possession of firearms in federal facilities except in certain circumstances.[1] One exception is that the statute does "not apply to … the lawful carrying of firearms … in a Federal facility incident to hunting or other lawful purposes." § 930(d)(3). Ayala argues that section 930 violates the Second

---

[1] A federal facility is any "building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." 18 U.S.C. § 930(g)(1).

Amendment, as applied to him. *See* Doc. 23 at 1, 6–7 (reiterating as-applied challenge). The indictment alleges that Ayala "did knowingly possess and cause to be present a firearm, that is, a Smith & Wesson 9MM firearm, in a federal facility, in violation of 18 U.S.C. § 930." Doc. 1 at 1. In his motion to dismiss, Ayala claims that he is a federal employee with a state-issued concealed weapons permit and security license. *See* Doc. 23 at 3–4.  He admits that he brought a loaded handgun to the post office where he works (a "federal facility") and carried it while on duty. *Id.* (These additional facts, however, are not alleged in the indictment). He also argues that the statute is unconstitutionally vague.

## Memorandum Of Law

I.    ***Bruen, McDonald*, and *Heller* require no further inquiry into the history of "presumptively lawful" firearm regulations in government buildings and schools.**

Ayala's motion is predicated on the Supreme Court's most recent Second Amendment decision, *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2125 (2022), which rejects the "'two-step' framework" under which appellate courts had previously "combine[d] history with means-end scrutiny" in analyzing Second Amendment challenges after *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). *Bruen* clarifies that a firearm regulation comports with the Second Amendment so long as it is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms"; neither strict nor intermediate scrutiny comes into play. *Bruen*, 142 S. Ct. at 2127.

"Part of" the historical tradition, *Bruen* explains, means "consistent with"—*i.e.*, not contrary to—that tradition. *Id.* at 2130.

*Bruen* is no help to Ayala. While clarifying that means-end scrutiny plays no role in a Second Amendment challenge, *Bruen* unequivocally affirms *Heller* and *McDonald. See, e.g., Bruen*, 142 S. Ct. at 2134 (making the "constitutional standard endorsed in *Heller* more explicit" and applying the same standard). Those cases expressly affirmed the common-sense notion that the government may regulate firearms in government buildings. Nothing in *Bruen* undermines or abrogates that. To the contrary, *Bruen* reiterates that the government may prohibit firearms in government buildings, schools, and other "sensitive places." *See Bruen,* 142 S. Ct. at 2133. The Supreme Court has now said so three times. *See also Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786.

Ayala does not dispute that a post office is a government building and a federal facility. *See* U.S. Const. Art. I § 8 ("The Congress shall have Power … to establish Post Offices and post Roads."); Doc. 23 at 7–12. This Court ordered further briefing on "historical evidence of regulation of firearms at post offices" (re: buildings and employees) "with a particular view to the time of the Founding." Doc. 26 at 4–5. And, in relation to Ayala's vagueness argument, the Court ordered the government to address the meaning of "other lawful purposes" in section 930(d)(3). *Id.* The government addresses both issues in the memorandum of law below. But first, some important context:

There is no evidence of firearms being prohibited at post offices, specifically, or of postal workers being prohibited from carrying them, at the time of the founding. This is not surprising. The evidence that the government has been able to find of analogous historical restrictions is described below. In the end, however, no further historical analysis is necessary, because the Supreme Court has already answered the question. It has repeatedly said that the government may restrict firearms in government buildings of whatever type, drawing from analogues like polling places, courthouses, and legislative assemblies. That is the appropriate framework here. *See Bruen*, 142 S. Ct. at 2132 ("[L]ike all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar'"—not necessarily identical.). Whatever this Court concludes about the evidence below, the Supreme Court has stated several times now the Second Amendment permits firearm restrictions in government buildings (which include post offices). *See Bruen,* 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786. To carve out a post-office exception would be in grave tension, if not direct conflict, with each opinion.

*Heller* began with the observation that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right [to bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. With that general principle in mind, *Heller* explained that striking down a local ordinance that had prohibited the

keeping of handguns in homes "should [not] be taken to cast doubt on … laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id*. The Court identified such sensitive-place restrictions as but one example in a non-exhaustive list of "presumptively lawful regulatory measures" that do not implicate the Second Amendment (also including "longstanding prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms"). *Id.* at 627 n.2.

