# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                              **Case No. 8:22-cr-00369-KKM-AAS**

**EMMANUEL AYALA**

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾/

## DEFENDANT'S RESPONSE TO GOVERNMENT'S SUPPLEMENTAL BRIEF OPPOSING DEFENDANT'S MOTION TO DISMISS ON SECOND AMENDMENT AND FIFTH AMENDMENT GROUNDS

The Defendant, Emmanuel Ayala, by and through his attorneys, pursuant to this Court's Order permitting supplemental briefing on the Second Amendment and Fifth Amendment issues present in this case, Doc. 26, responds to the Government's supplemental brief, Doc. 32, opposing his motion to dismiss as follows:

### MEMORANDUM OF LAW

The first three sections of this supplemental brief tackle the Second Amendment issues: past Supreme Court precedent on regulating firearms in government buildings; the Government's failure to show a historical tradition of firearm regulations at post offices for postal workers; and the Government's unavailing argument that it's acting as a proprietor and employer in regulating firearms in federal facilities. The last section addresses section 930(d)(3)'s

1

ambiguous immunity provision, the meaning of the phrases "incident to" in conjunction with "other lawful purposes," and the rule of lenity.

I. **The Supreme Court has not held that regulating the right to keep and bear arms in government buildings is consistent with the Second Amendment.**

The Government argues the Supreme Court has held that all government buildings are "sensitive places" where firearms may be banned, notwithstanding the Second Amendment. *See* Doc. 32 at 3–7. That issue has never been considered by the Supreme Court and it certainly has never reached such a holding.

The Government's position that three Supreme Court decisions foreclose Mr. Ayala's arguments can't withstand scrutiny. The first case the Government relies on, *District of Columbia v. Heller*, 554 U.S. 570, 574 (2008), confronted whether a regulation prohibiting possession of useable handguns in the home violated the Second Amendment. To answer this question, the Supreme Court interpreted the text of the Second Amendment, "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.' " *Id.* at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). Applying this approach, the Supreme Court found that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

2

The Court confirmed its interpretation by looking to the historical background of the Second Amendment "because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." *Id.* (emphasis in *Heller*). The Court further confirmed its interpretation by examining "analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment," as well as post ratification interpretation in published writings. *Id.* at 600–19. In short, the Supreme Court guided its entire analysis with reference to the historical understanding of the Second Amendment.

The Supreme Court acknowledged, however, that the right conferred by the Second Amendment "was not unlimited, just as the First Amendment's right of free speech was not[.]" *Id.* at 595 (citation omitted); *see also id.* at 626 ("Like most rights, the right secured by the Second Amendment is not unlimited."). The Court did "not undertake an exhaustive historical analysis . . .  of the full scope of the Second Amendment," but stated "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on . . .  laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." *Id.* at 626. Notably, the Supreme Court didn't refer to specific longstanding laws, or say all laws regulating carrying of firearms in all government buildings in all circumstances was permitted by the Second Amendment.

3

Certainly, "gun bans in certain government buildings and in polling places do have historical precent, [but] bans that apply to *all* government buildings do not." David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 289 (2018).[1] As an example, the regulation at issue here was not enacted until 1988. 18 U.S.C. § 930; PL 100-690, § 6215 (Nov. 18, 1988), 102 Stat 4181. As a result, the most natural reading of the Supreme Court's statement in *Heller* is that there are certain government buildings where carrying firearms was historically prohibited, rather than that all regulations in all government buildings, regardless of whether they are historically justified, are permissible under the Second Amendment.

