UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.  Case No. 8:22-cr-00369-KKM-AAS

EMMANUEL AYALA

_____/

## MOTION TO SUPPRESS EVIDENCE

The Defendant, Emmanuel Ayala, by and through his attorney, pursuant to Fed. R. Crim. P. 12(b) and the Fourth Amendment to the United States Constitution, moves to suppress the firearm in this case, a Smith & Wesson 9mm, along with video surveillance in the cab of his work truck, evidence which was obtained as the product of an unreasonable search and seizure. In support of his motion, Mr. Ayala states and argues as follows:

### FACTS

Mr. Ayala is a United States citizen and has been employed with United States Postal Service for about fourteen years as a semi-truck driver hauling packages and mail. He is a law-abiding citizen and is legally entitled to possess firearms under the Second Amendment. He is not, nor has he ever been deemed, a prohibited person from possessing firearms within the meaning of 18 U.S.C. § 922(g). Notably, Mr. Ayala has a concealed weapons permit and a class "G"

1

security license under Florida law. He got these licenses to work as an armed security guard when he was sidelined from USPS due to a labor dispute. When that dispute passed, he was back to driving semi-trucks for USPS. Little did Mr. Ayala know that September 14, 2022, would be one of the worst days of his life.

That day started off just like any other workday for Mr. Ayala. He works out of the post office located at 3501 Bessie Coleman Blvd Fl 3, Tampa, FL 33630. He parked his car a quarter-of-a-mile away at a designated postal parking lot just north of his workplace off Airport Service Road. He got out of his car, grabbed his red fanny pack, and swung it across his chest clipping it into place. Mr. Ayala always keeps his firearm, a Smith & Wesson 9mm, concealed inside his fanny pack.

He carries his gun primarily for self-defense while he's on the job and driving on the roadways. Most of the time he leaves his fanny pack and concealed firearm inside his parked car off site and grabs it after he picks up his semi-truck for his daily route. But from time to time, he carries his concealed firearm inside his fanny pack for extra protection on the short walk to work. It also cuts down on the extra trip it takes him to grab it from his car after he picks up his work truck.

That day, Mr. Ayala took his fanny pack and concealed weapon with him to his workplace. He walked from the northern employee parking lot to his

building with his fanny pack strapped across his chest. He entered through the metal turnstiles and walked inside the employee main entrance. He clocked in, exited the building, and made his way toward the work bay to pick up his clip board with the day's route and his assigned semi-tractor trailer. As he was walking towards his semi-truck, two strangers in plainclothes—a man and a woman—exited an unmarked black Dodge Caravan and walked towards Mr. Ayala. Unbeknownst to him, these strangers were agents with the USPS Office of Inspector General and had been conducting a criminal investigation since July.

Back on July 22, 2022, Scott Cunningham, a special agent with the USPS OIG, had received information from postal management that the Mr. Ayala's assigned work truck smelled of marijuana. He started an investigation and installed a hidden camera in Mr. Ayala's work truck without a warrant to surveil him. Fast-forward to September 8. At around 3:15 p.m., SA Cunningham was conducting surveillance and saw Mr. Ayala on video inside his work truck retrieving a clear plastic bag stowed inside a red fanny pack that contained suspected marijuana. SA Cunningham continued surveilling him. Four days later, at around 2:20 p.m., Mr. Ayala was seen on video again rummaging through his red fanny pack for some marijuana in a clear plastic bag; but this time he's also seen pulling out a handgun from the red fanny pack.

Back to the postal parking lot two days later, SA Cunningham and SA Jill Younce approached Mr. Ayala without a warrant, without any probable cause, and without any reasonable articulable suspicion that he had committed, was committing, or was about to commit a crime on postal property or that he was presently armed and dangerous. Upon approaching him, the agents never identified themselves as being affiliated with OIG, they never stated their business with Mr. Ayala, and they never informed him that he was under investigation for committing any crimes on USPS property. They were complete strangers to Mr. Ayala. Instead, SA Cunningham asked him if he was Emmanuel Ayala. Mr. Ayala hesitated for a moment. He didn't know who this man was but confirmed his identity with him anyway. After Mr. Ayala gave his name, SA Younce went back towards the minivan, slid the door open forcefully, and got the handcuffs from out of the van.

