UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                              CASE NO. 8:22-cr-369-KKM-AAS

EMMANUEL AYALA

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

The Court should deny Emmanuel Ayala's motion to suppress (Doc. 44) because there are no Fourth Amendment violations in this case. Ayala maintained no reasonable expectation of privacy in the United States Postal Service (USPS) truck that he used during his shift, as he shared the truck with other USPS employees and had no possessory interest in the truck.

Additionally, there was no illegal encounter with Ayala that led to the search of his red satchel, containing marijuana, a Smith & Wesson 9MM firearm and a magazine with 12 9MM rounds. USPS-Office of Inspector General (OIG) Special Agents (SAs) approached Ayala to speak with him about his known employee misconduct, to include smoking marijuana while driving a USPS truck and possessing a firearm during his USPS employment (both violations of the USPS Standards of Conduct as well as laws of Florida and the United States). USPS-OIG is permitted to interview USPS employees as part of an investigation and USPS employees are required to comply with such investigations as part of their employment.

Not only did Ayala fail to comply with the investigating USPS-OIG SAs, he

forcibly resisted them and fled. He also resisted and fled from a Tampa International Airport Police Department (TIAPD) officer who became involved in Ayala's pursuit.

TIAPD ultimately place Ayala under arrest and conducted a search of his red satchel incident to lawful arrest, recovering marijuana, a Smith & Wesson 9MM firearm and a magazine containing 12 9MM rounds.

Additionally, USPS-OIG SAs could have searched Ayala's red satchel at any time because he brought it to the USPS location that had posted regulations noticing employees of the ability for USPS to search their personal bags at any time. Based on those posted regulations, Ayala consented to the search of his red satchel.

Ultimately, the surveillance of and encounter with Ayala were both lawful and permissible pursuant to the Fourth Amendment. Ayala's red satchel was validly searched incident to lawful arrest but also could have been searched at any time because Ayala effectively consented to its search.

Accordingly, suppression of the video surveillance within a USPS truck as well as the recovered Smith & Wesson 9MM Firearm should be denied.

## I.  PROCEDURAL BACKGROUND

On October 26, 2022, a federal grand jury returned an indictment charging Ayala with one count of possessing a firearm in a federal facility, in violation of 18 U.S.C. § 930, and one count of resisting an officer, in violation of 18 U.S.C. § 111. Doc. 1. On November 16, 2022, the court held Ayala's initial appearance, during which it ordered Ayala's release pending trial. Docs. 13, 17. On January 5, 2023, Ayala filed a motion to dismiss the indictment in the above-detailed case. Doc. 23. On January

19, 2023, the United States filed a response in opposition of Ayala's motion to dismiss. Doc. 25. On April 28, 2023, the United States filed a supplemental brief in response to Ayala's motion to dismiss. Doc. 32. On June 20, 2023, Ayala filed a response to the Government's supplemental brief. Doc. 39. As of the date of filing of this response in opposition to Ayala's motion to suppress, Ayala's motion to dismiss is still outstanding. On July 28, 2023, Ayala filed a motion to suppress evidence, specifically the Smith & Wesson 9mm and the video surveillance from the cab of a USPS truck, alleging violations of the Fourth Amendment of the United States Constitution, to which the Government has been ordered to respond by August 11, 2023. Docs. 44, 45.

## II.   FACTUAL BACKGROUND

The United States anticipates that, should the Court set an evidentiary hearing, the case agents, USPS-OIG SAa Scott Cunningham and Jill Younce, would testify as follows:

1. OIG is a federal law enforcement and oversight agency that conducts audits and investigations of Postal Service programs and operations, and oversight of the Postal Inspection Service. (Administrative Support Manual (ASM) section 211.11)

2. The OIG conducts and supervises audits, evaluations, and investigations. Under applicable policies, regulations and procedures, it carries out investigations and presents evidence to the Department of Justice and U.S. attorneys in investigations of a criminal nature. (ASM section 211.13).

