# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA,

v.                                        Case No: 8:22-cr-369-KKM-AAS

EMMANUEL AYALA,

    Defendant.
_____

## ORDER

The United States indicted Emmanuel Ayala, a postal worker, for possessing a firearm in a Federal facility in violation of 18 U.S.C. § 930(a). Ayala argues that statute is unconstitutional as applied to him because the historical record does not support a law banning firearms in post offices. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Relying on dicta from earlier cases, the United States responds that the Second Amendment allows it to punish the bearing of arms inside *any* government building. But the Supreme Court has been clear: the government must point to historical principles that would permit it to prohibit firearms possession in post offices. *See id.* at 17, 24. The United States fails to meet that burden. Thus, I dismiss the § 930(a) charge because it violates Ayala's Second Amendment right to bear arms.

## I.   BACKGROUND

Ayala worked for the U.S. Postal Service as a semi-truck driver hauling packages out of a facility located in Tampa. MTD (Doc. 23) at 3; Gov't Position in Opp'n to Evid. Hr'g (Doc. 43) at 1. He possesses a Florida concealed carry permit and "ke[pt] his firearm, a Smith & Wesson 9mm, concealed inside his fanny pack" for self-defense while on the job. MTD at 3–4; Gov't Position in Opp'n to Evid. Hr'g at 1. "[F]rom time to time," he carried the firearm onto Post Office property when retrieving his semi-truck from work "for extra protection on the short walk" to and from the employee parking lot. MTD at 4.

On September 14, 2022, Ayala wore his fanny pack, with the gun inside, as he walked from the employee parking lot through the metal turnstiles and into the post office. *Id.* at 3–4. After he clocked in, two agents from the U.S. Postal Service's Office of Inspector General stopped him and tried to detain him. *Id.* at 4–5. Ayala fled, but was eventually arrested by officers from the Tampa Police Department. *Id.* at 5–6. A grand jury indicted him for violating 18 U.S.C. § 930(a) by knowingly bringing a firearm into a Federal facility and 18 U.S.C. § 111 by forcibly resisting arrest. *See* Indictment (Doc. 1).

Ayala moves to dismiss both counts. First, he argues that § 930(a), as applied to an ordinary post office, violates his Second Amendment right to carry a firearm for self-defense. MTD at 2. Second, he argues that § 930(a) and its incorporated exceptions in § 930(d) are vague and ambiguous in violation of the Fifth Amendment. *Id.* Finally, he

argues that he "should not stand prosecution for violating [§ 111] because he resisted an unlawful arrest under the common law and under the Fourth Amendment." *Id.*

After reviewing Ayala's motion and the United States' response, I directed further briefing on the Second Amendment question. *See* Suppl. Briefing Order (Doc. 26); *see also* Appendix B. I outlined *Bruen*'s analytical framework and explained that the United States' response to Ayala's Second Amendment challenge was "unhelpful in this task." App. B at 3. That two-paragraph response lacked any "searching analysis into the historical record to determine whether § 930 as applied to Ayala" complies with the Second Amendment. *Id.* Thus, I granted both parties another opportunity to brief the issue. *See id.* at 1, 5–6. That briefing is now complete. *See* Gov't Suppl. Br. (Doc. 32); Def. Suppl. Br. (Doc. 39).

## II.   LEGAL STANDARD

In a criminal case, "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1). An issue may be resolved on a pretrial motion under Rule 12(b)(1) "if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Covington*, 395 U.S. 57, 60 (1969) (footnote omitted).[1]

---

[1] *Covington* interpreted an older version of Rule 12(b)(1) that referred to "trial of the general issue" rather than "trial on the merits." *See* 395 U.S. at 60. But the amendment that made this change merely substituted

## III.   ANALYSIS

This order resolves only Ayala's Second Amendment challenge. The sole relevant facts are that Ayala carried a firearm into an ordinary post office, which neither party disputes. As a result, this issue presents a pure question of law ripe for disposition. Because I conclude that Count I must be dismissed on Second Amendment grounds, I need not consider Ayala's vagueness challenge. Ayala's challenge to Count II cannot be resolved on a motion to dismiss because, even if Ayala could have lawfully resisted arrest, the jury must resolve the contested factual issues surrounding his resistance.

### A. Second Amendment Challenge

*New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), requires the United States to present historical support for § 930(a)'s application to Ayala, which it fails to do. Post offices have existed since the founding, as have threats to the safety of postal workers and the public entering those locations. Yet the historical record yields no "distinctly similar historical regulation addressing" those safety problems by regulating firearms in post offices. *Id.* at 26. *Bruen* deems this absence strong evidence of the statute's unconstitutionality. *Id.* Even if the lack of a distinctly similar historical regulation was not dispositive, the United States has offered no relevant historical analogues. Although not

---

"[t]he more modern phrase 'trial on the merits' . . . for the more archaic phrase 'trial of the general issue.' No change in meaning [was] intended." *See* FED. R. CRIM. P. 12(b)(1) advisory committee's note to 2014 amendment.

my burden, I conduct a more robust historical inquiry and likewise uncover no tradition of relevantly similar firearms regulations.

I then dispel two misapprehensions held by the parties. First, nothing in Supreme Court dicta establishes that the United States may ban firearms in all government buildings. Second, the scope of the Second Amendment right is a legal question, not a factual one, and I need not hold an evidentiary hearing to resolve it. Instead, the government bears the burden to identify historical evidence supporting its challenged regulation.

Finally, I explain why the United States errs in arguing that its proprietorship of federal land and buildings excludes vast swathes of the country from the protection of the Second Amendment.

### 1. *Bruen*'s Second Amendment Standard and 18 U.S.C. § 930(a)

When a firearms regulation is challenged under the Second Amendment, "the government must affirmatively prove that [the challenged] regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. If "the Second Amendment's plain text covers an individual's conduct," then "the Constitution presumptively protects that conduct" and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearms regulation." *Id.* at 24. Regulations that sweep

beyond our historical tradition flout the Second Amendment's "unqualified command" that "the right of the people to keep and bear Arms, shall not be infringed." *Id.* at 17, 20.

This historical test often requires a searching inquiry, but not always. When a "general societal problem" has persisted since the founding, the inquiry is "fairly straightforward": "[T]he lack of a distinctly similar historical regulation addressing [the] problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26. "Likewise, if earlier generations addressed the societal problem, but did so through materially different means," that is evidence "that a modern regulation is unconstitutional." *Id.* On the other hand, cases that implicate "unprecedented societal concerns or dramatic technological changes," *id.* at 27, require courts to consider "how and why historical regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 29. Stated differently, addressing "regulations that were unimaginable at the founding" "will often involve reasoning by analogy—a commonplace task for any lawyer or judge." *Id.* at 28.

This latter approach, which requires the government to "identify a well-established and representative historical *analogue*," *id.* at 30, has caused some confusion.[2] To be clear,

---

[2] Some have criticized lower courts for failing to understand this aspect of *Bruen*. In a recent article, two scholars explain that *Bruen* encourages "an inquiry into the general law"—meaning an inquiry into the traditional scope of the Second Amendment right codified by the Founders. William Baude & Robert Leider, *The General Law Right to Bear Arms*, 99 NOTRE DAME L. REV. (forthcoming 2024) (Dec. 12, 2023, manuscript at 18) (available at https://perma.cc/XS5W-NA9F). Under this approach, the role of the court is "looking to a wide range of cases, parsing the close cases, setting aside unusual outliers, and trying to distill the general principles," *id.*, rather than engaging in a so-called "mindless parsing of historical

that inquiry requires a historical example that is "relevantly similar" to the challenged regulation, *id.* at 29 (quoting Cass R. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)), not "a historical *twin*," *id.* at 30. When the government's proffered examples are not directly on point, courts must distill the underlying legal principles from the historical record. In other words, I must determine "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 29.

> With the *Bruen* test in mind, I turn to § 930(a), which provides that:
>
> Except as provided in [a subsection not relevant here], whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal facility (other than a Federal court facility), or attempts to do so, shall be fined under this title or imprisoned not more than 1 year, or both.[3]

A Federal facility is "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." 18 U.S.C. § 930(g)(1).