Two years later, *McDonald* reiterated: "We made it clear in *Heller* that our holding did not cast doubt on … laws forbidding the carrying of firearms in sensitive places such as schools and government buildings [or other presumptively lawful restrictions] … *We repeat those assurances here.*" 561 U.S. at 786 (emphasis added). And *Bruen* again reaffirms firearm restrictions in schools and government buildings, noting that modern regulations require only "a well-established and representative historical *analogue*, not a historical *twin.*" 142 S. Ct. at 2133 (emphases in original; internal citations and quotations omitted). It is "settled," says *Bruen*, that schools and government buildings are among the "sensitive places" where firearms may constitutionally be prohibited:

> Consider, for example, *Heller*'s discussion of longstanding laws forbidding the carrying of firearms in sensitive places such as schools and government buildings. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that

> these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

*Id*. (emphasis in original; citations and some internal quotation marks omitted).

Whether *Bruen* means to say that schools and government buildings are themselves *historically* sensitive places (of the same vintage as legislative assemblies, polling places, and courthouses), or *new* and *modern* analogues to the enumerated examples, is debatable but irrelevant. The point, regardless, is that this part of *Bruen* explains why it is "constitutionally permissible" to prohibit the carrying of firearms in schools and government buildings (as *Heller* and *McDonald* said): either because the lawfulness of such prohibitions may be presumed "settled" given the lack of any historical dispute or because schools and government buildings—of whatever type—are "analogous enough to pass constitutional muster" when compared to other presumptively settled sensitive places. *Id*. Nothing in *Bruen* purports to narrow or restrict the categories of sensitive places that *Heller* and *McDonald* specifically identified. *See id*. at 2157 ("Nor have we disturbed anything that we said in *Heller* or *McDonald* ... about restrictions that may be imposed on the possession or carrying of guns ... Our decision, as noted, does not expand the categories of people who may lawfully possess a gun.") (Alito, J., concurring); *see also id*. at 2161 ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations," including "'laws forbidding the carrying of firearms in sensitive places such as schools and

government buildings.'") (Kavanaugh, J., concurring) (quoting *Heller* and *McDonald*).

 For 35 years, 18 U.S.C. § 930 has restricted the possession of firearms in any "building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." *See* Pub. L. No. 100-690 § 6215 (Nov. 18, 1988). *McDonald* reiterated *Heller*'s "assurances" that the Second Amendment casts no doubt on longstanding "laws forbidding the carrying of firearms in ... government buildings" (or other sensitive places). *McDonald*, 561 U.S. at 786. *Bruen* again reiterates *Heller* (and *McDonald*). If *Bruen* was an invitation to scrutinize firearm restrictions for particular types of government buildings—and there are myriad different types—it would cast significant "doubt" on section 930, contrary to the assurances in *Heller* and *McDonald* that *Bruen* affirms and reiterates. There is no subsequent case interpreting *Bruen* that way.

To the contrary, lower courts have consistently recognized that *Bruen* protects firearm regulations in all manners of government buildings (and, by the same reasoning, in schools). Two magistrate judges in the District of Maryland, for instance, have repeatedly rejected post-*Bruen* Second Amendment challenges to a federal regulation prohibiting firearms on the National Institutes of Health campus in Maryland. *See United States v. Marique*, No. 8:21-po-02263-AAQ, 2022 WL 17822443 (D. Md. Dec. 20, 2022); *United States v. Tallion*, No. 8:22-po-01758-AAQ, 2022 WL 17619254 (D. Md. Dec. 13, 2022); *United States v. Power*, No. 20-PO-331-GLS, 2023