Regardless, even in stating that longstanding regulations pertaining to the carrying of firearms in government buildings were "presumptively lawful regulatory measure[s]," *id.* at 627 n.26, the Court recognized it did not "provid[e] extensive historical justification for those regulations," *id.* at 635. Instead, the Court explained it could not "clarify the entire field" of the Second Amendment in one opinion, and would have "time enough to expound upon the historical

---

[1] The government owns or leases a massive amount of property. According to United States General Services Administration, it owns and leases over 371 million square feet of space in 8,600 buildings in more than 2,200 communities nationwide." GSA, *GSA Properties* (last reviewed Apr. 11, 2022), https://www.gsa.gov/real-estate/gsa-properties. These properties include office buildings, land ports of entry, courthouses, laboratories, post offices, and data processing centers. *Id.* It would be illogical to conclude that individuals don't enjoy a Second Amendment right at any of these places based off of broad language and an assumption by the Supreme Court that the Court expressly stated could be expounded upon at a later date.

justifications for those exceptions . . . if and when those exceptions come before us." *Id.* at 635. The Supreme Court therefore acknowledged that even the presumptively lawful regulations must be historically justified.

And, indeed, a presumption that something is lawful is not a holding that it is.[2] *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023) ("An assumption [by the Supreme Court] is not a holding."). Instead, speculations addressing a case not before a court "are the purest of dicta," are not part of the holding, and are not binding. *United States v. Santos*, 553 U.S. 507, 523 (2008) (plurality opinion); *see also Van Buren v. United States*, 141 S. Ct. 1648, 1660 (2021) ("As an initial matter, *Musacchio* did not address—much less resolve in the Government's favor—the 'point now at issue,' and we thus 'are not bound to follow' any dicta in the case."); *United States v. F.E.B. Corp.*, 52 F.4th 916, 928 n.5, 929 n.6 (11th Cir. 2022) ("We are duty-bound to follow the Supreme Court's decisions but we don't unnecessarily follow dicta to the point at which the result would conflict with the express text of a statute."); *Range v. Att'y Gen.*, 2023 WL 3833404, at *5 n.7 (3d Cir. June 6, 2023) (*en banc*) (stating the Supreme Court's reference in *Heller* to "law-abiding, responsible citizens" was dicta that should

---

[2] Black's Law Dictionary defines "presumption" as "1. Something that is thought to be true because it is highly probable. 2. A legal inference or assumption that a fact exists because of the known or proven existence of some other fact or group of facts." *Presumption*, Black's Law Dictionary (11th ed. 2019).

not be overread as the Third "and other circuits did with *Heller*'s statement that the District of Columbia firearm law would fail under any form of heightened scrutiny").

Foreclosing future examination of specific regulations and their applications based on broad statements that don't refer to any specific laws or conduct the necessary historical analysis is inconsistent with *Heller*—especially in light of its statement that such regulations would be addressed in the future when presented to the Court. *Cf. Range*, 2023 WL 3833404, at *5 n.7 ("The *Heller*, *McDonald*, and *Bruen* courts cited no such "longstanding prohibitions," presumably because they did "not undertake an exhaustive historical analysis . . . of the full scope of the second Amendment.") (citing *Heller*, 554 U.S. at 262). Instead, whether any specific regulations fall within the scope of the right secured by the Second Amendment must be justified by historical analysis.

The Government also relies on *McDonald v. City of Chicago, Illinois*, 561 U.S. 742 (2010), to argue the Supreme Court has resolved whether the government can regulate possession of firearms in all government buildings. The Supreme Court didn't address that issue in *McDonald*. Instead, *McDonald* addressed whether the individual right found to exist in *Heller* was fully applicable to the states. *Id.* at 750. In finding that it was, the Supreme Court again engaged in a historical analysis, this time to evaluate whether the Second Amendment "right

6

to keep and bear arms [was] fundamental to *our* scheme of ordered liberty" or, in other words, was "deeply rooted in this Nation's history and tradition." *Id.* at 767 (quotations and citations omitted). Relying on *Heller*, the Supreme Court explained it was. *Id.* at 767–68.

Aside from relying on *Heller*, the *McDonald* Court looked to history to explain "[t]he right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights." *Id.* at 768. The Supreme Court also reviewed Reconstruction-Era history to find the right to be fundamental when the Fourteenth Amendment was enacted. *Id.* at 770–78.