SA Cunningham then took Mr. Ayala's arm, placed it behind his back, and forcefully directed him towards the passenger side of the minivan. Mr. Ayala peered inside the minivan and noticed, to his horror, that some of the passenger seats were missing. There was nothing but a bare floor inside.

Panic struck him. Fear instantly flooded in. And a choking sense of terror began to consume him. Mr. Ayala thought he was being taken.

SA Cunningham then tried to place the handcuffs on Mr. Ayala, but he managed to jerk his arm away in the nick of time. His fight-or-flight response kicked in. Mr. Ayala had to make a split-second decision: stand his ground or run. He chose without thinking. It was instinct. He ran for his life.

The agents—persons still unknown to Mr. Ayala—caught up to him and tackled him to the ground near the truck parking lot entrance. Mr. Ayala managed to get back up and ran out of the parking lot. He was tackled to the ground a second time and managed to break free. He ran south across Economy Parking Road and crossed the street heading east onto oncoming traffic on Airport Service Road. He managed to escape into the safety of a parking garage at Tampa International Airport.

He ran into an elevator and tried to frantically close the doors behind him. Before the elevator doors could close shut, uniformed officers with the Tampa Police Department announced their presence, drew their weapons, and ordered Mr. Ayala to drop the firearm. "Drop the firearm?" he thought to himself. "This is what all this was about?", Mr. Ayala internalized. Only then did he realize that this whole ordeal was about his concealed weapon. He immediately unclipped his fanny pack. It fell to the ground. He stepped out of the elevator, was tackled to the ground by Tampa police officers, and was taken into custody.

Mr. Ayala was arrested and later charged in a two-count indictment for possession of a firearm at a federal facility in violation of 18 U.S.C. § 930 and for forcibly resisting arrest in violation of 18 U.S.C. § 111. He moves to suppress the video surveillance and the firearm in this case, a Smith and Wessen 9mm, because his rights against unreasonable searches and seizures were violated under the Fourth Amendment.[1]

### MEMORANDUM OF LAW

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Amend. IV, U.S. Const. "Searches and seizures by government employers or supervisors of the private property of their employees . . . are subject to the restraints of the Fourth Amendment." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987) (plurality opinion).[2]

> Not everything that passes through the confines of the business address can be considered part of the workplace context, however. An employee may bring closed luggage to the office prior to leaving on a trip, or a handbag or briefcase each workday. While whatever expectation of

---

[1] Mr. Ayala previously moved to dismiss the indictment on Second, Fourth, and Fifth Amendment grounds, Doc. 23, and that motion remains pending before the Court.
[2] Notably, courts refer to this Supreme Court decision as *O'Connor* or *Ortega*. Both are used interchangeably throughout this motion.

6

> privacy the employee has in the existence and the outward appearance of the luggage is affected by its presence in the workplace, the employee's expectation of privacy in the *contents* of the luggage is not affected in the same way. *The appropriate standard for a workplace search does not necessarily apply to a piece of closed personal luggage, a handbag or a briefcase that happens to be within the employer's business address.*

*Ortega*, 480 U.S. at 716 (emphasis added). "*O'Connor* did not disturb the well-settled rule that probable cause is required for criminal investigations." *Cerrone v. Brown*, 246 F.3d 194, 201 (2d Cir. 2001) (citing *O'Connor*, 480 U.S. at 723).