3. OIG SAs are authorized to perform a variety of functions in connection with any matter within their respective official duties, including the following: make arrests without warrant for offenses against the United States committed in their presence; make arrests without warrant for felonies cognizable under the laws of the United States, if they have reasonable grounds to believe that the person to be arrested has committed or is committing such a felony. (ASM section 211.21).

4. On or about July 22, 2022, Postal Management notified SA Cunningham about the presence of the odor of marijuana in Postal Truck 8811565.

5. Postal Truck 8811565 was assigned to the Tampa Processing and Distribution Center and was used by Ayala, a Tractor Trailer Operator, during his official USPS duties.

6. Ayala was not the only individual to use Postal Truck 8811565. At least one other individual used Postal Truck 8811565 for employment purposes on a different shift than Ayala.

7. USPS maintains three sets of keys for each postal truck. The driver utilizes one set of keys during his/her shift but must return that set of keys at the end of the shift. The second set of keys is locked up in a registration cage with other valuable items. The third set is stored at the vehicle maintenance facility.

8. A USPS truck driver is not to take the truck keys with them at the end of a shift.

9. USPS may assign a truck driver a different truck on any given day for any

reason. A USPS truck driver maintains no possessory interest over a USPS truck.

10. Every USPS employee acknowledges responsibility for all postal policies, including those detailed in the ASM and the USPS Standards of Conduct (detailed in the Employee and Labor Relations Manual ("ELM")), when signing onboarding paperwork and during new employee training.

11. Section 222.5 of the ASM states: "If it is suspected that drugs are being used or sold on postal property or by a postal employee on duty, notify the inspector in charge immediately."

12. USPS Standards of Conduct prohibit the sale, possession, or use of illegal drugs, or the abuse of legal drugs while on duty or on postal premises. Employees found to be engaged in these activities are subject to discipline, including removal and/or criminal prosecution where appropriate.

13. Section 271.5 of the ASM states: "All Postal Service-owned or -furnished property under the custody or control of the Postal Service, including that individually assigned to postal personnel, is for official use only. This property and its contents are at all times subject to examination and inspection by duly authorized postal officials in the discharge of their official duties…law enforcement examination and inspection include searching, monitoring, and video recording."

14. Additionally, USPS-OIG conducts GPS tracking under the authority of the Inspector General Act in situations that do not require a court order, such as

tracking postal-owned vehicles.

15. On or about August 26, 2022, surveillance cameras were installed into Postal Truck 8811565 based on the reported odor of marijuana coming from the truck.

16. On or about September 7, 2022, an additional surveillance camera, along with GPS tracking, was installed in Postal Truck 8811565.

17. On or about September 8, 2022, SA Cunningham conducted surveillance on Postal Truck 8811565 by monitoring the live camera feed from the surveillance camera within the postal truck. SA Cunningham observed Ayala retrieve a clear bag, which contained a green leafy substance, which was suspected to be marijuana, from a red satchel. SA Cunningham confirmed the location of Postal Truck 8811565 by checking the GPS tracking associated with the truck and determined the truck was parked at Peninsula Tampa Station, which is a USPS federal location in Tampa, within the Middle District of Florida.

18. On or about September 12, 2022, SA Cunningham conducted surveillance on Postal Truck 8811565 by monitoring the live camera feed from the surveillance camera within the postal truck. SA Cunningham observed Ayala retrieve a clear bag, which contained a green leafy substance suspected to be marijuana, from a red satchel. The red satchel appeared to be the same red satchel viewed on the surveillance feed on or about September 8, 2022. In the video feed, SA Cunningham observed Ayala rolling a joint and smoking the

green leafy substance. Additionally, SA Cunningham observed Ayala holding a handgun while seated within the driver's seat of Postal Truck 8811565 and racking the slide of the handgun.

19. SA Cunningham confirmed the location of Postal Truck 8811565 by checking the GPS tracking associated with the truck and determined it was parked at the Peninsula Tampa Station, which is a USPS federal location in Tampa, within the Middle District of Florida.