---

analogies," *id.* at 40. The U.S. Solicitor General's arguments in *United States v. Rahimi* sounded in much the same register. *See* Transcript of Oral Argument at 40:4–12, *United States v. Rahimi*, 22-915 (2023) ("The way constitutional interpretation usually proceeds is to use history and regulation to identify principles, the enduring principles that define the scope of the Second Amendment right. And so we think that you should make clear the courts should come up a level of generality and not nit-pick the—the historical analogues that we're offering to that degree.").

[3] The statute contains two potentially relevant operative provisions: Subsection 930(a), quoted above, and subsection 930(b). The latter requires that the defendant "inten[d] that [the] firearm or other dangerous weapon be used in the commission of a crime." 18 U.S.C. § 930(b). Although the indictment does not specify the applicable subsection, the omission of § 930(b)'s mens rea element removes any doubt. The United States charges Ayala with violating § 930(a) only. *See* Indictment at 1. Accordingly, this Order is limited to the issue before me—§ 930(a)'s constitutionality as applied to Ayala.

Possessing a firearm in a Federal facility is an activity that falls within the plain text of the Second Amendment. *See* U.S. CONST. amend. II; *see also Bruen*, 597 U.S. at 32–33 (reiterating that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation" (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008))). Thus, the United States must show that a ban on firearms in ordinary post offices is consistent with our nation's founding-era tradition of firearms regulation.

## 2.  Section 930(a)'s Application to Post Offices Has No Historical Support

The United States concedes that "[t]here is no evidence of firearms being prohibited at post offices, specifically, or of postal workers being prohibited from carrying them, at the time of the founding." Gov't Suppl. Br. at 4. Despite the opportunity to present supplemental briefing, the United States fails to point to sufficient historical evidence supporting § 930(a)'s application here. *See id.* at 15–16 (providing only two paragraphs listing potential historical analogues without any analysis of how they are relevantly similar).

### i.  The Historical Record Yields No "Distinctly Similar Historical Regulation Addressing" a Problem that "Has Persisted Since" the Founding

"Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 597 U.S. at 34 (quotations omitted). To decide the constitutionality of this *federal* statute, then, I must ascertain the scope of the Second

Amendment right against the federal government in 1791. *See id.* at 37–38 (declining to decide whether the appropriate time period for ascertaining the meaning of the right against a state was 1868 when the Fourteenth Amendment was ratified or the founding because, "for all relevant purposes, [the right was] the same with respect to public carry").

As explained earlier, if a "general societal problem" has persisted since the founding, "the lack of a distinctly similar historical regulation addressing [the] problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26. And "if earlier generations addressed the societal problem, but did so through materially different means," that too is relevant evidence "that a modern regulation is unconstitutional." *Id.* at 26–27. Here, any potential societal problems that § 930(a) might seek to remedy have persisted since the founding.

Although the United States does not explain a specific reason for banning firearms in Federal facilities, § 930(a) could reasonably be understood to target one of three problems. First, Congress might have sought to promote public safety generally. Of course, if the United States' purpose amounts to a policy disagreement about the virtue of the right to bear arms, the Constitution forecloses that as an impermissible basis to regulate. *See Bruen*, 579 U.S. at 78 (Alito, J., concurring) (explaining that *Heller* rejected arguments "the real thrust" of which are "that guns are bad and that States and local jurisdictions should be free to restrict them essentially as they see fit" (footnote omitted)). And even if

a proper purpose exists, it still remains unclear why restricting firearms in government buildings, rather than private buildings or public spaces generally, would uniquely promote public safety. Public safety concerns were not unknown to the Founders. Yet such concerns were not addressed through sweeping bans on firearms possession. Just the opposite. *See Heller*, 554 U.S. at 601 ("Many colonial statutes required individual arms bearing for public-safety reasons—such as the 1770 Georgia law that 'for the security and *defence of this province* from internal dangers and insurrections' required those men who qualified for militia duty individually 'to carry fire arms' 'to places of public worship.'" (quoting 19 Colonial Records of the State of Georgia 137–39 (A. Candler ed. 1911 (pt. 1)))).

A second concern might be some combination of postal-employee safety and ensuring the efficacy of mail delivery. Again, these concerns pose no new problems. Post offices have existed since before the founding. The British ran postal lines up through the Revolution, and the colonies started their own competing system for inter-colonial mail service when they declared independence. *See* OFFICE OF THE HISTORIAN, CORPORATE AFFAIRS, U.S. POSTAL SERVICE, THE UNITED STATES POSTAL SERVICE: AN AMERICAN HISTORY 2–3 (2022) (hereinafter USPS, AN AMERICAN HISTORY), https://perma.cc/9J86-6DEQ. Of course, the Constitution gave Congress authority to create more post offices, which it did. *See* U.S. CONST. art. I § 8. cl. 7. Between 1790 and 1828, the Post Office grew from 75 offices to 7,530. USPS, AN AMERICAN HISTORY at

8–9. "By 1831, postal employees accounted for 76 percent of the civilian federal workforce." *Id.* at 9.

Since the Post Office's creation, mail carriers have faced the risk of violence. Passengers of nineteenth-century stagecoaches, which carried mail, "risked death or injury if coaches were attacked by robbers or Indians." USPS, AN AMERICAN HISTORY at 5, 17. Recognizing this reality, Congresses in the first half of the nineteenth century appropriated money to reward individuals who helped apprehend postal robbers. *See, e.g.*, An Act for the Relief of D.W. Haley, ch. 66, 25 Stat. 713 (1838). In the latter half of the nineteenth century, when locomotive became the dominant way to move mail, bandits threatened postal workers aboard trains. *Colorado Train Robbers*, N.Y. TIMES, 2 Sept. 1891, at 8. Yet the federal government never sought to ban firearms to protect employees or secure mail delivery. In fact, when mail train robberies became a growing threat in the early twentieth century, the Postmaster General *armed* railway mail clerks with "government-issued pistols" from World War I. USPS, AN AMERICAN HISTORY at 23, 107.

Although the "general societal problem[s]" of violence directed towards postal employees and threats to mail delivery "ha[ve] persisted since" at least the founding, there is a "lack of a distinctly similar historical regulation addressing that problem." *Bruen*, 597 U.S. at 26. As the United States acknowledges, the first prohibition on firearms possession

in government buildings was not codified until 1964. 29 Fed. Reg. 15,982 (1964); *see also* Gov't Suppl. Br. at 14. And the first regulation specifically banning arms on post office property was codified in 1972. 37 Fed. Reg. 24,346–47 (1972). Section 930 itself was not enacted until late 1988, a mere thirty-five years ago. Pub. L. 100-690, § 6215(a), 102 Stat. 4361 (1988).

The final potential concern that § 930 might address is intimidation during official government proceedings. This generalized concern was known at the founding, as evidenced by a handful of founding-era anti-intimidation laws banning firearms during specific times and at specific places. Yet there is no evidence that Congress ever sought to address intimidation at post offices with firearms bans. And as I explain in the next subsection, the legal principles supporting those few anti-intimidation laws do not apply to post offices in any relevant sense. In short, post offices do not resemble the narrow classes of government buildings that were, at times, firearms-free zones at the founding.

All of the societal problems identified above have either persisted since the founding without being regulated by means of broad firearms prohibitions or are inapplicable to ordinary post offices like the one here. Even according to the United States, the first firearms prohibitions in relevantly similar federal buildings did not appear until the mid-twentieth century—over 170 years after the founding. That fact is "relevant evidence"

that § 930(a) "is inconsistent with the Second Amendment" as applied to Ayala.[4] *Bruen*, 597 U.S. at 26. Indeed, *Bruen* classifies this scenario as "fairly straightforward." *Id.*

ii.    There Is No Relevantly Similar Historical Analogue to § 930(a) as Applied to Post Offices

The United States does not contend that § 930(a) addresses "unprecedented societal concerns or dramatic technological changes" requiring comparison to "a well-established and representative historical *analogue*." *Bruen*, 579 U.S. at 27–30. Nor could it, as the government attempts to address age-old problems through a new and near-complete firearms ban. But even if *Bruen* contemplated that old problems might be constitutionally addressed through novel regulations, the United States fails to identify any relevantly similar analogue, and my own research uncovers none. Thus, the United States fails to carry its burden under *Bruen* to identify a historical tradition from the founding that supports the application of §930(a) to an ordinary post office.