WL 131050 (D. Md. Jan. 9, 2023); *United States v. Robertson*, No. 22-PO-867-GLS, 2023 WL 131051 (D. Md. Jan. 9, 2023). The regulation challenged in those cases states that "[n]o person other than a specifically authorized police officer shall possess firearms, explosives, or other dangerous or deadly weapons or dangerous materials intended to be used as weapons either openly or concealed" on the NIH property. 45 C.F.R. § 3.42(g). In each case, the court upheld the regulation and refused to dismiss the indictment, because the NIH property is a "government building," and therefore—according to *Bruen*—a "sensitive place" where firearms may constitutionally be prohibited. *See Marique*, 2022 WL 17822443, at *8 (ruling that "the Supreme Court has already engaged in the analogical reasoning regarding schools and government buildings," and rejecting defendant's argument that certain government buildings may not be sensitive places); *Tallion*, 2022 WL 17619254, at *7 (same); *Power*, 2023 WL 131050, at *8–9 ("[B]ecause the NIH is a government building(s), it is a sensitive place [where firearms may be banned].");  *Robertson*, 2023 WL 131051, at *8–9 (same). A district court in Minnesota similarly observed, albeit in dicta, that "[a]lthough the *Bruen* Court identified few other founding-era sensitive places with outright prohibitions on weapons, the lack of evidence of 'disputes regarding the lawfulness of such prohibitions' suggested that 'arms carrying could be prohibited [in schools and government buildings] consistent with the Second Amendment.'" *Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *5 n.12 (D. Minn. Mar. 31, 2023) (quoting *Bruen*; brackets in original). And a district court in New Jersey refused to temporarily restrain enforcement of a statute barring firearms

at playgrounds because, the court concluded, "*Bruen* and *Heller* ... expressly identified restrictions at certain sensitive places (such as schools) to be well-settled, even though the 18th- and 19th-century evidence has revealed few categories in numbers." *Siegel v. Platkin*, No. CV-22-7464, 2023 WL 1103676, at *10 (D.N.J. Jan. 30, 2023). "Playgrounds fall within the sphere of schools," the court decided, and "[t]herefore, under *Bruen*, the Court 'can assume it settled' that playgrounds are a 'sensitive place.'" *Id.* (quoting *Bruen*); *see also Frey v. Nigrelli*, No. 21-CV-05334, 2023 WL 2473375, at *20 (S.D.N.Y. Mar. 13, 2023) (likewise reading *Bruen* to have "'assumed it settled that' schools full of children were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment'") (quoting *Bruen*). The few courts that have thus far addressed these issues consistently recognize that *Bruen*, *McDonald*, and *Heller* foreclose any Second Amendment challenge to firearm regulations in government buildings or schools, period.

"[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Bruen,* 142 S. Ct. at 2133. Courts should neither "uphold every modern law that remotely resembles a historical analogue" nor strike down every modern law that lacks an identical historical analogue. *Id*. *Bruen*, *McDonald*, and *Heller* make clear that government buildings—including post offices—fall on the constitutionally-regulable side of that line. This Court should not second-guess the Supreme Court's "repeat[ed] … assurances" that its recent precedents cast no doubt on firearm restrictions in such places. *McDonald*, 561 U.S.

at 786.

## II.    Historical Traditions in the United States Support the Ban on Firearms at Post Offices

### A. *New York State Rifle & Pistol Association v. Bruen*

When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2129–30 (2022). The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Id.* at 2130. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Id*. Even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster. *Id*. at 2118. Analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical *twin*. *Id.*at 2132. Courts can use analogies to "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" to determine whether modern regulations are constitutionally permissible. *Id.* at 2118.

Although the historical record yields relatively few 18th- and 19th-centruy "sensitive places" where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—there is no dispute regarding the lawfulness of such prohibitions; thus it is settled that those locations were "sensitive places" where arms carrying could be prohibited consistent with the Second

Amendment. *Id*. at 2132. Additionally, where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide the interpretation of an ambiguous constitutional provision. *Id*. at 2137 (citing *NLRB v. Noel Canning*, 572 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)).

### B. Historical Analysis of Post Offices and "Sensitive Places"

The ban of firearms at federal facilities is supported by legal and historical precedents. "Sensitive places" such as government buildings have long been exceptions to the Second Amendment, and post offices fall under that umbrella. Pursuant to *Bruen*, although the government is required to conduct a historical analysis of the firearm ban in question, the government is not required to provide a "historical twin." There is sufficient historical support of a weapons ban at post offices; however, the more relevant analysis is the historical ban of weapons at "sensitive places," as post offices are designated sensitive places and fall within the category of a government building.