In issuing its decision, the Supreme Court noted it was "important to keep in mind that *Heller . . .* recognized that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.' " *Id.* at 786 (quoting *Heller*, 554 U.S. at 626). The Supreme Court reiterated that *Heller* made clear that its "holding did not cast doubt on such longstanding regulatory measures as . . . 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . .' " *Id.* (quoting *Heller*, 554 U.S. at 262-27). As was the case in *Heller*, the Court didn't specify which regulations or government buildings the Court referred to, and didn't provide any historical analysis for any particular regulation. Such vague

dicta cannot be used as a wholesale future bar to a historical analysis examining specific regulations or the application of those regulations.

Lastly, the Government relies on *New York Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), to argue it is "settled" that all government buildings are sensitive places where the Second Amendment doesn't confer a right to possess firearms. Doc. 32 at 5–6. Yet again, *Bruen* doesn't support this position because it didn't address whether the government can regulate possession of firearms by employees in post offices or even any other government building. Instead, *Bruen* resolved whether the Second Amendment protects an individual's right to carry a handgun for self-defense outside the home. 142 S. Ct. at 2122. The Court held that it did, and in doing so clarified how to determine whether a regulation is constitutional under the Second Amendment.

The Supreme Court held "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. To justify the regulation, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (quotations and citation omitted). Thus, under *Bruen*, a court first looks to whether the

regulated conduct falls within the Second Amendment's plain text. If it does, the government must "affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.*

*Bruen* also provided guidance for applying these steps. At the first step, determination of whether regulated conduct is protected is done through a " 'textual analysis' focused on the 'normal and ordinary' meaning of the Second Amendment's language." *Id.* (quoting *Heller*, 554 U.S. at 576–77, 578). Conduct falling within the plain text is presumptively protected. *Id.* at 2126.

At the second step, the scope of the right is "confirmed by the historical background of the Second Amendment" by examination of "a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification." *Id.* at 2127–28 (emphasis in *Bruen*) (quotations omitted). The second step requires examination of the nation's "well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* at 2138.

The Supreme Court recognized two potential modes of analysis at this step. In cases where the "challenged regulation addresses a general societal

problem that has persisted since the 18th century," the analysis is

"straightforward." *Id.* at 2131. In such cases:

> [T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.*

Other cases, however, may "implicat[e] unprecedented societal concerns or dramatic technological changes" and "may require a more nuanced approach." *Id.* at 2132. In such cases, "th[e] historical inquiry that courts must conduct will often involve reasoning by analogy . . . ." *Id.* "[D]etermining whether a historical regulation is a proper analogue for a distinctly modern firearm requires a determination of whether the two regulations are 'relevantly similar.' " *Id.* (quoting C. Sunstein, *On Analogical Reasoning*, 106 Har. L. Rev. 741, 773 (1993)). When doing so, two factors to take into consideration are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. And, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden

is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* (quoting *McDonald*, 561 U.S. at 767).

*Bruen* then discussed the "sensitive places" doctrine as an example of how to employ analogical reasoning. The Supreme Court stated:

> Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. at 626, 128 S. Ct. 2783. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. *See* D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); *see also* Brief for Independent Institute as *Amicus Curiae* 11–17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

*Id.* at 2133–34. The Government interprets this as holding that the Second Amendment permits regulating carrying firearms in all government buildings. But it's wrong.

*Bruen* doesn't categorically hold, or even state it is settled, that *all* government buildings are sensitive places. Instead, *Bruen* advises that there is a historical tradition showing that *some* government buildings, which include legislative assemblies, polling places, and courthouses, are sensitive places where the government can regulate the carrying of firearms. To determine whether

11

other locations—including other government buildings—are also sensitive places. As a result, that is what the Court should do here.