> The rationale for the lesser burden *O'Connor* places on public employers is not applicable for federal agents engaged in a criminal investigation. As the *O'Connor* Court noted in declining to hold public employers to the probable cause standard, "while law enforcement officials are expected to 'school themselves in the niceties of probable cause,' no such expectation is generally applicable to public employers, at least when the search is not used to gather evidence of a criminal offense."

*United States v. Taketa*, 923 F.2d 665, 675 (9th Cir. 1991) (quoting *O'Connor*, 480 U.S. at 724).

"It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). "Unless, at the time of the stop, the officers could point to specific articulable facts that reasonably warrant suspicion, the stop cannot be justified." *United States v. Ballard*, 573 F.2d 913, 915 (5th Cir. 1978) (cleaned up and citation omitted).

> *Terry* "stop and frisks" are "constitutionally permissible if two conditions are met. First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or

7

> has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous."

*Arizona v. Johnson*, 555 U.S. 323, 326 (2009). "A seizure under the Fourth Amendment occurs 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.' " *United States v. Franklin*, 323 F.3d 1298, 1301 (11th Cir. 2003) (quoting *Terry*, 392 U.S. at 19 n.16).

> *Terry*, and the cases which have followed it, make clear that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119 (2000). To make a showing that he in fact had reasonable suspicion, "the officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" of criminal activity.' " *Id.* (quoting *Terry*, 392 U.S. at 27). Thus, " 'while reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop.' " *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) (quoting *Wardlow*, 120 S.Ct. at 675–76). A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity. *See Wardlow*, 120 S.Ct. at 677; *Terry*, 392 U.S. at 22–23.

*United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000) (cleaned up). But "officers cannot improperly provoke—for example by fraud—a person into fleeing and use the flight to justify a stop." *Franklin*, 323 F.3d at 1302 (citation omitted).

Any evidence obtained in violation of the Fourth Amendment is the fruit of the poisonous tree, which must be rooted out and excluded as evidence at trial. *Wong Sun v. United States*, 371 U.S. 471 (1963).

8

> The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, *Weeks v. United States*, 232 U.S. 383 (1914), and of testimony concerning knowledge acquired during an unlawful search, *Silverman v. United States*, 365 U.S. 505, (1961). Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341 (1939).

*Murray v. United States*, 487 U.S. 533, 536–37 (1988) (citing *Wong Sun*, 371 U.S. at 484–85). "Under the exclusionary rule, evidence obtained in an encounter that is in violation of the Fourth Amendment . . . cannot be used in a criminal trial against the victim of the illegal search and seizure." *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003). Let's start with the September video surveillance and why it should be suppressed.

    **I.    The September video surveillance.**

This isn't a situation where a public employer is investigating work-place misconduct of a public employee. Instead, it's a situation where postal management recruited a law enforcement agency to conduct a criminal investigation on its behalf.[3] Given the criminal nature of the investigation SA Cunningham started with, Mr. Ayala's privacy interests were fully protected by the Fourth Amendment. Installing a hidden camera in the cab of Mr. Ayala's

---

[3] Simple possession of a controlled substance is a federal crime that's still on the books. 21 U.S.C. § 844.

9

work truck to spy on him and to collect evidence of suspected criminal activity violated his reasonable expectation of privacy. SA Cunningham needed a warrant supported by probable cause to conduct this type of surveillance. *Taketa*, 923 F.2d at 675 (holding that warrantless video surveillance conducted by DEA aiding investigation of state agent's suspected illegal wiretapping couldn't benefit from reasonableness standard under *O'Connor* and was instead covered by probable cause and warrant requirement standard under the Fourth Amendment after finding that surveillance was not an investigation of work-related employee misconduct but a search for evidence of criminal conduct).