20. The USPS Code of Conduct includes the prohibition on possession of firearms or other dangerous weapons on postal service property. Additionally, section 276 of the ASM addresses "Firearms Security" and details that USPS employees are prohibited from possessing firearms (a) while on official duty, either on or off Postal Service property; or (b) while on or within Postal Service property at any time, unless the USPS employee is authorized by the chief postal inspector or the inspector general to possess a firearm.

21. Ayala was not a USPS employee authorized by the chief postal inspector or the inspector general to possess a firearm during his employment with the USPS.

22. On or about September 14, 2022, Ayala entered the Tampa Processing and Distribution Center located at 3501 Bessie Coleman Boulevard, within the Middle District of Florida. When entering the property, Ayala had to pass several signs notifying him that firearms were not legally permitted on the property.

23. Within the lobby of the building as well as inside the Tampa Processing and Distribution Center, there are posters titled "Rules and Regulations Governing Conduct on Postal Service Property." The poster details that "[p]urses, briefcases, and other containers brought into, while on, or being removed from the property are subject to inspection."

24. The poster also details that "[a]ll persons in and on property shall comply with official signs of a prohibitory or directory nature and with the directions of Security Force personnel or other authorized individuals." Additionally, "[n]otwithstanding any other law, rule, or regulation, no person while on Postal Service property may carry firearms…except for official purposes."

25. On or about September 14, 2022, a USPS employee notified SAs Cunningham and Younce that Ayala was in the break room of the Tampa Processing and Distribution Center wearing a red satchel.

26. At approximately 2:50 P.M., SAs Cunningham and Younce observed Ayala, who was wearing a red satchel, exit the loading dock area of the Tampa Processing and Distribution Center and walk into the parking lot.

27. SAs Cunningham and Younce's interaction with Ayala was caught on video surveillance, which was provided to Ayala in discovery on or about December 14, 2022.

28. SAs Cunningham and Younce approached Ayala in the USPS parking lot in their official USPS-OIG capacity to question him about the use of marijuana while working as a USPS employee and the illegal possession of a firearm on

federal property, which are both violations of the USPS Standards of Conduct and ASM.

29. The USPS Standards of Conduct require all employees to cooperate in any postal investigation, including OIG investigations.

30. SA Cunningham asked Ayala to confirm his identity and Ayala refused. Investigators Cunningham and Younce identified themselves as law enforcement and were both wearing their USPS-OIG badges, which are visible on the video surveillance. Additionally, SA Younce showed Ayala her USPS-OIG photo credentials, which is also visible on the video surveillance.

31. SA Cunningham explained to Ayala that he was the subject of an investigation and agents needed to speak to him inside the postal facility. SA Cunningham told Ayala that he was going to pat Ayala down to search for weapons prior to entering the facility. This is standard for officer safety.

32. SA Cunningham initiated the weapons pat down in the parking lot and Ayala stepped backwards and stuck out his arm, which prevented SA Cunningham from conducting his weapons search. SA Cunningham escorted Ayala to SA Cunningham's official government vehicle to conduct the pat down and limit Ayala's mobility. Ayala continued to resist by tightening his arms and dragging his feet.

33. SA Cunningham informed Ayala that he was not under arrest but he was being detained for investigation. SA Cunningham attempted to handcuff Ayala and felt Ayala move his body away from the vehicle in an attempt to

avoid being handcuffed. Ayala moved his hand towards the right-side pocket of his shorts and SA Cunningham had to grab Ayala's hand and put it behind his back. SA Cunningham instructed SA Younce to use her handcuffs, at which point Ayala pulled away and ran from the investigators.

34. The investigators pursued Ayala on foot and SA Cunningham eventually tackled Ayala to the ground in an effort to end the pursuit. While Ayala was on the ground, SA Younce grabbed Ayala's left arm to handcuff his left wrist, Ayala recovered to his feet, squared up to SA Younce, and ran away with the red satchel. This interaction is also captured on video surveillance, which was provided to Ayala in discovery.