The United States argues that some founding-era laws prohibited arms in legislatures, polling places, and courthouses. Gov't Suppl. Br. at 15–16. As the Supreme Court has explained, there were "relatively few" such laws. *Bruen*, 597 U.S. at 30 ("[T]he

---

[4] More modern regulations are not relevant. The Supreme Court has refused to even address twentieth-century historical evidence because it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66 & n.28; *see also id.* (like *Heller*, severely discounting the value of late-nineteenth century evidence that "contradicts earlier evidence"). I discount these more recent regulations on the same basis, at least to the extent that they contradict the founding-era record. And for reasons already explained, the pertinent time period for a Second Amendment (compared to a Fourteenth Amendment) challenge is the founding—not 1868.

historical record yields relatively few 18th- and 19th- century 'sensitive places' where weapons were altogether prohibited."). And the United States singles out only one example, a Delaware law banning arms at polling places before the founding. It then cites scholarship that refers to other examples, such as a pair of Maryland laws that prohibited arms while the legislature was in session. *See* David B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 233 (2018). After offering this smattering of evidence, the United States proposes that prohibitions on "carrying arms into centers of government deliberation" existed at the Founding. The United States concludes by baldly proclaiming that "[p]ost offices and other government buildings are, at a minimum, analogous." Gov't Suppl. Br. at 15.

This unreasoned comparison fails. First, not every government building—certainly not ordinary post offices—constitutes a "center" of government deliberations. Second, the United States does not explain "how [or] why [§ 930(a)] burden[s] a law-abiding citizen's right to armed self-defense" in the same manner as laws prohibiting possession in legislative bodies, polling places, or courthouses. *Bruen*, 597 U.S. at 29. Nor could it. The United States' historical examples are not relevantly similar to § 930(a) in several important ways. For example, § 930(a) completely forbids possession in most government buildings. By contrast, the Maryland legislative assembly bans applied only when the legislature was in

session, 1647 Md. Laws 216 (prohibiting weapons in the chamber of the legislature when it was in session); 1650 Md. Laws 273 (extending the same prohibition to apply to both chambers when the legislature was split into two houses), and the Delaware election law governed polling places only on election day, *see* DEL. CONST., art. 28 (1776) (prohibiting weapons at elections, and militias from assembling within one mile of them within 24 hours of an election). These regulations contained meaningful time and place constraints; they were not perpetual exceptions to the right to bear arms. Finally, even if § 930(a) were analogous to these statutes, I doubt that so few regulations "could suffice to show a tradition." *Bruen*, 597 U.S. at 4 (calling into doubt whether three restrictions on public carry is enough).

Although I am "not obliged to sift the historical materials for evidence to sustain [the United States'] statute," *id.* at 60, I do so here. Unlike the plethora of post-*Bruen* challenges to 18 U.S.C. § 922, this case presents a unique sensitive-places challenge to § 930(a) that could have broader implications, so a thorough historical inquiry might inform future challenges. *Compare* Gov't Suppl. Resp. to MTD Ex. A (Doc. 68-2), *United States v. Beasley*, No. 23-cr-140-KKM-AAS (M.D. Fla. Oct. 17, 2023) (cataloging fifty-five pages of post-*Bruen* challenges to various parts of § 922), *with United States v. Tallion*, No. 22-po-01758, 2022 WL 17619254 (D. Md. Dec. 13, 2022) (one of two decisions I am aware of analyzing the constitutionality of this type of federal

building restriction under *Bruen*); *United States v. Marique*, 647 F. Supp. 3d 382 (D. Md. 2022) (same).[5]

To articulate the legal principles that underlie the Second Amendment, I begin by looking to English common law. After all, the Second Amendment codifies a preexisting right "inherited from our English ancestors." *Heller*, 554 U.S. at 599 (quotations omitted). And because the founding-era colonies and States were similarly codifying natural and customary law rights, their understanding of the right to bear arms is particularly informative about the scope of the Second Amendment's protections. Together, this evidence illustrates several legal principles, but none justify the application of § 930(a) to Ayala.

   a.   The Statute of Northampton and State Copycats

The earliest potential analogue is the English Statute of Northampton, enacted around 1328. The statute provided:

> [N]o man great nor small, of what condition soever he be, except the king's servants in his presence, and his ministers in executing of the king's precepts, or of their office, and such as be in their company assisting them, and also [upon a cry made for arms to keep the peace, and the same in such places where such acts happen,] **be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms,** nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other

---

[5] Whether the United States' position here—that no historical evidence exists related to post offices and very few analogues exist—forfeits the offering of otherwise uncited historical evidence on appeal is not for me to decide. I simply explain why the historical evidence of which I am aware does not support § 930(a)'s constitutionality here.

ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure.

2 Edw. 3, c. 3 (1328) (emphasis added).

*Bruen* discounts the latter half of the statute—the ban on going or riding "armed"— because later English law, such as *Sir John Knight's Case*, interpreted that provision to apply only to " 'going armed *to terrify* the King's subjects.' " 597 U.S. at 40–45 (quoting *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686)). Unlike the provision interpreted in *Sir John Knight's Case*, the clause of the Statute of Northampton banning Englishmen from "com[ing] before the King's Justices or other of the King's Ministers doing their office, with force and arms" does not appear to have attached the same "terror" requirement. *See* Brief of *Amicus Curiae* The Independent Institute in Support of Petitioners at 10–11, 10 n.7, *Bruen*, 597 U.S. 1 (No. 20-843) (citing EDWARD COKE, 3 INSTITUTES OF THE LAWS OF ENGLAND 161–62 (6th ed. 1680) (discussing the case of a man arrested for concealed carrying in the palace and in Westminster Hall); STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? 39 (2021)); Kopel & Greenlee, *supra*, at 213–15 (2018) (also discussing that case and noting "the ban on carrying around courts was enforced as written"); HALBROOK, *supra*, at 39 ("By the first half of the seventeenth century, it was thus established that [under the Statute of Northampton] a subject may not carry arms in a manner to terrorize other subjects *or in a place like a palace*

*where the Justices of the King's Bench were assembled*." (emphases added)). With this limitation of the terror requirement in mind, the Statute of Northampton remains relevant in informing the historical tradition of firearms regulation. *Bruen*, 597 U.S. at 39, 45.

Three states—and possibly the District of Columbia—enacted near duplicates of the Statute of Northampton around the founding, and each included a version of this provision. *See* Appendix A (compiling copycat statutes from Massachusetts, North Carolina, Virginia, and the District of Columbia). But neither the Statute of Northampton nor its copycats help the United States justify applying § 930(a) to Ayala.

First, some copycats exclusively applied to judicial officers and thus extended only as far as bans in courthouses. For example, the Virginia statute applies only to "Ministers of Justice." COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC AND PERMANENT NATURE, AS ARE NOW IN FORCE ch. 21, at 33 (1794); *see also* App. A at 1. And the draft District of Columbia statute refers to "the justices or judges of any court within the [District], or either of their ministers of justice," likewise focusing only on the judiciary. WILLIAM CRANCH, *An Act for Punishment of Crimes and Offences, within the District of Columbia*, § 40, *in* CODE OF LAWS FOR THE DISTRICT OF COLUMBIA: PREPARED UNDER THE AUTHORITY OF THE ACT OF CONGRESS OF THE 29TH OF APRIL, 1816 235, 253–54 (1818), https://perma.cc/88PB-Y654; *see also* App. A at 2–3 & 3 n.9. Thus, two of the four founding-era copycat statutes

exclusively apply to bans on firearms possession at judicial proceedings. Their purpose is obvious: to avoid intimidation or interference in the orderly administration of justice.