The United States Postal Service is a quasi-governmental corporation established by Congress and is the successor to the United States Post Office. *United States v. Dorosan*, 2008 WL 2622996, (E.D. La. June 30, 2008). The business of USPS is mail. *Id*. The U.S. Constitution authorizes Congress "[t]o establish Post Offices and post Roads," which Congress has done throughout nearly the entirety of the history of the United States. *See* U.S. Const. art. I, § 8, cl. 7; *Postal History*,

https://about.usps.com/who/profile/history/ (including timeline of significant dates, beginning with Benjamin Franklin's appointment as first Postmaster General in 1775, and including lists of historical post offices). The Property Clause authorizes Congress to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. The Property Clause authorizes the enactment and enforcement of regulations that are designed to maintain safety and order on government property. *See United States v. Brown*, 552 F.2d 817 (8th Cir. 1977); *Robbins v. United States*, 284 F. 39 (8th Cir. 1922); *United States v. Matherson*, 367 F.Supp. 779 (E.D. NY 1973).

The United States Postal Service is a state actor rather than a private business, so its actions must comply with the Constitution. *Bonidy v. United States Postal Service*, 790 F.3d 1121, 1126 (10th Cir. 2015). The government has more flexibility to regulate when it is acting as a proprietor (such as when it manages a post office) than when it is acting as a sovereign (such as when it regulates private activity unconnected to a government service. *Id.* Ultimately, the United States Postal Service has broad discretion to govern its business operations according to the rules it deems appropriate, and a regulation banning firearms on postal property is consistent with the United States Postal Service objectives, which include providing a safe environment for its patrons and employees. *Id.* at 1127. Certainly, our Founders understood that property owners had the right to exclude others from their property and, along with it, the lesser power to restrict the actions or conduct of visitors as a condition of admittance. *See* William Michael Treanor, *The Original Understanding of*

*the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 826–27 (1995)

("Blackstone's conception, while narrower than Locke's, was still broad, as well as

remarkably modern: The individual's right of property 'consists in the free use,

enjoyment, and disposal of all acquisitions, without any control of diminution, save

only by the laws of the land.'") (quoting Blackstone's Commentaries); *see also*

*Nekrilov v. City of Jersey City*, 45 F.4th 662, 683–84 (3d Cir. 2022) (Bibas, J.,

concurring) (similarly describing the Founders' "broad conception" of property

rights) (also citing Blackstone's Commentaries).

     Although the American postal network operated under the Continental

Congress and Confederation Congress from 1775 to 1781, the post office essentially

remained a mirror image of the royal postal system for British North America as it

had existed in the period prior to 1775. Founding-Era Socialism: The Original

Meaning of the Constitution's Postal Clause, 7 Brit. J. Am. Legal Stud. 1, 25 (2018).

In 1788, there were approximately 69 post offices across the continental United

States. *Id.* at 28. The post offices at the time of the Founding were starkly different

from the post offices in modern day America. In some colonies, every family sent a

member onboard incoming ships for the purpose of receiving letters. In the King's

Service (2009), https://www.archives.gov/publications/prologue/2009/summer/

finlay.html. Letters that were unclaimed on the ships were taken to a nearby

coffeehouse or tavern that was heavily frequented by the community. *Id.* Letters were

spread out on a table and people would come and not only gather their own mail but

gather the letters belonging to people in their neighborhood. *Id.* A local magistrate or

minister was ultimately responsible to distribute letters or packages for individuals that lived far from the city. *Id.*

Post offices were only loosely, if at all, regulated, and the employees and patrons of post offices were not regulated either. In 1794, Congress established the Post Office indefinitely. 1 Stat. 354 (1794). From 1790 to 1860, the number of post offices increased from 75 to 28,498. The United States Postal Service, An American History (2022), https://about.usps.com/publications/pub100.pdf. Through the evolution of mail carrier systems, post offices became similar to what they are in modern day America. As such, regulations of the firearms at post offices evolved in similar time.

In 1962, as part of the new Federal Property Management Regulations, firearms and other weapons or explosives were banned from federal property except for official purposes. 29 F.R. 15982 (1964). In 1972, the United States codified the ban of firearms, dangerous or deadly weapons, or explosives on postal property except for official purposes. Conduct on Postal Property, 37 Fed. Reg. 24346, 24347 (November 16, 1972). In 1988, Congress outlawed carrying a firearm or other dangerous weapon in a federal facility. 18 U.S.C. § 930. The term "federal facility" means a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties. *Id.*  Additionally, in 1998 the same ban was codified, reinforcing that "[n]o person while on postal property may carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, or store the same on postal

property, except for official purposes". Conduct on Postal Property, 39 C.F.R. § 232.1(l).