**II.   The Government has not shown a historical tradition of prohibiting postal employees from carrying firearms into post offices while working.**

Under *Bruen*, courts first ask whether the regulated conduct falls within the plain text of the Second Amendment. Mr. Ayala's conduct of possessing a firearm for self-defense while outside the home is, undoubtedly, covered conduct. *Bruen*, 142 S. Ct. at 2122. The Government therefore must show that its regulation, as applied (*i.e.*, prohibiting a postal delivery worker's possession of a firearm while working) is consistent with this Nation's historical tradition of firearms regulations. The Government didn't do so.

**a.  Section 930 addresses a general societal problem that has persisted since the 18th century and the Government has not pointed to any distinctly historical regulation.**

Section 930 was "intended to protect federal employees, witnesses, judges, and others present in places where the business of the federal government is conducted." 134 Cong. Rec. S17360-02, 134 Cong. Rec. S17360-02, S17360, 1988 WL 182529 (Nov. 10, 1988). Protection from gun violence was a societal problem that existed at the time of the Founding. Likewise, postal offices existed at the time of the Founding. *See* Historian of the United States Postal Service, *First U.S.*

12

*Post Offices by State* (Sept. 2019), *available at* https://about.usps.com/who-we-are/postal-history/first-post-offices.pdf.

The Government has not found any regulation showing at the time of the Founding—or at any other time—that postal employees were prohibited from carrying firearms while working. That's because there were none. The absence of "a distinctly similar historical regulation addressing th[is] problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

### b. The Government hasn't shown section 930 is analogous to historical regulations.

Having failed to find a historical comparator for section 930, the Government argues postal offices are sensitive places. Because post offices and the harm sought to protect against by section 930 existed at the time of the Founding, the Government must show there is an unprecedented societal concern or dramatic approach. *Id.* at 2132. The Government hasn't done so. The Court should, therefore, end its inquiry and hold that the Government hasn't met its burden under *Bruen*.

Even if the Court addresses the sensitive places argument on the merits, the Government still hasn't met its burden to establish that post offices are sensitive places where employees can be prohibited from exercising their Second Amendment right to carry a firearm for self-defense. *Bruen* tells us that such

13

analogical reasoning must show that the new sensitive place (here, a postal office and postal truck) is similar to a historically recognized one such as legislative assemblies, polling places, or courthouses. *Id.* at 2133–34; *see also Koons v. Platkin*, 2023 WL 3478604, at *52 (D.N.J. May 16, 2023), *appeal filed*, No. 23-2043 (3d Cir. June 5, 2023) ("Thus, this Court reads the *Bruen* discussion for the proposition that prohibitions on carrying firearms at government buildings tend not to violate the Second Amendment, but to the extent that a dispute arises concerning a prohibition at a particular government building, resolution will turn on whether analogies to historical regulations can justify the challenged law."). In applying analogical reasoning, the Court should consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133.

"Given the historical record, one can only guess about what factors make places 'sensitive.' Some of the guesses are: places where most persons therein are minors (K-12 schools), places that concentrate adversarial conflict and can generate passionately angry emotions (courthouses, legislatures, polling places), or buildings containing people at acute personal risk of being targets of assassination." Kopel, *supra* p. 3, at 289–90.

The Government has made no effort to show that the postal office in question is such a place, or otherwise comparable to a school, courthouse,

legislative building, or polling place. Nor has the Government taken into consideration the burden imposed on Mr. Ayala's Second Amendment right, and whether the burden on that right is similar to those historically imposed.[3] *Bruen*, 142 S. Ct. at 2132. Instead, with no analysis or foundation for the assertion, the government broadly states "[p]ost offices and other government buildings are, at a minimum analogous to the specific historical examples cited in *Bruen* . . . ." Doc. 32 at 15. This mere assertion is not sufficient to meet the significant burden described in *Bruen*.