SA Cunningham cannot avail himself and his agency to the relaxed reasonableness standard under *Ortega* when collecting evidence of a suspected crime. *Contra Wiley v. Dept. of Justice*, 328 F.3d 1346, 1354 (Fed. Cir. 2003) (finding *Ortega* reasonableness standard applicable in correctional institution's search of correction officer's personal car to protect against the introduction of contraband into the prison); *but see Friedenberg v. Sch. Bd. of Palm Beach Cnty.*, 911 F.3d 1084 (11th Cir. 2018) (upholding public employer's suspicionless drug testing for substitute teacher applicants as being minimally invasive and departing from Fourth Amendment probable cause requirement under *Ortega* where public employer had reasonable interest in the efficient and proper operation of its schools, finding individualized suspicion of wrongdoing unreasonable, drug

10

testing wasn't related to crime detection, and results weren't shared with law enforcement). When that barrier is crossed—the line between investigating public employee misconduct and investigating the commission of a crime—the relaxed Fourth Amendment reasonableness standard in *Ortega* no longer applies.

And that's exactly what happened here. SA Cunningham should've got a warrant supported by probable cause to place a hidden camera inside Mr. Ayala's semi-truck because he was conducting a criminal investigation, which is well within his wheelhouse as a law enforcement agent. *Taketa*, 923 F.2d at 675 ("While the burden of showing probable cause and obtaining a warrant may be "intolerable" for public employers . . . it is *de rigueur* for law enforcement officials."). Hence, the September video surveillance must be suppressed as evidence at trial for the violation of Mr. Ayala's Fourth Amendment rights. Let's move next to Mr. Ayala's illegal seizure on postal property and why it was unsupported by probable cause or any reasonable articulable suspicion that he was committing a crime.

## II.   The illegal seizure on postal property.

But for SA Cunningham illegally surveilling Mr. Ayala in his work truck, he and SA Young wouldn't have approached him in the postal parking lot and seized him in violation of the Fourth Amendment in the first place. It's certainly arguable that the agents' initial contact with Mr. Ayala could've started off as a

11

consensual encounter. *Florida v. Bostick*, 501 U.S. 429 (1991). But the encounter quickly morphed into a *Terry* stop unsupported by any reasonable suspicion once SA Cunningham placed his hands on him. There wasn't anything for the agents to rely upon to conduct an investigatory stop—just a bare hunch of suspected criminal activity. Mr. Ayala was unlawfully seized within the meaning of the Fourth Amendment contrary to *Terry*. The agents had no business searching Mr. Ayala's personal red fanny pack that happened to be on his employer's property, especially since they were conducting a criminal investigation. *Ortega*, 480 U.S. at 716.

     But let's set the video surveillance that was illegally obtained aside for a moment and focus on some important questions. What probable cause did the agents have to stop Mr. Ayala in the postal parking lot? What reasonable suspicion could the agents articulate that would justify stopping him? And what facts could the agents point to that made them believe he was armed and dangerous on postal property? The answer is simple: they had nothing to rely on. *Contra Franklin*, 323 F.3d at 1301 (finding facts sufficient to establish reasonable suspicion since defendant was present in a problem area at nighttime, he was underneath a no loitering sign, and he took "headlong" flight from officers as soon as he saw them). The *Terry* stop was unjustified at its inception and Mr. Ayala was illegally seized. *Ballard*, 573 F.2d at 915; *but see Reyes v. Maschmeier*, 446

12

F.3d 1199 (11th Cir. 2006) (affirming defendants' motion for summary judgment in § 1983 action between sheriff-employee and her supervisor for throwing a 3-ring binder at her, reasoning that the incident—although disturbing—was work-related, supervisor's actions didn't involve enforcing the law, and supervisor's actions didn't rise to the level of a Fourth Amendment seizure).