35. Officer Carlos Lopez, a Tampa International Airport Police Department (TIAPD) officer, observed the incident between USPS-OIG SAs and Ayala. After Ayala fled the investigators for a second time, Officer Lopez took over pursuit on foot. Officer Lopez warned Ayala multiple times to stop and was wearing a full police uniform.

36. Officer Lopez stopped Ayala on the first floor of the Economy Parking Garage, inside Green Elevator #1. Upon stopping Ayala, Officer Lopez ordered Ayala to drop the red fanny pack multiple times. Ayala slowly placed the red fanny pack on the ground and refused to exit the elevator.

37. SA Cunningham eventually grabbed one of Ayala's arms and Officer Lopez grabbed the other and both attempted to pull Ayala out of the elevator. Ayala stiffened and braced his legs, refusing to move, but the law enforcement

officers were able to pull Ayala out of the elevator and physically escort him to the ground.

38. While on the ground, Ayala stiffened his arms, refusing to put them behind his back. Law enforcement was eventually able to handcuff Ayala.

39. TIAPD officers seized and searched the red satchel bag incident to Ayala's arrest for resisting an officer and discovered a green leafy substance, field testing positive for marijuana, and a Smith & Wesson 9 MM semi-automatic firearm and a magazine containing 12 9MM rounds.

## III.  **ARGUMENT**

### A. Ayala did not possess a reasonable expectation of privacy supported by the Fourth Amendment in the shared postal truck he used as part of his USPS employment.

The Fourth Amendment provides that: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…" U.S. Const. amend. IV. A defendant seeking to suppress evidence bears the burden of establishing a legitimate expectation of privacy in the area searched. *United States v. Harris*, 526 F.3d 1334 (11th Cir. 2008). Two requirements must be met before an individual may prevail on a Fourth Amendment claim: (1) the individual must prove a subjective expectation of privacy in the object of the search, and (2) the individual must prove that his subjective expectation of privacy is one that society is prepared to recognize as legitimate. *U.S. v. Esser*, 284 Fed. Appx. 757, 758 (11th Cir. 2008); *United States v. Chaves*, 169 F.3d 687, 690 (11th

Cir. 1999); *United States v. McKennon*, 814 F.2d 1539, 1543 (11th Cir. 1987).

Constitutional protection against unreasonable searches by the government does not disappear merely because the government has the right to make reasonable intrusions in its capacity as employer, but some government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable. *O'Connor v. Ortega*, 480 U.S. 709, 717-718 (1987). Given the variety of work environments in the public sector, an employee's reasonable expectation of privacy must be addressed on a case-by-case basis. *Id*. at 718. Intrusions upon the constitutionally protected privacy interests of government employees for investigations of work-related misconduct should be judged by the standard of reasonableness under all the circumstances. *Id*. The privacy interests of government employees in their workplace are far less than those found at home or in some other contexts and may be reduced by virtue of actual office practices and procedures, or by legitimate regulation. *Id.* at 717, 725. Employees have no reasonable expectation of privacy in common or shared work areas, such as shared offices. *United States v. Buettner-Janusch*, 646 F.2d 759, 766 (2d Cir. 1981). Additionally, the Eleventh Circuit has held that an employee does not have a subjective expectation of privacy in a situation where policy provides for the monitoring in question. *See Smith v. City of Pelham*, 2021 WL 58634412 (11th Cir. 2021) (employee did not have a subjective expectation of privacy in her workplace computer because the city's Computer Use Policy made it clear the information on her computer could be monitored).