Next, the Statute of Northampton and its North Carolina copycat refer to "the King's justices," *see* Frederick Pollock, *The King's Justice in Early Middle Ages*, 12 HARV. L. REV. 227, 237 (1898) (explaining that in the Assize of Northampton the King appointed a group of justices "to see to the enforcement of criminal law and the Crown's dues" and to hear land disputes), as well as "the King's Ministers doing their office," 2 Edw. 3, c. 3 (1328); A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA 60–61 (F. Martin ed. 1792) (hereinafter NORTH CAROLINA STATUTES). But I doubt that the latter phrase encompasses ordinary postal employees. To start, a narrow reading comports best with the historical regulations' text and context. The statutes refer to "the King's justices, or other of the King's ministers," suggesting that the former is a subset of the latter and that both are similar in level of importance. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 31, at 195 (2012) ("Associated words bear on one another's meaning."). The statutes also contrast between "the King's servants" and "[the King's] Ministers," which implies that not everyone who worked for the King was one of "the King's Ministers." 2 Edw. 3, c. 3 (1328); NORTH CAROLINA STATUTES, *supra*, at

60–61; *e.g.*, SCALIA & GARNER, *supra*, § 26, at 174 ("If possible, every word and every provision is to be given effect.").

The list of officials authorized to execute the statutes sheds further light on who qualified as one of the "King's Ministers":

> [T]he King's Justices in their presence, Sheriffs, and *other Ministers [of the King] in their Bailiwicks*, Lords of Franchises, and their Bailiffs in the same, and Mayors and Bailiffs of Cities and Boroughs, within the same Cities and Boroughs, and Borough-Holders, Constables, and Wardens of the Peace within their Wards.

2 Edw. 3, c. 3 (1328) (emphases added); *see also* NORTH CAROLINA STATUTES, *supra*, at 60–61 (containing the same language). Each of these officials appears to have possessed an adjudicative or law enforcement function, often as the King's representative within a certain area. *See generally id.*

Other historical evidence supports defining "the King's Ministers" as high-ranking officials. One of the Ordinances of 1311, for example, purported to allow Parliament to appoint King Edward II's "Ministers," defined as a list of high-ranking officials including the Chancellor, the Chief Justices of the King's Bench, and the Treasurer. 5 Edw. 2, c. 14 (1311). Likewise, the Statute of 1341 purported to hold "any Minister of the King" to "answer in the Parliament." 15 Edw. 3, c. 3 (1341); Charles Donahue, Jr., *Magna Carta in the Fourteenth Century: From Law to Symbol?: Reflections on the "Six Statutes"*, 25 WM. & MARY BILL RTS. J. 591, 614–15 (2016). "The statute further attempt[ed] to require that

the king's ministers swear to uphold [Magna Carta] by taking an oath in parliament." *Id.*

At 621. The list of those required to be sworn—"the Chancellor, Treasurer, Barons, and

Chancellor of the Exchequer, the Justices of the one Bench and of the other, Justices

assigned in the Country, Steward and Chamberlain of the King's House, Keeper of the

Privy Seal, Treasurer of the Wardrobe, Controllers, and they that be chief deputed to abide

nigh the King's Son Duke of Cornwall"—is far narrower than the universe of everyone who

worked for the King. *Id.* at 614; *see also* Charles Donahue, Jr., *What Happened in the*

*English Legal System in the Fourteenth Century and Why Would Anyone Want to Know*,

63 S.M.U. L. Rev. 949, 959 (2010) (characterizing this portion of the Statute of 1341 as

an attempt by Parliament "to control the appointment of [Edward III's] *ministers*"

(emphasis added)).

Finally, a copycat from colonial Massachusetts referred to "their majesties' justices

or other their officers or ministers doing their office." Ma. Province Laws ch. 18, § 6

(1692); *see also* App. A at 1. This statute cannot carry the United States' burden to prove

a tradition of firearms bans in any building with federal employees. First, this statute, like

the Virginia and District of Columbia copycats, might only extend to judicial officers.

Second, the Supreme Court already explained that the Massachusetts statute "merely

codified the existing common-law offense of bearing arms to terrorize the people, as had

the Statute of Northampton itself." *Bruen*, 597 U.S. at 47. As discussed, although the

Statute of Northampton's "Ministers" clause does not appear to attach the same terror requirement as its public carry provision, neither did Northampton extend to every soul who performed a duty for the Crown. Third, absent *Bruen* and other countervailing historical evidence, reading "officers" to cover every government employee would come dangerously close to endorsing a de facto ban on public carry. *Cf.* U.S. BUREAU OF LABOR STATISTICS, *May 2022 Nat'l Occupational Emp. & Wage Estimates: Federal, state and local gov't* (last modified Apr. 25, 2023) (noting over 21.3 million government employees across various sectors), https://perma.cc/8RE4-QTZ2. The sensitive-places exception cannot sweep so broadly. *See Bruen*, 597 U.S. at 31; Baude & Leider, *supra*, at 35.[6]

At most, the United States may be able to analogize to modern-day equivalents of the listed officials from the Statute of Northampton, or to the especially high-ranking officials sometimes referred to elsewhere in the Statutes of the Realm as "the King's Ministers." Ordinary postal employees at an ordinary post office do not fit the bill.[7]

---

[6] Even giving "officer" its broadest possible meaning, Supreme Court precedent provides that there is a lower class of government workers, "employees," that do not qualify as officers. *See Lucia v. SEC*, 138 S. Ct. 2044, 2049, 2051 (2018).

[7] In the final paragraph of *Bruen*'s analysis, the Supreme Court summed up its conclusions: "The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions. Those restrictions, for example, limited . . . the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials." 597 U.S. at 70 (citations omitted). At first glance, the reference to "other government officials" could be taken as support for applying § 930(a) to ordinary post offices. But this passage refers, in part, to the historical evidence that I just discussed: The Statute of Northampton and its copycats. For the reasons I just explained, those laws do not apply to *all* government officials. Although history supports firearms restrictions in the presence of some "other government officials," that does not include ordinary postal workers.

Again, it is the United States' burden to point to a "relevantly similar" historical analogue in support of § 930(a)'s application to Ayala. To do so, it must marshal the historical record and explain "how" and "why" the founders similarly burdened the right to bear arms. *Bruen*, 597 U.S. at 29, 58 n.25. The United States does not point to the Statute of Northampton or any of its copycats, let alone address their meaning. At most, only three of the statutes appear to have extended beyond the context of judicial proceedings. And even those laws did not prohibit weapons everywhere that a government employee worked. Thus, I do not find them relevantly similar to § 930(a) as applied to Ayala. *Cf. id.* at 44 n.11 ("[F]avor[ing] the [interpretation of *Sir John Knight's Case*] that is more consistent with the Second Amendment's command" despite "multiple plausible interpretations.").

b.   Prohibitions in Legislatures and Polling Places

Besides the copycat Northampton statutes, I have identified a total of three founding-era firearms restrictions that could be understood as "sensitive-place" regulations—two Maryland laws and a provision of the Delaware constitution. It remains doubtful that such sparse evidence alone can constitute a "tradition." *See Bruen*, 597 U.S. at 46. Nonetheless, giving the examples full weight, the general principle to be discerned from them is that governments may restrict firearms possession in places where important

and legally definitive governmental decisions are regularly made. But this principle is inapplicable to § 930(a) because post offices are not ordinarily the sites of such decisions.

First in 1647, and again in 1650, Maryland restricted persons from "com[ing] into the howse of Assembly (whilst the howse is sett) with any weapon upon perill of such fine or censure as the howse shall thinke fit." 1647 Md. Laws 216; *see also* 1650 Md. Laws 273 ("That none shall come into eyther of the houses whilst they are sett, with any gun or weapon upon perill of such fine or censure as the howses shall thinke fitt."). In modern parlance, Maryland banned firearms possession in legislative chambers while those bodies were in session. Because the two laws were essentially identical and the latter was passed separately to cover both houses of the same colonial legislature after splitting into an upper and lower house, they serve as a single historical datapoint. As far as I am aware, no other colony or state followed suit near to the founding. Nevertheless, in the light of similar English regulations, I will consider this precedent as a permissible tradition restricting the right to bear arms. *Cf. e.g.*, COKE, *supra*, at 160 (explaining that arms are banned wherever Parliament sits because otherwise the proceedings would be "hindered or disturbed").