The *Bruen* court held that courts can use analogies to longstanding laws forbidding the carrying of firearms in sensitive places to determine whether modern regulations are constitutionally permissible. *Bruen*, 142 S. Ct. at 2118 (citing *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)). The *Bruen* court further held that although there were few 18th- and 19th-century "sensitive places" where weapons were altogether banned—*e.g.*, legislative assemblies, polling places, and courthouses—there was no dispute regarding the lawfulness of such prohibitions. *Id.* at 2133. As such, those locations are settled "sensitive places" where arms carrying may be prohibited consistent with the Second Amendment, despite the lack of historical analogue. *Id.* Post offices and other government buildings are, at a minimum, analogous to the specific historical examples cited in *Bruen*—if not among those examples themselves (this part of *Bruen* is ambiguous). *Id.* at 2133. Under either reading, a post office is a "sensitive place" that does not require further historical analysis beyond that already established in *Bruen*.

At the time of the Founding, Delaware enacted a "sensitive place" ban on firearms at polling places. D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms, 13 Charleston L. Rev. 205, 235–36 (2018). Additionally, during the colonial and Founding periods, a few jurisdictions had laws against carrying arms into centers of government deliberation, including polling places. *Id.* at 244. These restrictions became more prominent in the late 17th-

century, with Louisiana, Maryland, and Texas implementing polling place firearm bans. *Id.* at 245.

In 1874, the Georgia Supreme Court upheld a statute against carrying weapons into a court of justice, citing the right of individuals to safely seek the privileges of a courthouse without being surrounded by weapons. *Id.* at 246. It wasn't until the late twentieth century that firearm bans at schools rose in popularity; firearms previously were typically present at schools as students stored them in their lockers or vehicles to go hunting or target shooting after school. *Id.* at 263.

Courts across the country have held that the United States Postal Service, acting as a proprietor, can prohibit the presence of firearms on its properties, specifically as it relates to Postal Service employees. The Fifth Circuit, for example, upheld the ban of firearms in all post offices and post office parking lots. *United States v. Dorosan*, 350 F. App'x 874 (5th Cir. 2009). The *Dorosan* court held that because the Postal Service used the parking lot as a place of regular government business, it fell within the "sensitive places" exception and thus Dorosan could not lawfully bring his firearm to the postal parking lot. *Id.* at 875. The Tenth Circuit reached the same decision and held that the Postal Service parking lot in question did not infringe on an individual's Second Amendment rights because the Second Amendment right to carry firearms does not apply to federal buildings and the parking lot qualified because it contained a drop-off mailbox. *Bonidy v. U.S. Postal Service*, 790 F.3d 1121 (10th Cir. 2015). The defendant in that case had a valid concealed-carry permit under Colorado law and claimed he should be able to bring his gun into the post office

building and store the gun in the post office parking lot when he picked up his mail. *Id*. at 1123. The Tenth Circuit ruled that the firearm ban on postal property is substantially related to the Postal Service's important interest in creating a safe environment for its patrons and employees, and only affects private citizens when they are doing business with the Postal Service or on Postal Service property. *Id*. at 1127. The *Bonidy* court also held that a concealed-carry permit did not override the constitutionality of the Postal Service regulation banning firearms from its property. *Id.*

Throughout the history of the United States, firearm regulations have ebbed and flowed, with more regulations enacted in the nineteenth and twentieth centuries. Post offices fall within the category of a government building, protected by the "sensitive place" exception to the Second Amendment, even though—as *Bruen* acknowledged—there were "relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited" at the time of the Founding. *Bruen*, 142 S. Ct. at 2133. Specific, pre-existing firearm prohibitions on postal property or for postal employees at the time of the Founding are not necessary to justify the longstanding, presumptively lawful firearm prohibitions in government buildings (including post offices), as *Bruen*, *Heller*, and *McDonald* recognize. The historical analogues cited above (and in *Bruen*) are sufficient.