And, in fact, "a USPS post office and parking lot are manifestly different from the U.S. Capitol and its surrounds." *Koons*, 2023 WL 3478604, at *55. It's not a place of discourse, or heightened or adversarial emotions, or where one is at particular risk of being assassinated. Thus, it isn't a sensitive place.

The Government's reliance on pre-*Bruen* cases is misplaced. For example, in *United States v. Dorosan*, 350 F. App'x 874 (5th Cir. 2009), the Fifth Circuit affirmed a postal worker's conviction under 39 C.F.R. § 232.1 for bringing a firearm onto government property. In doing so, the circuit court relied on the

---

[3] There can be no doubt that currently, and historically, postal delivery workers have a need for self-defense. *See* The Chicago Chronicle, *John Beargrease's Fight for Life* (Nov. 21, 1897), attached as "Exhibit A"; *see also* Jack Nissen, *US Postal Service offering $50K for help arresting suspect who robbed letter carrier in Detroit*, Fox channel 2 (Nov. 1, 2022); Jessica D'Onofrio, Tre Ward & Stephanie Wade, *Chicago Postal Worker Traumatized After Robbed at Gunpoint While on the Job*, ABC 7 Chicago (Jan. 13, 2023).

statement in *Heller* regarding longstanding regulations of sensitive places, such as government buildings. *Id.* at 875. But, as explained above, because *Heller* didn't hold that all government buildings are sensitive places—a proposition recently clarified by *Bruen*—*Dorosan* is not persuasive. Instead, this Court should do what the Supreme Court has repeatedly instructed courts to do and engage in a historical analysis of whether the regulation at issue, section 930, is part of this Nation's historical tradition of firearms regulation.

The decision in *Bonidy v. United States Postal Service*, 790 F.3d 1121 (10th Cir. 2015), also decided before *Bruen*, cannot be relied on for the same reason. In *Bonidy*, the Tenth Circuit found it was bound by the language in *Heller* and *McDonald* regarding government buildings being sensitive places. *Id.* at 1225. Because this language was no more than dicta, it doesn't purport to address all regulations relating to carrying firearms in all government buildings, and has since been limited and clarified by *Bruen*, the decision in *Bonidy* is unpersuasive.[4]

And, indeed, instead of supporting the Government's position, *Bonidy* shows the government must establish its regulation is consistent with this Nation's history of firearm regulation. *Bonidy* recognizes that regulating the

---

[4] As an alternative, the Tenth Circuit applied intermediate scrutiny to evaluate whether the regulation in question (39 C.F.R. § 232.1(*l*)) violated the defendant's rights under the Second Amendment. *Bonidy*, 790 F.3d at 1125. The Supreme Court unequivocally rejected any interest balancing or means-end scrutiny in *Bruen* and this alternative holding is no longer good law. 142 S. Ct. at 2127.

carrying of firearms at postal offices burdens a person's Second Amendment right to carry weapons outside the home. 790 F.3d at 1126. Thus, under *Bruen*, the Government must provide a historical justification for such a regulation. 142 S. Ct. at 2127. The Government has not and cannot show a historical analogue justifying section 930's application to Mr. Ayala. As a result, the statute must be found unconstitutional under the Second Amendment as applied to him.

### III.   The Government cannot violate Mr. Ayala's Second Amendment rights simply because it was regulating government property or acting as an employer.

The Government's "proprietor" argument holds no water.[5] Doc. 32 at 12–13. It is true that "the government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers . . . [just] as a private individual" may. *Camfield v. United States*, 167 U.S. 518, 524 (1897). But it is not exempt from recognizing the protections afforded to individuals by the Constitution simply because it acts on government property. *Cf.*, *United States v. Kokinda*, 497 U.S. 720, 725 (1990) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business[.]"); *see also* Doc. 32 at 12

---

[5] Indeed, its position has been rejected in cases otherwise relied on by the government. *United States v. Tallion*, No. 8:22-po-1758, 2022 WL 17619254, at *4 (D. Md. Dec. 13, 2022) (stating that no court has adopted the sweeping proposition advanced by the United States that it "may ignore constitutional rights if they do so on federal property").