All the agents had was a mere hunch that Mr. Ayala was armed because he had a red fanny pack on his person. But that fact alone doesn't mean he's *always* in possession of marijuana or a concealed firearm. The video surveillance that was gathered spanned only two days and wouldn't be sufficient corroborating evidence that Mr. Ayala would be in possession of a controlled substance and a concealed firearm in the future on postal property; he was only seen once possessing a concealed firearm and only seen twice possessing suspected marijuana. *See Wiley*, 328 F.3d 1353–54 (utilizing *Ortega* reasonable grounds standard and holding that anonymous tip that corrections officer kept a gun in his car in the work parking lot lacked indicia of reliability to support search of his car). At least in *Wiley* there was an anonymous tip that prison officials tried to rely on to justify the search, but that still wasn't even enough to withstand scrutiny under the relaxed reasonableness standard under *Ortega* because the tip wasn't sufficiently corroborated. *Wiley*, 328 F.3d at 1355–56. All the agents had here was ill-gotten surveillance video.

But let's assume for purposes of argument that *Ortega*'s reasonableness standard <u>does</u> apply given the investigation at hand (*e.g.*, suspected employee misconduct for drug use). The reasonableness standard kicks in, there would be a balancing of interests' test, and we'd need to look at the sufficiency of the evidence as to whether the agents had reasonable grounds to suspect that Mr. Ayala carried marijuana and a firearm on his person in a red fanny pack to conduct a *Terry* stop. Similar to *Wiley*, there was no reasonable suspicion for the agents to conduct a *Terry* stop on Mr. Ayala; as soon as he was grabbed, he was unlawfully seized in violation of the Fourth Amendment. *Contra Gordon*, 231 F.3d at 756 (concluding that there was reasonable suspicion to justify stopping defendant where, combined with "headlong" flight, he and his co-defendant were sighted standing within ten feet of a parked car, surrounded by abandoned buildings, in an area notorious for violent crime and drug trafficking).

But don't let the Government fool you into thinking that Mr. Ayala's flight from the agents gave them the reasonable suspicion they needed to pursue him like the defendant in *Wardlow*. The agents provoked his flight. *Franklin*, 323 F.3d at 1302. Mr. Ayala was, and remains, an innocent person and he ran for innocent reasons; he thought he was being kidnapped in broad daylight. The agents were in plainclothes, they didn't announce themselves, they didn't state their purpose with him, and they tried putting him into an unmarked van. A reasonable person

14

in Mr. Ayala's shoes would have fled in the same manner and surrendered when he or she saw local police in full uniform. *Contra Franklin*, 323 F.3d at 1302–03 (finding that police didn't provoke defendant's flight since reasonable person in his shoes wouldn't have fled from police in a clearly marked van wearing SWAT uniform; and when SWAT team pulled up and opened the van door, a reasonable person might've dropped to the ground or moved away from the building and wouldn't have ran away from vigorously). All this to say that the agents committed an unlawful *Terry* stop and the firearm that eventually was recovered from Mr. Ayala must be suppressed.

## CONCLUSION

This case is disturbing on many levels. It runs the gamut from Orwellian surveillance to sloppy law enforcement tactics all of which violated Mr. Ayala's Fourth Amendment rights against unreasonable searches and seizures. The evidence led to criminalizing Mr. Ayala's lawful right to carry a firearm for self-defense at his public place of work and for resisting an unlawful arrest. It must be suppressed.

We ask that the illegally obtained video surveillance and his concealed firearm that was unlawfully seized in violation of the Fourth Amendment be suppressed as evidence at trial.

                    **A. FITZGERALD HALL, ESQ.**
                    **FEDERAL DEFENDER**

                    */s/ Stephen Consuegra*
                    Stephen Consuegra, Esq.
                    Florida Bar No. 105816
                    Assistant Federal Defender
                    400 N. Tampa Street, Suite 2700
                    Tampa, Florida 33602
                    Telephone: (813) 228-2715
                    Facsimile: (813) 228-2562
                    E-mail: Stephen_Consuegra@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 28, 2023, a true and correct copy of the foregoing was furnished using the CM/ECF system with the Clerk of the Court, which will send notice of the electronic filing to the following:

Abigail King, AUSA

/s/ *Stephen Consuegra*
Stephen Consuegra, Esq.
Assistant Federal Defender