Ayala possessed no reasonable expectation of privacy in USPS Postal Truck

8811565. He maintained no sufficient control over the postal vehicle to create any expectation of privacy. It was not Ayala's private property, as required to trigger Fourth Amendment protections under *O'Connor*. *O'Connor*, 480 U.S. at 715. Ayala was provided keys at the beginning of each shift for a postal truck and was required to return the keys at the end of his shift. USPS maintained an additional two sets of keys for every postal truck. Ayala even alludes to his lack of possessory interest in any USPS postal truck in his own motion to suppress, where he details his parking of his personal vehicle every workday and subsequent walk to pick up his assigned work truck. Doc. 44 at 2-3. Ayala did not necessarily always operate the same USPS truck; on any given shift he could have been assigned a different truck, without notice or reason. Ayala also shared any work truck with any other USPS trailer-truck operator working on a different shift who was assigned that same truck. Ayala was afforded limited use of a USPS truck during his hours of employment, and nothing more.

Upon becoming a USPS employee, Ayala was provided a copy of the ASM, in which he was notified that any postal vehicle was under the control of the USPS and subject to monitoring, which could include video surveillance. The USPS policy stating that any postal vehicle was subject to monitoring dissipated any reasonable expectation of privacy Ayala may have felt he had in a USPS truck he was driving.

As a USPS employee, Ayala was also expected to comply with the USPS Standards of Conduct in the ELM. He was required to exhibit safe driving and maintain compliance with local and state traffic laws. Additionally, USPS

13

maintained ownership over any USPS vehicle Ayala used and had long-standing

regulations of such vehicles. As such, Ayala had no reasonable expectation of

privacy in the cab of a USPS truck when he was violating the USPS Standards of

Conduct as well as local and state traffic laws all while the cab of the USPS truck

was regulated and controlled by USPS. *See El-Nahal v. Yassky*, 993 F.Supp.2d 460,

465 (S.D.N.Y. January 29, 2014) (taxicab driver had no reasonable expectation of

privacy in the GPS data of his vehicle because he was required to create

documentation of the same information obtained and taxicabs had long been subject

to regulation by the New York City Taxi and Limousine Commission, who gathered

the GPS data).

SA Cunningham's investigation into Ayala began based on a report that the cab

of USPS Postal Truck 8811565 smelled of marijuana. USPS maintains a drug-free

workplace and has a business interest in preventing intoxicated individuals from

operating USPS vehicles. USPS could be subject to a slew of liability and litigation if

a USPS employee, especially a USPS driver, were under the influence of controlled

substances while performing their USPS duties. As such, USPS-OIG installed

surveillance equipment into USPS Postal Truck 8811565 to conduct its employee

misconduct investigation. The ability to install surveillance equipment into the USPS

postal truck was governed by the ASM and all employees were on notice of such

ability. There was no Fourth Amendment violation because the USPS postal truck

did not belong to any person, such as Ayala, it was the property of USPS.

Additionally, the installation of the surveillance equipment was not to further a

criminal investigation, but to further a work-related employee misconduct investigation. Ayala improperly mischaracterizes SA Cunningham's investigation as a criminal investigation; however, SA Cunningham became involved in the situation solely to sift out any employee misconduct for the safety of the USPS workplace. Just because the investigation into Ayala later led to criminal charges based on his actions on September 14, 2022, does not mean that all investigative action leading up to that date is automatically criminal.

Under *O'Connor*, reasonableness is the standard for searches of constitutionally protected privacy interests of government employees; however, the government maintains that Ayala did not have a constitutionally protected privacy interest in any USPS truck he operated during any given shift and thus the Fourth Amendment is not applicable as it relates to the implementation of video surveillance in a USPS truck.

If this Court were to determine that Ayala did maintain a privacy interest in whatever USPS truck he operated during a shift, which the government maintains he did not, the reasonableness standard would apply because the investigation into Ayala was for work-related employee misconduct (using marijuana in a drug-free workplace while operating a USPS vehicle). The actions taken by USPS-OIG to investigate the reported odor of marijuana from the cab of USPS truck 8811565 were completely reasonable. USPS-OIG used the tools afforded to it by the USPS Standards of Conduct and ASM to recognize the violation of the drug-free workplace and install a surveillance camera into the cab of USPS truck 8811565 to further

investigate the potential work-related employee misconduct. USPS put all employees on notice that USPS maintained the possessory interest in any USPS vehicles, USPS employees were to obtain the keys to USPS vehicles at the start of their shift and return them at the end of their shift, and USPS vehicles were subject to search and surveillance.