The second piece of relevant evidence is contained in the Delaware Constitution of 1776. "To prevent any violence or force being used at . . . elections," Delaware prohibited individuals from "com[ing] armed to any [elections]." DEL. CONST. art. 28 (1776). This is the first polling-place carry restriction. New York also passed a law in 1787 that

prohibited individuals from interfering with a citizen's right to vote "by force of arms" or "malice," or by otherwise "disturb[ing] or hinder[ing]" citizens from freely voting. New York Act of Jan. 26, 1787, ch. 1., cl. 9. But New York's law focused on carrying with an impermissible intent—not carrying in a sensitive place. Thus, I do not consider it as a sensitive-place regulation.

In sum, two founding-era state governments prohibited individuals from carrying during legislative sessions or at polling places. The lone polling-place restriction applied only on election day and only at the polls. Likewise, the lone legislative restriction did not extend beyond an active session. Accepting these as part of the historical tradition of firearms regulation, the record demonstrates a very limited principle: firearms regulation may be permissible in places to prohibit intimidation or interference with important and legally definitive governmental decisions. Indeed, the Delaware Constitution explicitly justifies its restriction in these terms. DEL. CONST. art. 28 (1776) (restricting firearms so "[t]hat every elector may, in a peaceable and orderly manner, give in his vote on the said day of election"). This principle could reasonably extend to courthouses and perhaps high-level executive branch offices where weighty decisions with legally determinative consequences are a common occurrence. But such regulations are inarguably limited to locations where important and final governmental decisions are made.

The government has not justified Ayala's prosecution in the light of this principle. On average, the decisions made by post office employees are far from the weighty subject matter of elections or the legislative process. True, during the short window of time before an election, some post offices may receive mail-in ballots, making them more analogous to polling places. But even polling places were not protected indefinitely; instead, restrictions were tailored to the date of an election. That makes sense given the legal reason for these regulations—to prevent intimidation or interference with important government decisions. Thus, a blanket restriction on firearms possession in post offices is incongruent with the American tradition of firearms regulation.

### 3. Dicta in *Heller*, *McDonald*, and *Bruen* Do Not Establish That All Government Buildings Are Sensitive Places

In the United States' view, all the above historical analysis is unnecessary. It claims that the Supreme Court has "settled" whether arms prohibitions in "all manners of government buildings" can categorically survive a Second Amendment challenge. *See* Gov't Suppl. Br. at 5–7. I am not convinced.

The United States first points to a passage in *Heller*, which declared that—without "an exhaustive historical analysis today of the full scope of the Second Amendment"— "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing

conditions and qualifications on the commercial sale of arms." 554 U.S. at 626–27. Without elaboration, the Supreme Court repeated those assurances verbatim in *McDonald*, 561 U.S. at 786. And the Supreme Court had good reason not to comment further, as neither *Heller* nor *McDonald* implicated the issue. The United States contends that these opinions' references to "schools and government buildings" as sensitive places were an "express[] affirm[ance]" that "the government may regulate firearms in government buildings," period. Gov't Suppl. Br. at 3.

The United States misunderstands what these cases held. Neither statement was necessary to the reasoning of either case; they were pure dicta. *See Kanter v. Barr*, 919 F.3d 437, 453–54 (7th Cir. 2019) (Barrett, J., dissenting) (calling *Heller*'s language identifying presumptively lawful regulatory measures "dictum"). Nor were they even related to the topics addressed. *Id.* at 453. *Heller* concludes that the right to bear arms includes the right to possess a handgun in the home. *McDonald* extends that right against the States. No sound argument exists that either *Heller* or *McDonald* or both logically entail a rule that "all manners of government buildings" are sensitive places. Notwithstanding any dicta to the contrary, only "the holding of [a] prior decision" governs. 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 134.03[2] (Matthew Bender 3d ed. 2023). And the Eleventh Circuit has clearly reminded district courts not to follow dicta blindly. *See e.g., Fresh Results LLC v. ASF Holland, B.V.*, 921 F.3d 1043, 1049 (11th Cir. 2019)

(concluding that a district court should not have followed Eleventh Circuit dicta because "[a]lthough our holdings are precedential, our dicta are not"); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379 (1994) ("It is the holdings of our cases, rather than their dicta, that we must [follow].").

Perhaps I fundamentally part ways with the United States on what constitutes a holding. The traditional view is that a decision's holding consists of "the rule that is logically entailed by the reasoning that was necessary to reach the outcome on the basis of the legally salient facts and the arguments of the parties." *See* Lawrence B. Solum, *Originalist Theory and Precedent: A Public Meaning Approach*, 33 CONST. COMMENT. 451, 459 (2018) (referring to this as the "ratio decidendi" approach). This view comports with founding-era conceptions of stare decisis. *See* Brutus XII (Feb. 7, 1788), *in* 4 THE FOUNDER'S CONSTITUTION 236 (Philip B. Kurland & Ralph Lerner eds., 1987) (explaining that to resolve cases, "courts must and will assume certain principles, from which they will reason, in forming their decisions" and that "[t]hese principles, whatever they may be, when they become fixed, by a course of decisions . . . will be the rule"); *Cage v. Acton*, 12 Mod. 288, 294 88 Eng. Rep. 1327, 1331 (1796) (Holt, C.J.) ("[T]he reason of a resolution is more to be considered than the resolution itself."). In line with the Supreme Court's recent and repeated endorsements of the same approach, I adhere to it as well. *See, e.g., Ramos v. Louisiana*, 140 S. Ct. 1390, 1404 (2020) ("It is usually a judicial

decision's reasoning—its *ratio decidendi*—that allows it to have life and effect in the disposition of future cases."); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) (explaining that the holding includes the result and "those portions of the opinion necessary to that result"); *see also United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019) ("The holding of a case comprises both the result of the case and those portions of the opinion necessary to that result. . . . In contrast, dicta is a statement that neither constitutes the holding of a case, nor arises from a part of the opinion that is necessary to the holding of the case." (citations and quotations omitted)).

The United States' position that the Supreme Court has "specifically identified" and "settled" the issue of whether all government buildings are sensitive places sounds in the "predictive approach." *Originalist Theory*, *supra*, at 459; Gov't Suppl. Br. at 5–6. That view of what constitutes a holding includes statements "far beyond the facts of the particular case," *Originalist Theory*, *supra*, at 459, including statements that look more like legislative pronouncements than legal reasoning, Lawrence B. Solum, *Holdings*, Legal Theory Lexicon (last modified Jan. 29, 2023), https://perma.cc/DAZ2-JQGJ. This understanding of the judicial power raises serious constitutional concerns. *See* U.S. Const. art. III, § 2 (limiting federal courts' jurisdiction to cases or controversies). The predictive approach improperly broadens the judicial power by allowing federal courts to announce binding rules unrelated to any controversy before them. *Cf. California v. Texas*,

141 S. Ct. 2104, 2115 (2021) (explaining that judicial remedies "operate with respect to specific parties" and "[i]n the absence of any specific party, they do not simply operate on legal rules in the abstract" (quotations and citations omitted)). And it contradicts the traditional view—stated repeatedly by Chief Justice John Marshall—"that the positive authority of a [judicial] decision is co-extensive only with the facts on which it is made." *Ogden v. Saunders*, 25 U.S. (12 Wheat) 213, 333 (1827) (Marshall, C.J., dissenting); *see also Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("[R]egardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case."); *United States v. Files*, 63 F.4th 920, 928–29 (11th Cir. 2023) (noting that Eleventh Circuit caselaw "treat[s] as dicta" "legal conclusions predicated on facts that aren't actually at issue").