Besides, Ayala argues that section 930 is unconstitutional *as applied to him*. *See* Doc. 23 at 1, 6–7. Even if *Bruen* left any doubt about firearm prohibitions in post offices or other government buildings as a general matter (it doesn't), Ayala certainly

cannot show that the Second Amendment prevents the government from prohibiting its own employees from bringing guns to work.

### III.   The "Other Lawful Purposes" Exception under 18 U.S.C. § 930(d)(3) Does Not Apply to Ayala.

Section 930(d)(3) permits the "lawful carrying of firearms or other dangerous weapons in a Federal facility incident to hunting or other lawful purposes." There are three cases that interpret this exception to the firearm prohibition, none of which support Ayala's broad reading of the statute. *See Yorzinski v. Imbert*, 39 F. Supp. 3d 218, 227 (D. Conn. 2014); *Tagore v. United States*, No. CV H-09-0027, 2012 WL 12877829, at *22–23 (S.D. Tex. Feb. 2, 2012); *United States v. De la Cruz-Bancroft*, 2010 WL 8752034 (D.N.M. Jan. 4, 2010). These cases either hold or endorse the view that section 930(d)(3) requires that the firearm be both lawfully carried *and* carried for a "lawful purpose that is related to the federal facility." *De la Cruz-Bancroft*, 2010 WL 8752034 at *2–3; *see also Yorzinksi*, 39 F. Supp. at 227; *Tagore*, 2012 WL 12877829, at *22–23.

Regardless, a plain reading of the text shows that the exception does not provide blanket authorization for all ostensibly "lawful carrying." It is far more limited than that. For one thing, the lawful carrying in the federal facility must be "incident to" some "lawful purpose" (as the cases above recognize). Lawful carrying is necessary but not sufficient. The latter requirement—lawful purpose—would be superfluous if it was synonymous with lawful carrying, and statutes should be read to avoid surplusage. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal

principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.").

Moreover, the scope of "other lawful purpose" is informed by the specific example that the statute provides: hunting. When a statute includes a "'catchall phrase' to 'an enumeration of specifics,' additional inclusions would be appropriate if they are sufficiently similar [to the specifics]." *Hicks v. City of Tuscaloosa*, 870 F.3d 1253, 1259 (11th Cir. 2017) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012)). This canon of statutory interpretation is known as "ejusdem generis." *Id*. With this principle in mind, section 930(d)(3) is best read to encompass (1) the lawful carrying of a hunting rifle into a federal facility where hunting is permitted—such as a national park—for that particular purpose (hunting), or (2) sufficiently similar conduct for sufficiently similar purposes. Ayala's purported conduct—carrying a concealed handgun for "self defense," while working at a post office—appears to lack any particular purpose at all; certainly not one related to the federal facility, and it's qualitatively different than hunting on federal lands, regardless. In any event, whether or not Ayala lawfully carried the weapon, and for a lawful purpose, would be up to a jury to decide. *See generally United States v. McArthur*, 108 F.3d 1350, 1354–56 (11th Cir. 1997) (similar exception to section 930—permitting firearms in federal facilities if they fail to post conspicuous notice of the prohibition—is an affirmative defense). It has no bearing on the sufficiency of the indictment.

Finally, "other lawful purpose" should not be equated with state-licensed carrying or possession both because being licensed is not a purpose and because Congress explicitly exempts state-licensed carrying or possession from firearm prohibitions when it wants to do so. Elsewhere in Chapter 44 of Title 18 (where section 930 likewise resides), for instance, Congress has prohibited individuals from transferring firearms "to any person ... who the transferor knows or has reasonable cause to believe does not reside in ... the State in which the transferor resides"—but not if the transfer involves a firearm bequeathed to "*a person who is permitted to acquire or possess a firearm under the laws of the State of his residence*." 18 U.S.C. § 922(a)(5). Another example is the general prohibition against firearms in school zones. *See* 18 U.S.C. § 922(q)(2). There, Congress made clear that the prohibition does not apply "if the individual possessing the firearm is licensed to do so by the State" and the state requires law enforcement to "verify that the individual is qualified under law to receive the license." § 922(q)(2)(B)(ii). Congress could have similarly provided in section 930 for the carrying of firearms in federal facilities by those with a state permit or license, if that's what it intended. But that's not what subsection (d)(3) says.