("The United States Postal Service is a state actor rather than a private business, so its actions must comply with the Constitution."). The Government attempts to frame this case as involving a regulation by the United States Postal Service made as part of its business operations. Doc. 32 at 12. That is not what is at issue in this case. Rather, this case involves whether the United States government may impose criminal sanctions—a thing a private business surely can't due—on an employee while on government property for conduct protected by the Second Amendment. Thus, its regulation is subject to a Second Amendment analysis. *Koons*, 2023 WL 3478604, at *52 ("In other words, the State cannot succeed in claiming that the scope of Plaintiffs' public carry right does not extend to government property simply because there the State is acting in its proprietary capacity to exclude firearms for some good reason.").

**IV.    The Government fails to establish that its reading of section 930(d)(3) is unambiguously correct. Accordingly, the rule of lenity applies to resolve the ambiguity in Mr. Ayala's favor and immunizes him against criminal prosecution.**

The Government misses the forest from the trees here in arguing that traditional rules of statutory construction counsel against lenity and shielding Mr. Ayala from criminal liability in this case. Doc. 32 at 18–23. The problem lies on its overreliance of precedent outside the Eleventh Circuit interpreting the "other lawful purposes" clause under section 930(d)(3) pre-*Bruen*. The Government also completely ignores the fact that carrying a firearm for self-

defense outside the home is lawful in a post-*Bruen* world. *Id.* at 21. The

Government chiefly relies on three cases, *id.* at 18, that are readily distinguishable

from the facts in Mr. Ayala's case.

### a. The Government's cases interpreting the phrase "other lawful purposes" and being "incident to" a federal facility under subsection (d)(3).

*United States v. De la Cruz-Bancroft*—the only criminal case the Government

cited and an unpublished opinion out of New Mexico—deals with an

undeveloped record predicated on a stipulation of facts. 2010 WL 8752034, at *1

(D.N.M. Jan 4, 2010). There, a dubious defendant pretending to be a federal agent

tried to pass through security at a federal building with his holstered firearm in

an open carry state, but was later escorted off the premises. *Id.* He was charged

by information with possessing a firearm at a federal facility in violation of 18

U.S.C. § 930(a), and he moved to dismiss the charge based on subsection (d)(3)'s

immunity provision because he carried his firearm lawfully under New Mexico

law. *Id.* at *1 The magistrate judge agreed and dismissed that charge. *Id.* But the

district court judge reversed. *Id.* at *3.

The district court noted that there were no cases that had interpreted the

"other lawful purposes" clause and turned to traditional rules of statutory

construction. *Id.* at *2. The district court agreed that the statute was clear on its

face but interpreted the statute differently. *Id.* The court reasoned that it must

give "full effect to every word in the statute," doing so required that the phrase "other lawful purposes" for possessing firearms be "related to the federal facility" at issue. *Id*. But the rule of lenity was never at issue or mentioned in *De la Cruz-Bancroft*.

The irony of the Government relying upon *De la Cruz-Bancroft* is palpable. Two different jurists reasonably believed that section 930(d)(3) was clear on its face but came to completely opposite conclusions. That should be evidence enough that section 930(d)(3) isn't as clear cut as the Government boasts and that there's an ambiguity regarding the section 930(d)(3) immunity provision as applied to Mr. Ayala. Where there's ambiguity in the law, such as here, lenity applies to resolve the ambiguity in a defendant's favor.