USPS had a valid concern about an employee using marijuana while driving a USPS vehicle and thus began an internal employee misconduct investigation. Section 831 of the ELM details Motor Vehicle Safety, explicitly putting employees on notice of USPS's objective to require safe driving and compliance with applicable U.S. Department of Transportation regulations, as well as all state and local traffic laws and Postal Service driving policies. Additionally, USPS could be subject to liability if a USPS driver were under the influence of controlled substances and caused a crash during the course of their employment. Ayala was in direct violation of the USPS Standards of Conduct, as laid out in the ELM, by smoking marijuana and driving a USPS vehicle. He exhibited non-safe driving behavior by being under the influence of an illegal substance while operating a USPS vehicle and violated state and local laws by driving while under the influence of a controlled substance. He not only was putting himself at risk but was also putting the general population at risk. Unequivocally, the USPS investigation would reach the reasonableness standard set forth by *O'Connor*, but ultimately it wouldn't have to because Ayala maintained no reasonable expectation of privacy in the cab of a USPS truck to instigate the Fourth Amendment analysis.

**B. USPS-OIG special agents legally encountered Ayala as part of their investigation into Ayala's employee misconduct while working as a USPS employee.**

Ayala improperly characterizes the USPS-OIG employee misconduct investigation as a criminal investigation, seemingly because the situation ultimately resulted in criminal charges. SAs Cunningham and Younce approached Ayala in broad daylight, wearing identifying badges (with SA Younce showing additional credentials), all captured on surveillance video, to discuss alleged employee misconduct. Their intention was to interview Ayala about his use of marijuana and possession of a firearm while driving a USPS vehicle, in direct defiance of the USPS Standards of Conduct.

Contrary to Ayala's argument, this is not a *Terry* stop because it did not involve a criminal investigation. *Terry v. Ohio*, 392 U.S. 1 (1968). Absent probable cause, police officers may briefly detain an individual based on reasonable suspicion that he is (or is about to be) engaged in criminal activity. *Id*. at 30-31. Reasonable suspicion is a "particularized and objective basis" for suspecting a person of criminal activity. *Ornelas v. United States*, 517 U.S. 690 (1996). It requires "specific, articulable, and object facts reasonably to suspect" that a crime is being or will soon be committed but is a less demanding standard than probable cause. *United States v. Puglisi*, 723 F.2d 779, 789 (11th Cir. 1984); *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

The initial interaction on September 14, 2022, between SAs Cunningham and Younce and Ayala was to discuss his work-related employee misconduct, not a

criminal investigation. As a USPS employee, Ayala was bound by the USPS Standards of Conduct, which requires all USPS employees to cooperate with OIG investigations.

As captured on video surveillance, the interaction started cordial and calm, with SAs Cunningham and Younce identifying themselves and their stated business of investigation into workplace misconduct. According to SAs Cunningham and Younce, Ayala refused to confirm his identity. SA Cunningham told Ayala he was going to initiate a weapons pat down for safety prior to taking Ayala into the postal facility for an interview. The action of a weapons pat down was reasonable for general safety but especially in the situation where SA Cunningham had knowledge of Ayala impermissibly and illegally carrying a firearm while on USPS property.