In addition to the comment in *Heller* and *McDonald*, the United States relies on a passage in *Bruen* elaborating on how to apply the sensitive-places exception. *See* Gov't Suppl. Br. at 5–6. The Court explained that where arms were historically prohibited without challenge, courts can assume regulation in the same manner is constitutional today:

> Consider, for example, *Heller*'s discussion of 'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.' 554 U.S. at 626. Although the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. *See* D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); *see also* Brief for Independent Institute as *Amicus Curiae* 11–17. We therefore can assume it settled that

> these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

597 U.S. at 30. The United States claims that "these locations" in the third sentence refers to "sensitive places such as schools and government buildings," and therefore declares it "settled" that any weapons prohibition in any school or government building is constitutional. *See* Gov't Suppl. Br. at 5; *but see id.* at 15 (conceding that this portion of *Bruen* is ambiguous as to what "these locations" refers).

The United States' suggested reading of this key paragraph is mistaken, both as a grammatical matter and a contextual one. "[T]hese locations" refers to the nearest antecedent—"18th- and 19th-century 'sensitive places,'" such as "legislative assemblies, polling places, and courthouses"—in the second sentence, rather than "schools and government buildings" in the first sentence. *Bruen*, 597 U.S. at 30; *see* SCALIA & GARNER, *supra*, § 18, at 144 ("A pronoun, relative pronoun, or demonstrative adjective generally refers to the nearest reasonable antecedent."); *Washington Mkt. Co. v. District of Columbia*, 172 U.S. 361, 368 (1899) ("The grammatical structure of the sentence also supports the view that the [referenced] corporation . . . was the city government, for the nearest antecedent to the word 'corporation' is the city government.").

The context reinforces that reading. The Supreme Court was providing an example of how the *Bruen* test works in practice. It had earlier explained that largely unchallenged founding-era regulations will almost certainly be constitutional. It then provided three examples—legislative assemblies, polling places, and courthouses. The paragraph proceeds to direct lower courts to use these three places as analogues when deciding how the sensitive-places exception applies to modern regulations.

Finally, opinions are not subject to the rigorous interpretive methods used to discern the meaning of a statute or other positive law enactment. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979) ("[T]he language of an opinion is not always to be parsed as though we were dealing with language of a statute."); *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("[J]udicial opinions are not statutes, and we don't dissect them word-by-word as if they were."). I will not overread this paragraph as if it were setting out the definitive boundaries of the sensitive-places exception for all government buildings, particularly when *Bruen* had no occasion to opine on government property at all. To be sure, *Bruen*'s above discussion is "reasoned dicta," *Gimeno v. NCHMD, Inc.*, 38 F.4th 910, 915 (11th Cir. 2022) (quotations omitted), and is thus "not something to be lightly cast aside," *Peterson v. BMI Refractories*, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997). As the Eleventh Circuit notes, "there is dicta and then there is dicta, and then there is Supreme Court dicta." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006). The highest-level dictum is "well

thought out, thoroughly reasoned, and carefully articulated analysis by the Supreme Court," *id.*, not bare legislative statements like those in *Heller* and *McDonald*, *see Heller*, 554 U.S. at 635 (acknowledging that the opinion did not cite historical authority for its assurances and explaining that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us"). I do not cast aside this section of *Bruen*'s analysis. Instead, I follow its lead and look to the reasoning for why firearms were historically banned in certain places to draw relevant analogies in evaluating § 930(a).

Reading the passage as the United States urges would put *Bruen*'s dicta in direct contradiction with *Bruen*'s holding. Indeed, it would render the analogical reasoning required by *Bruen* pointless. 597 U.S. at 31 (rejecting an analogy between legislative bodies, polling places, and courthouses and the whole of Manhattan because "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly"). Because there is neither a holding nor reasoned dicta from the Supreme Court answering whether all government buildings are sensitive places, *Bruen* requires the above historical analysis. For the reasons explained already, there is no historical practice of a near-total prohibition on firearms in ordinary post offices and there is no relevantly similar historical analogue supporting such a prohibition.

### 4. Whether a Firearms Regulation Is Consistent with Our Nation's Historical Tradition Is a Legal Question, Not a Factual One, and the United States Bears the Burden to Marshal the Historical Record in Support of its Legal Argument

Before applying the *Bruen* test, Ayala requests an evidentiary hearing so that I can make "findings of fact, based on evidence received in the record, that the post office where Mr. Ayala worked was a historically 'sensitive place.'" Def. Br. in Supp. of Evid. Hr'g (Doc. 42) at 2. He claims that such evidence "cannot come in the form of artfully drafted prose, from compelling briefs or legal memoranda, or from cited law review articles." *Id.* at 3. Instead, according to Ayala, it "must" come from "an expert historian produced by the Government." *Id.*

The existence, or lack thereof, of a particular historical practice is of course in some sense factual. But whether Ayala's motion to dismiss should be granted turns on a distinct *legal* question to which certain historical facts are merely relevant—whether the United States has shown an analogous tradition of founding-era firearms regulation that justifies its prosecution of Ayala under § 930(a). *See Bruen*, 597 U.S. at 27–30. For example, background facts about the history of the English language, the common usage of a word by a particular kind of merchant, or the circumstances of a written instrument's formation can all inform a court's conclusion about the meaning of a standard commercial contract. But few people would suggest that I must hear from a linguistics expert or a historian

34

specializing in the practice of merchants before resolving a motion to dismiss in a contract dispute.

The above example illustrates that the relevant inquiries are *interpretive* and that the questions at bottom are *legal*. Nothing differs about constitutional cases—the Supreme Court did not require expert testimony to determine the original meaning of the Confrontation Clause in *Crawford* or the Vesting Clause of Article II in *Seila Law*. *See Crawford v. Washington*, 541 U.S. 36 (2004); *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020). After all, it is the judicial function—not that of an expert witness—"to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

### 5. The United States' Proprietor Argument Cannot Justify Excluding All Federal Property from Second Amendment Scrutiny

Beyond its scant analogical reasoning and its appeals to dicta, the United States' supplemental brief argues that its power to exclude individuals from its own property includes "the lesser power to restrict the actions or conduct of visitors as a condition of admittance." Gov't Suppl. Br. at 12.

This idea does not fit cleanly into *Bruen*'s established framework. Instead, the United States seems to contend that it need not apply the Second Amendment at all to its property. It is one thing for the United States to fail to carry its burden under *Bruen* to fully marshal the historical record. As I have demonstrated above, courts can (but need not) address such failures by conducting independent historical research. It is another thing

entirely to imply that a separate legal principle—whatever that might be—narrows the constitutional right to bear arms outside the Supreme Court's ordinary analytical framework. Accordingly, any "government-as-property-owner" idea distinct from *Bruen* presents a separate legal issue from the "searching analysis into the historical record" undertaken above.

The United States dedicates only a handful of pages to advancing its government-as-proprietor theory and does not explain how that theory interacts with *Bruen* or any other Second Amendment precedent. *See id.* at 11–14. The United States simply asserts that at least some gun regulations—those governing citizens whose daily lives bring them onto government property—are exempt from Second Amendment analysis. I can find no support for that proposition in the Supreme Court's cases, and the United States furnishes none. Furthermore, although I do not disagree that "[t]he government has more flexibility to regulate when it is acting as a proprietor," *id.* at 12, that does not mean it can bring *criminal charges* for conduct that occurs on its property regardless of an individual's constitutional rights. Applying that principle in any other context reveals its absurdity. Would an indictment for failing to submit to a full body cavity search when showing up at the District of Columbia Department of Motor Vehicles to apply for a learner's permit pass Fourth Amendment muster? Or could the United States charge the adherent of a

non-favored religion with trespass for entering government property without offending the Free Exercise or Establishment Clauses? I think not.

Of course, in First Amendment speech cases, government regulation on government property can be subject to varying levels of means-end scrutiny. *See, e.g.*, *United States v. Kokinda*, 497 U.S. 720, 726–27 (1990) (plurality opinion) (noting that different levels of scrutiny apply in different places). But *Bruen* explicitly rejected that kind of judicial interest balancing in the Second Amendment context. *See* 597 U.S. at 26. Moreover, First Amendment government-as-proprietor regulations are best understood as being analyzed *within* the Supreme Court's First Amendment framework, not outside the scope of the right altogether. *Cf. Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1136 n.7 (10th Cir. 2015) (Tymkovich, J., concurring in part and dissenting in part) (noting that, in his view, firearms regulations in some government buildings *survive* Second Amendment scrutiny, but the scope of the Second Amendment still extends to those buildings). The same logic applies here. The United States must point to a historical tradition justifying any claimed power to regulate conduct protected by the Second Amendment's plain text, even as a proprietor. *See Bruen*, 597 U.S. at 24. As discussed in detail above, the United States identifies no such tradition.