The statute calls for inquiry into a defendant's purpose in bringing the firearm to a federal facility, and the possession of the firearm must be not only lawful but also for a lawful purpose that is related to the federal facility. Any other interpretation would fail to give full effect to every word in the statute, as other courts have recognized. If mere lawful possession of a firearm outside the federal

facility were enough to permit someone to bring it inside, then almost anyone could bring a weapon inside a federal facility for any reason. Ultimately, this is not consistent with either the statutory text or the legislative intent of preventing firearms within federal facilities, and it also raises the probability of inconsistent results across the United States, where each state has varying gun-control and carrying laws.

Ayala argues that subsection (d)(3) is ambiguous and that he should benefit from lenity. 18 U.S.C. § 930(d)(3). But whatever ambiguity might exist at the margins, the statute is not grievously ambiguous. It plainly does not permit the carrying of firearms in federal facilities without a specific lawful purpose similar to hunting, as explained above. Ayala identifies no such purpose. Ultimately, Ayala is not immune under 18 U.S.C. § 930(d)(3) simply because he may have been permitted to carry his weapon outside of federal facilities. Ayala's position as a delivery driver does not grant him authority to carry a firearm. He was not acting in the capacity of a security guard or individual tasked with maintaining order and security at the postal facilities. The United States Postal Service explicitly bans employees from carrying firearms as part of their employment unless specifically authorized to do so as part of their job responsibilities. As such, Ayala is unable to point to a lawful purpose for bringing a firearm into a federal facility and is not permitted to do so under 18 U.S.C. § 930(d)(3).

In any event, there is nothing vague about Ayala's alleged offense. The firearm count in this indictment clearly alleges that Ayala knowingly possessed a firearm in a federal facility, in violation of 18 U.S.C. § 930. Doc. 1 at 1. That is all that it alleges.

Prohibiting firearms in federal facilities raises no Second Amendment concerns for the reasons above, whatever exceptions Congress may choose to provide (or not provide). The "other lawful purposes" exception in section 930(d) is subject to the same sort of interpretation as most any statutory provision. Reasonable minds may dispute which purposes suffice. Nevertheless, mere ambiguity about the scope of a potential exception to a criminal statute does not create the sort of fair-notice and arbitrary-enforcement problems that implicate the Due Process clause. Determining whether a purpose was "lawful" within the meaning of section (d)(3) does not require the same sort of wide-ranging and indeterminant inquiry as—by contrast— whether a defendant's years- or decades-old predicate offense was of the type that, at that time, categorically involved conduct presenting "a serious potential risk of physical injury to another" in the abstract sense. *See contra Johnson v. United States*, 576 U.S. 591, 593–97 (2015) (finding Armed Career Criminal Act's residual clause unconstitutionally vague).

## IV.    Conclusion

Because post offices are government buildings and, consequently, sensitive places, the historical analysis that *Bruen* otherwise normally required is not necessary here. Additionally, the fact that Ayala may have been permitted to carry a firearm under state law does not create a "lawful purpose" under 18 U.S.C. § 930(d)(3) to carry it in a federal facility.

> Respectfully submitted,
>
> ROGER B. HANDBERG
> United States Attorney
>
> By:    /s/ *Sean Siekkinen*
> Sean Siekkinen
> Assistant United States Attorney
> Illinois Bar No. 6297623
> 400 N. Tampa Street, Suite 3200
> Tampa, Florida 33602-4798
> Telephone:   (813) 274-6000
> Facsimile:    (813) 274-6358
> E-mail: Sean.Siekkinen@udsoj.gov
>
> /s/ *Abigail K. King*
> Abigail K. King
> Assistant United States Attorney
> Florida Bar No. 294963
> 400 N. Tampa Street, Suite 3200
> Tampa, Florida 33602-4798
> Telephone:   (813) 274-6000
> Facsimile:    (813) 274-6358
> E-mail: Abigail.King@udsoj.go

**U.S. v. Emmanuel Ayala**                    **Case No. 8:22-cr-369-KKM-AAS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 28, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Stephen Consuegra, FPD

/s/ *Abigail K. King*
Abigail K. King
Assistant United States Attorney
Florida Bar No. 294963
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6358
E-mail: Abigail.King@usdoj.gov