The next two cases the Government hangs its hat on, *Yorzinski v. Imbert*, 39 F. Supp. 3d 218 (D. Conn. 2014) and *Tagore v. United States*, 2012 WL 12877829 (S.D. Tex. Feb. 2, 2012), are even less persuasive. Neither case is criminal in nature nor dealt with issues surrounding the rule of lenity. In *Yorzinski*, a *pro se* plaintiff sued several federal agents arguing that he was denied the right to possess a firearm at a federal facility under the Second Amendment. *Yorzinski*, 39 F. Supp. 3d at 221–22, 225. He relied on 18 U.S.C. § 930(d)(3)'s "other lawful purposes" immunity provision as establishing a substantive right to possess a firearm. *Id.* at 225.

20

Importantly, the district court judge in *Yorzinski* noted that the plaintiff hadn't been charged criminally with violating section 930(a). *Id.* at 226. The court recognized that subsection (d)(3) doesn't create a substantive right to possess a firearm at a federal facility but "merely provides an exception to criminal liability in limited circumstances." *Id.* at 226–27. Ultimately, the district court reasoned that the right to possess a firearm at a federal facility hadn't been clearly established, held that the federal agent was entitled to qualified immunity, and dismissed the plaintiff's Second Amendment claim. *Id.* at 227.

Moving to *Tagore*, an unpublished decision out of Texas, the district court denied reconsideration of its opinion denying the plaintiff's motion for summary judgment for religious discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, and 42 U.S.C. § 2000bb, *et seq.*, against several defendants in their official and individual capacities. 2012 WL 12877829, at *1, *6–7. There, the plaintiff sued for religious discrimination because she wasn't allowed to bring her ceremonial sword into the federal building where she worked. *Id.* at *1. The defendants tried to accommodate her religious beliefs by permitting her to bring a shorter ceremonial sword into work. *Id.* But she rebuffed the accommodation, brought an EEOC action against her employer, and later sued. *See id.* The district court rejected the plaintiff's claim and granted the defendants' motion for summary judgement. *Id.*

21

Like the plaintiff in *Yorzinski*, the plaintiff in *Tagore* tried to establish a substantive right to bring the appropriate ceremonial sword to work using section 930(d)(3)'s immunity provision. *See id.* at *21. The district court had occasion to briefly interpret the phrase "other lawful purposes" in subsection (d)(3) and flatly rejected the plaintiff's substantive claim, reasoning that the "exemptions all contain objective enforcement criteria"—important for religious discrimination suits—that cannot be parsed on a subjective case-by-case basis. *Id. Tagore* is too far afield from interpreting section 930(d)(3) in the context of the Fifth Amendment and due process considerations.

The Government reads, just as courts outside the Eleventh Circuit have read, that the phrase "incident to" in section 930(d)(3) modifies the term "Federal Facility" that precedes it. In so doing, the Government asks this Court to write new words into the law under the guise of giving the whole statute "purpose and effect." Doc. 32 at 19. If the Court accepts the Government's reading of "other lawful purposes" as limiting a defendant's ability to carry a firearm that's contingent upon the type, purpose, and scope of each federal facility in a given case, then it would eviscerate and criminalize, as applied here, a defendant-employee's right to carry a firearm at his federal workplace for his own protection under the Second Amendment. Moreover, it turns a blind eye to an

22

equally plausible and fair reading of the immunity clause, which doesn't give

Mr. Ayala fair notice under the Fifth Amendment's Due Process Clause.

### b. A fair reading of the phrases "incident to" in relation to "other lawful purposes" in subsection (d)(3).

The Government concedes there might be some "ambiguity at the

margins" under section 930(d)(3). Doc. 32 at 21. In subsection (d)(3), the phrase

"incident to" can be read to relate to the succeeding terms "hunting" and "other

lawful purposes," rather than to the term "federal facility" that precedes it.[6]

Congress merely listed one example in subsection (d)(3) for possessing a firearm

in connection with a familiar act under the Second Amendment: hunting. But it

couldn't think of every reason under the sun to immunize those defendants who

lawfully carry firearms at federal facilities. Congress, therefore, included the

phrase "other lawful purposes"—inherently broad language—that necessarily

includes possessing a firearm for purposes of self-defense.