Despite his ill-conceived allegation that he believed he was the subject of an adult kidnapping scheme in broad daylight, at his place of employment, by individuals wearing badges around their necks, Ayala escalated the situation to the point of a criminal investigation. He actively and forcibly resisted SAs Cunningham and Younce on multiple occasions during their short initial interaction, to the point handcuffs were deemed appropriate to properly restrain Ayala. He fled from SAs Cunningham and Younce, was tackled to the ground by SA Cunningham and attempted to be handcuffed again by SA Younce, at which point he squared up with SA Younce and fled again, all of which is captured on video surveillance. Ayala then fled from a uniformed Tampa International Airport Police Officer who instructed Ayala to stop on multiple occasions. If Ayala truly believed he was the target of an

adult kidnapping, would he not have stopped and asked for assistance from the uniformed police officer chasing him? At this point, Ayala had committed several criminal offenses by resisting SAs Cunningham and Younce and Officer Lopez. Once Ayala was finally stopped, he was ordered to put down his red satchel multiple times, to which he finally complied. Ayala refused to follow law enforcement instructions to exit the elevator and was consequently removed by law enforcement. Ayala continued to physically resist law enforcement as they removed him from the elevator. TIAPD officers searched Ayala's red satchel incident to his arrest for resisting an officer and discovered approximately 2 grams of marijuana and a Smith & Wesson 9MM Semi-automatic firearm with a magazine containing 12 9MM rounds.

Ayala improperly argues that SAs Cunningham and Younce lacked probable cause or reasonable suspicion to stop Ayala on postal property nor did they have a belief that he was armed and dangerous on postal property. Doc. 44 at 12. As noted earlier, this is not a *Terry* stop because SAs Cunningham and Younce's stopping of Ayala was not part of a criminal investigation, conversely it was part of an employee misconduct investigation that Ayala was required to comply with as part of his employment. If this Court were to determine that the encounter was a *Terry* stop, the government contends there was sufficient reasonable suspicion to stop Ayala and conduct an interview. SA Cunningham received information relating to Postal Truck 8811565 having an odor of marijuana. Based on SA Cunningham's investigation of this workplace misconduct, he obtained video surveillance in which he confirmed

that Ayala was smoking marijuana while operating a USPS vehicle and possessed a firearm (that he took out and racked) while operating a USPS vehicle, both in direct violation of the USPS Standards of Conduct and the smoking in violation of local and state laws. The video surveillance also showed Ayala taking the marijuana out of a plastic baggie from within a red satchel. As such, SA Cunningham had reasonable suspicion to believe that Ayala possessed a firearm on federal property, i.e. Postal Truck 8811565, and would have been justified in stopping Ayala on that basis. But again, the government maintains that this is not a *Terry* stop because the investigation was into workplace misconduct rather than a criminal investigation.

Ultimately, Ayala turned the situation from a workplace misconduct investigation into a full-fledged criminal investigation. Given the facts of this case, it is improper to allege that SAs Cunningham and Younce's interaction with Ayala was a *Terry* stop or at all improper under the Fourth Amendment. SAs Cunningham and Younce were within their legal abilities to stop Ayala and interview him relating to a USPS-OIG investigation.

### IV.   Ayala's red satchel was validly searched incident to lawful arrest.

The search incident to arrest doctrine has an ancient pedigree that predates the Nation's founding, and no historical evidence suggests that the Fourth Amendment altered the permissible bounds of arrestee searches. *Birchfield v. North Dakota*, 579 U.S. 438, 439 (2016). The mere "fact of the lawful arrest" justifies "a full search of the person." *United States v. Robinson*, 414 U.S. 218 (1973). The Supreme Court has held:

"When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction….There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control' – construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 752, 762-763 (1969).

Searches of highly personal items like wallets or purses are permissible if searched incident to arrest, regardless of need or exigency. *U.S. v. Richardson*, 764 F.2d 1514, 1526-27 (11th Cir. 1985).

SAs Cunningham and Younce legally encountered Ayala as part of their official OIG duties, to conduct an interview relating to Ayala's employee misconduct. Ayala forcibly resisted and fled from two federal officials and actively fled from an additional law enforcement officer. Upon his resistance and flight, Ayala committed various crimes of resisting an officer for which he could be arrested, and ultimately was. Once he was finally stopped, he was instructed to remove his red satchel from his person. TIAPD Officer Lopez, with the assistance of SA Cunningham, physically removed Ayala from the elevator he was within, and Officer Lopez placed Ayala under arrest for resisting an officer. Ayala's red satchel was subsequently searched incident to his lawful arrest. The search of Ayala's red satchel, which is equivalent to a purse worn on an individual's body, is a well-established exception to the Fourth Amendment and a valid search. *See Richardson*, 764 F.2d at 1526-27 (holding that a search incident to arrest of highly personal items is permissible regardless of need or

exigency). There is no legal basis to suppress the contents of Ayala's red satchel because they were lawfully obtained search incident to arrest.