Given the expansive modern role of the federal government in everyday life, an even more fundamental problem with the United States' position remains. *City of Arlington,*

*Tex. v. F.C.C.*, 569 U.S. 290, 313 (2013) (Roberts, C.J., dissenting) ("The administrative state 'wields vast power and touches almost every aspect of daily life.' " (quotations omitted)). Whatever the historical record permits with respect to firearms regulation on government property, that legal principle cannot be used to abridge the right to bear arms by regulating it into practical non-existence. *See* Baude & Leider, *supra*, at 35 (identifying this as "probably the most important [Second Amendment] principle"). For example, take the criminal statute here: It bans knowingly possessing a firearm in a Federal facility, which is defined as "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." 18 U.S.C. § 930(g)(1). The plain language captures everything from the White House to toll booths in national parks to Social Security Administration buildings. Under this criminal statute, with the proliferation of the federal government comes the diminution of the People's right to bear arms. At some point, when twenty-eight percent of land in the United States is owned by the federal government and many ordinary activities require frequenting a "Federal facility," the government's theory would amount to a nullification of the Second Amendment right altogether. *See* CAROL HARDY VINCENT ET AL., CONGRESSIONAL RESEARCH SERVICE, FEDERAL LAND OWNERSHIP: OVERVIEW AND DATA 1 (Feb. 21, 2020), https://perma.cc/55NA-S9UV.

### 6.  The United States Fails to Raise Any Argument Regarding Its Authority to Restrict Firearms as an Employer

Lastly, when I directed supplemental briefing on what kinds of firearms regulations were permitted, I specifically asked how the United States' employment relationship with Ayala might affect the analysis. *See* App. B at 4 ("Ayala's situation presents another potential wrinkle: what kinds of firearms regulations at the founding applied to postmasters (or other postal office employees)? The government's obligation here thus requires a survey of . . . historical evidence of firearms regulations, at post offices and of their *workers*." (emphasis added)). In a single sentence, the United States suggests that it can do whatever it wants when acting as an employer: "Even if *Bruen* left any doubt about firearms prohibition in post offices or other government buildings as a general matter (it doesn't), Ayala certainly cannot show that the Second Amendment prevents the government from prohibiting its own employees from bringing guns to work." Gov't Suppl. Br. at 18. This throw-away line fails to present the issue or develop any argument.

In this case, the United States *indicted* Ayala under § 930(a) for knowingly possessing a firearm on federal property. I do not know whether the United States also fired him or took any other disciplinary action for carrying a firearm in violation of a condition of his employment. Whether such a condition of employment would comport with the Second Amendment has gone entirely unbriefed and remains wholly irrelevant. As it stands, the criminal prosecution is completely divorced from his status as a postal

employee. I repeat the United States' single line on this point: "Ayala certainly cannot show that the Second Amendment prevents the government from prohibiting its own employees from bringing guns to work." *Id.* That is all. No citation, no authority, no reasoning.

While it is my job to apply the correct law, I cannot explore every unturned stone. *Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation."). Parties "are responsible for advancing the facts and arguments entitling them to relief." *Id.* at 244 (footnote omitted) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment)). The facts and arguments advanced by the United States fail to carry their burden under *Bruen*, much less preserve potential wrinkles based on competing constitutional principles. "[D]istrict courts should not 'be expected to construct full blown claims from sentence fragments.' " *T.P. ex rel. T.P. v. Bryan Cnty. Sch. Dist.*, 792 F.3d 1284, 1291 (11th Cir. 2015) (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)); *cf. NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived.").

## B. Count II

As for Count II, Ayala argues that he had a "common law right" to resist the postal inspectors' attempted arrest because the arrest was illegal under "the totality of the circumstances." MTD at 18–19. There is, as Ayala concedes, "scant legal support" for this argument. *Id.*; *see United States v. Bailey*, 691 F.2d 1009, 1018 (11th Cir. 1982) (explaining that, although "[t]he common law recognized the right of a citizen to use reasonable force to resist an unlawful arrest," that rule "has been greatly eviscerated, if not virtually abolished, in this circuit"). But more importantly for my purposes, it is not a proper basis for a motion to dismiss because it would require looking beyond the allegations in the indictment to the facts and circumstances of the arrest. *See John Bad Elk v. United States*, 177 U.S. 529, 535 (1900) (evaluating justified resistance based on whether the defendant employed "no more force than was absolutely necessary to repel" the unlawful arrest); *see also United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987) ("[A] court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial."); FED. R. CRIM. P. 12(b)(1). Thus, Ayala's motion is denied as to Count II.

## IV.    CONCLUSION

The United States fails to meet its burden of pointing to a historical tradition of firearms regulation justifying Ayala's indictment under § 930(a). Accordingly, the following is **ORDERED:**

1.    Ayala's Motion to Dismiss (Doc. 23) is **GRANTED in part**.

2.    Count I of the Indictment (Doc. 1) is **DISMISSED with prejudice**.

3.    Ayala's Motion for an Evidentiary Hearing (Doc. 40) is **DENIED**.

4.    No later than **January 19, 2024**, the parties are **DIRECTED** to file a joint notice as to whether the pending Motion to Suppress (Doc. 44) is moot, including proposed dates for a suppression hearing if necessary.

**ORDERED** in Tampa, Florida, on January 12, 2024.

Kathryn Kimball Mizelle
United States District Judge

# Appendix A

There were at least four Northampton copycats around the time of the founding.

First, a Massachusetts province law enacted in 1692 provided:

> That **every justice of the peace in the county where the offence is committed, may cause to be staid and arrested** all affrayers, rioters, disturbers or breakers of the peace, and **such as shall ride, or go armed offensively before any of their majesties' justices or other their officers or ministers doing their office** or elsewhere by night or by day in fear or affray of their majesties' liege people, and such others as shall utter any menaces or threatening speeches ; and upon view of such justice or justices, confession of the party or other legal conviction of any such offence, shall commit the offender to prison until he find sureties for the peace and good behaviour, and seize and take away his armour or weapons, and shall cause them to be apprized and answered to the king as forfeited.

Ma. Province Laws ch. 18, § 6 (1692).

> Closer to the founding, a 1786 Virginia statute provided:

> Be it enacted by the General Assembly, that no man, great nor small, of what condition soever he be, except the Ministers of Justice in executing the precepts of the Courts of Justice, or in executing of their office, and such as be in their company assisting them, **be so hardy to come before the justices of any court, or either of their Ministers of Justice, doing their office, with force and arms**, on pain, to forfeit their armour to the Commonwealth, and their bodies to prison, at the pleasure of a Court; nor go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the county, upon pain of being arrested and committed to prison by any Justice on his own view, or proof by others, there to abide for so long a time as a jury, to be sworn for that purpose by the said Justice, shall direct, and in like manner to forfeit his armour to the Commonwealth; but no person shall be imprisoned for such offence by a longer space of time than one month.

COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A

PUBLIC AND PERMANENT NATURE, AS ARE NOW IN FORCE ch. 21, at 33 (1794).

1

North Carolina followed in 1792:

Item, it is enacted, that no man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, or of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, **be so hardy to come before the King's justices, or other of the King's Ministers doing their office with force and arms**, nor bring no force in affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor it [sic, likely "in"] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. And that the King's Justices in their presence, Sheriffs and other ministers in their bailiwicks, Lords of Franchises, and their bailiffs in the same, and Mayors and Bailiffs of cities and boroughs, within the same cities and boroughs, and boroughholders, constables and wardens of the peace within their wards shall have power to execute this etc. [in original] And that the Justices assigned, at thier coming down into the country, shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertain to their office.

A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA 60–61 (F. Martin ed. 1792).