This reasonable interpretation of the phrases "incident to" in relation with

"other lawful purposes" comports with the Second Amendment's right to bear

arms and with the Fifth Amendment's due process protections. The " 'text,

---

[6] Black's Law Dictionary defines "incident," in the form of an adjective, as "[d]ependent upon, subordinate to, *arising out of, or otherwise connected with* (something else, usually of greater importance). . . ." *Incident*, Black's Law Dictionary (11th ed. 2019) (emphasis added). As an adjective, Webster's defines "incident" as "tending to arise or occur as a concomitant"; and in law, defines "incident" as "contingent upon or related to something else." *Incident*, Webster's II New Riverside University Dictionary (1994). "Concomitant," according to Webster's, means "occurring or existing concurrently: Accompanying." *Id.*

structure, and history' " of section 930 and the "other lawful purposes" clause in subsection (d)(3) "fail[s] to establish the Government's position is unambiguously correct"; hence, " 'the rule of lenity [applies] and resolve[s] the ambiguity in the [defendant's] favor.' " *Muscarello v. United States*, 524 U.S. 125, 149 (1998) (5–4 decision) (Ginsburg, J., dissenting) (quoting *United States v. Ganderson*, 511 U.S. 39, 54 (1994)).

## CONCLUSION

The Government invites this Court to treat all federal facilities as sensitive places, including the post office where Mr. Ayala worked. This requires a tenuous reading of *Heller*, expanding *McDonald* beyond its limits, and is contrary to *Bruen*'s analytical framework for assessing which regulations pass constitutional muster under the Second Amendment from a historical standpoint. The Court should reject its invitation to do so. The Government's proprietor and employer argument is another means of shielding its regulations from Second Amendment scrutiny. It must similarly be cast aside. Since the Government hasn't shown a historical regulation of firearms for postal workers at post offices, the Court should hold that section 930(a), as applied to Mr. Ayala, is unconstitutional.

Defendants must have fair notice of the law—which actions are and aren't criminal. The Government's reading of section 930(d)(3)'s immunity provision

and the phrase "other lawful purposes" is unclear and ambiguous. Lawfully carrying a firearm isn't limited to hunting and isn't entirely dependent on the federal facility at play. Reasonably read, the phrase "incident to" in section 930(d)(3) relates to the language that succeeds it: both to "hunting" and to "other lawful purposes." Section 930(d)(3) just isn't that clear. The Court should employ the rule of lenity to resolve this ambiguity in Mr. Ayala's favor and dismiss the section 930(a) charge against him.

**A. FITZGERALD HALL, ESQ.**
**FEDERAL DEFENDER**

*/s/ Stephen Consuegra*
Stephen Consuegra, Esq.
Florida Bar No. 105816
Assistant Federal Defender
400 N. Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone: (813) 228-2715
Facsimile: (813) 228-2562
E-mail: Stephen_Consuegra@fd.org

*/s/ Laura J. Daines*
Laura J. Daines, Esq.
Florida Bar No. 105060
Assistant Federal Defender
400 N. Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone: (813) 228-2715
Facsimile: (813) 228-2562
E-mail: Laura_Daines@fd.org

# Exhibit A

Newspapers
by Ancestry

The Chicago Chronicle (Chicago, Illinois) · Sun, Nov 21, 1897 · Page 26

https://www.newspapers.com/image/668129353

Downloaded on May 26, 2023

# John Beargrease's Fight for Life.



"DRIVING THE SHARP BLADE ALMOST THROUGH ONE OF HIS FOES AT EACH STROKE."

Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers.com™

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 20, 2023, a true and correct copy of the

foregoing was furnished using the CM/ECF system with the Clerk of the Court,

which will send notice of the electronic filing to the following:

Abigail King, AUSA


*/s/ Stephen Consuegra*
Stephen Consuegra, Esq.
Assistant Federal Defender