**V.     Ayala consented to the search of his red satchel by bringing it on USPS property.**

A USPS employee does not have a reasonable expectation of privacy in a personal bag, such as a purse, briefcase or other container, given the posted regulations informing individuals entering postal property that such items were subject to inspection and office rules require employees to read all posted regulations. *Esser,* 284 Fed.Appx 757, 759 (11th Cir. 2008). The *Esser* Court held that based on the posted regulations, the USPS employee had no reasonable expectation of privacy in her purse. *Id*. Additionally, because the USPS employee was a voluntary employee who decided to bring her purse on postal property, she consented to its search and thus her Fourth Amendment rights were not violated. *Id*.

Similar to the situation in *Esser*, the USPS location in question had various posted regulations notifying employees that "[p]urses, briefcases, and other containers brought into, while on, or being removed from the property are subject to inspection." On September 14, 2022, Ayala went to work at a USPS location that had that posted regulation. He voluntarily brought with him/wore a red satchel, that would be considered a purse, briefcase or other container. By bringing his red satchel onto USPS property, he consented to its search.

Accordingly, even if law enforcement did not discover the marijuana and firearm search incident to arrest of Ayala for his various criminal violations, USPS-OIG

could have searched Ayala's red satchel that day because Ayala brought it onto USPS property.

## VI.  **Conclusion.**

There are no Fourth Amendment implications for Postal Truck 8811565, which Ayala operated during USPS shifts. Ayala maintained no privacy interest in Postal Truck 8811565 or any postal truck as he shared those vehicles with other USPS truck drivers, he did not permanently possess a key to the truck, USPS maintained several copies of the keys to the trucks and USPS could assign Ayala a different truck to drive on any given day. Additionally, the video surveillance was permissibly installed into Postal Truck 8811565 based on the work-place employee misconduct investigation into a driver of Postal Truck 8811565, who was suspected of smoking marijuana during a USPS shift. All employees were put on notice of the ability of USPS to install video surveillance equipment as part of USPS investigations and USPS did so in a vehicle it owned and maintained but allowed other individuals to briefly drive for one shift at a time.

Ayala was not illegally seized on postal property, resulting in the recovery of marijuana and a firearm. SAs Cunningham and Younce legally approached Ayala as part of their official USPS-OIG duties to conduct their investigation into Ayala's workplace misconduct. Ayala forcibly and actively resisted USPS-OIG SAs, fled the scene, and also resisted and fled from TIAPD. TIAPD placed Ayala under arrest and searched his red satchel incident to lawful arrest.

Had Ayala's red satchel not been searched incident to lawful arrest, USPS-OIG

could have searched it at any time once it was on the USPS property in question because of the posted regulations that Ayala was on notice of and required to comply with as part of his voluntary employment. Ultimately, based on those regulations, Ayala consented to the search of his red satchel by bringing it to the USPS location.

Accordingly, Ayala's Motion to Suppress (Doc. 44) should be denied.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

/s/ *Abigail K. King*
Abigail K. King
Assistant United States Attorney
Florida Bar No. 294963
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:  (813) 274-6000
Facsimile:   (813) 274-6358
E-mail: Abigail.King@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2023, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which

will send a notice of electronic filing to the following:

Stephen Consuegra, AFPD

/s/ *Abigail K. King*
Abigail K. King
Assistant United States Attorney
Florida Bar No. 294963
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:  (813) 274-6000
Facsimile:   (813) 274-6358
E-mail: Abigail.King@usdoj.gov