Lastly, an 1818 Draft Code of the District of Columbia provided:

No man, great nor small, of what condition soever he be, except the ministers of justice in executing the precepts of the courts of justice, or in executing their office, and such as may be in their company assisting them, **shall be so hardy as to come before the justices or judges of any court within the District of Columbia, or either of their ministers of justice, doing their office**, on pain to forfeit his armour to the United States, and his body to prison, at the pleasure of such court; nor go, nor ride armed by night nor by day, in fairs, or markets, or in other places, in terror of the country, upon pain of being arrested and committed to prison by any justice or judge on his own view, or proof by others, and of forfeiture of his armour to the United States;

but no person shall be imprisoned for any offense against this act, by a longer space of time than one month.

WILLIAM CRANCH, *An Act for Punishment of Crimes and Offences, within the District of Columbia*, § 40, *in* CODE OF LAWS FOR THE DISTRICT OF COLUMBIA: PREPARED UNDER THE AUTHORITY OF THE ACT OF CONGRESS OF THE 29TH OF APRIL, 1816 235, 253–54 (1818), https://perma.cc/88PB-Y654.[8]

---

[8] It is unclear from the historical record whether this provision ever possessed the force of law. *See* Act of Apr. 29, 1816, ch. 148, § 1, 1 Stat. 323 (1816) (authorizing "the judges of the circuit court, and the Attorney for the District of Columbia" to "prepare and digest a code of jurisprudence, both civil and criminal, for the said district, to be hereafter submitted to the Congress of the United States, to be modified, altered or adopted, as to them shall seem proper"); Walter S. Cox, *Efforts to Obtain a Code of Laws for the District of Columbia*, 3 RECS. COLUMBIA HIST. SOC'Y, WASH., D.C. 115, 117 (1900) (explaining that had the 1818 code "been adopted, [it] would have advanced us very little. It was, however, not acted upon by Congress, and the whole subject was allowed to sleep for some twelve years, when a committee of the House of Representatives, who had been directed to inquire into the expediency of providing for the appointment of commissioners to digest and form a code of civil and criminal law for the District, etc., made a report."). Thus, I consider the draft code only as confirmatory evidence that the Virginia copycat was not considered defunct soon after the founding.

3

# Appendix B

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No: 8:22-cr-369-KKM-AAS

EMMANUEL AYALA,

        Defendant.
_____

## ORDER

To assist in the fully informed resolution of Mr. Ayala's motion to dismiss with respect to count one of the indictment, the government is ordered to provide additional briefing on the historical evidence of regulations banning firearms in post offices and the meaning of "other lawful purposes" in 18 U.S.C. § 930(d)(3). Ayala may respond.

Ayala brings an as-applied constitutional challenge to his indictment under § 930, arguing that there is no historical evidence justifying bans on firearms in post offices. That is the right inquiry for purposes of the Second Amendment: "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2127 (2022). If a regulation exceeds that historical tradition, the Second Amendment's "unqualified command" protects an individual's right. *Id.* at 2126.

It is true that neither *District of Columbia v. Heller*, 554 U.S. 570 (2008), nor *McDonald v. City of Chicago*, 561 U.S. 742 (2010), "cast doubt" on "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626; *McDonald* 561 U.S. at 786. But the Supreme Court in *Bruen*— while noting it had "no occasion to comprehensively define sensitive places"—clarified the sensitive places exception and instructed courts to use that test to evaluate future constitutional challenges:

> Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. *See* D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); *see also* Brief for Independent Institute as *Amicus Curiae* 11–17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

142 S. Ct. at 2133.

Other lower courts have taken the cue from *Bruen* to apply the proper historical test to determine whether other "longstanding prohibitions" and "sensitive places" bans, *Heller*,

554 U.S. at 626, are consistent with the Second Amendment. *See e.g.*, *Siegel v. Platkin*, No. 22-7464, 2023 WL 1103676 (D.N.J. Jan. 30, 2023) (granting temporary restraining order in part on challenge to New Jersey law banning guns in several places including public libraries, museums, parks and restaurants); *United States v. Power*, No. 20-po-331, 2023 WL 131050 (D. Md. Jan. 9, 2023) (denying motion to dismiss indictment for bringing gun into National Institute of Health campus after government presented evidence that it is analogous to sensitive places recognized at the Founding); *Range v. Attorney General*, 53 F.4th 262 (3d Cir. 2022) (concluding 18 U.S.C. § 922(g)(1) is constitutional only after a historical review), *vacated en banc* 56 F.4th 992 (3d Cir. 2023).

I must do likewise. The government's response to Ayala's motion to dismiss on this ground is unhelpful in this task. It consists of two paragraphs summed up as follows: "A government building has been deemed a sensitive place that can ban the carrying of firearms while not violating an individual's Second Amendment rights and is consistent with the Nation's historical tradition of firearm regulation." Resp. (Doc. 25) at 4. That assertion simplifies (and likely overstates) the sensitive places exception as definitely carving out from Second Amendment protection all government buildings. But *Bruen* requires a more searching analysis into the historical record to determine whether § 930 as applied to Ayala defeats the "presumpt[ion]" that the Constitution protects his conduct. *See* 142 S. Ct. at 2127. The government has the burden to "affirmatively prove" that its firearms

regulation in non-public areas of post offices is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.*

Because the government squarely fails to do so in its initial response, the government must submit supplemental briefing that examines the historical evidence of regulation of firearms at post offices, with a particular view to the time of the Founding. *Bruen*, 142 S. Ct. at 2135–38 (explaining the inherent limitations of evidence that either long predates or postdates ratification of the Second Amendment).[9] Given that the Constitution gave Congress the power "[t]o establish Post Offices" even before the States ratified the Second Amendment, *see* Art. I, § 8, Const., the existence—or lack thereof—of firearms regulations governing post offices is highly informative.

Ayala's situation presents another potential wrinkle: what kinds of firearms regulations at the Founding applied to postmasters (or other postal office employees)? The government's obligation here thus requires a survey of both kinds of historical evidence of firearms regulations, at post offices and of their workers.

---

[9] The Eleventh Circuit recently held that Reconstruction Era historical sources "are more probative of the Second Amendment's scope than" Founding Era sources when determining the scope of the Second Amendment right incorporated against the States. *Nat'l Rifle Ass'n v. Bondi*, __ F.4th __, 2023 WL 2416683, at *3 (11th Cir. 2023). This is because "the Fourteenth Amendment is what *caused* the Second Amendment to apply to the States," so "the understanding that prevailed when the States adopted the Fourteenth Amendment . . . is what matters." *Id.* But here, Ayala challenges a federal statute, so the scope of the Second Amendment when it was adopted is what matters. *Id.* (quoting *Bruen*, 142 S. Ct. at 2136) ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.").

Ayala also attacks § 930 as unconstitutionally vague as applied to him. Before analyzing the merits of any Due Process Clause concern, I must first attempt to determine the scope of § 930(d)(3) to know whether Ayala falls within the exception that permits possessing a firearm in a federal facility. That subsection excludes from prosecution "the lawful carrying of firearms or other dangerous weapons in a Federal facility incident to hunting *or other lawful purposes*." (emphasis added). If Ayala's conduct falls within the plain meaning of that provision, he is entitled to dismissal of count one without resort to any vagueness challenge. Because Ayala had a concealed weapons permit and a class "G" security license under Florida law (which the government does not dispute), the key inquiry is whether he carried the firearm for another "lawful purpose" while at work at the post office. But neither party attempts to define—using ordinary tools of statutory construction, including the relevance of any corollary federal regulations—what "other lawful purposes" means in context of § 930(d). The government asserts that "there is no evidence" that "Ayala carried his concealed firearm during his employment with USPS on multiple dates incident to hunting or other lawful purposes." Once again, that is a conclusion without explanation of the legal rule applied.

Accordingly, the government must submit supplemental briefing not to exceed 30 pages no later than **April 14, 2023**. Ayala may respond no later than **May 5, 2023**, in

briefing not to exceed 20 pages. The status conference remains scheduled for **March 14, 2023**.

   **ORDERED** in Tampa, Florida, on March 13, 2023.


Kathryn Kimball Mizelle
United States District Judge