# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA,

v.                                                 Case No. 8:22-cr-369-KKM-AAS

EMMANUEL AYALA,

Defendant.

_____

## **ORDER**

Defendant Emmanuel Ayala moves to suppress warrantless surveillance video of himself working in a United States Postal Service truck. The video captures Ayala smoking what appears to be marijuana and handling a firearm. Mot. (Doc. 44).[1] The government opposes suppression. Resp. (Doc. 48). I deny the motion because Ayala had no expectation of privacy in the truck, and even if he did, the surveillance was a reasonable investigation of workplace misconduct.

---

[1] The motion also seeks suppression of a firearm recovered during an encounter that resulted in Ayala's arrest. *See* Mot. at 6. At the start of the suppression hearing, Ayala withdrew that portion of the motion, which I now deny as moot. Tr. at 5–6.

## I.      BACKGROUND

In July 2022, a USPS employee reported that Postal Truck 8811565 smelled like marijuana. Tr. 62:9–13.[2] USPS management notified the USPS Office of the Inspector General (USPS OIG), which conducts investigations for the agency. Resp. at 3. Special Agent (SA) Scott Cunningham took the case. After an inspection where he "observe[d] the smell of what appeared to be marijuana," Cunningham obtained permission from OIG management to install a camera inside the postal truck. Tr. 67:23–68:8, 70:5–12; Resp. ¶¶ 15–19 (Factual Background); Mot. at 3.

Defendant Ayala, a tractor-trailer operator, was assigned to Postal Truck 8811565. *See* Mot. at 3; Resp. at 4. Through the surveillance—the authenticity of which is undisputed—SA Cunningham observed Ayala smoke "a green leafy substance" in the truck and handle a handgun. Resp. ¶¶ 17–18. For example, footage from September 8 and September 12 shows Ayala in the driver's seat while parked at a USPS parking lot. *See* Exs. 4–5 (Doc. 95); Resp. ¶ 19. As one would expect, the truck has windows on each side and in the front. *See* Ex. 4. He rolls chunks of a green, leafy substance into a cigarette, lights it,

---

[2] SA Cunningham testified that a USPS employee who "utilized that truck . . . complain[ed] about the odor of marijuana when they took over their shift." Tr. 62:9–13. The employee complained to his or her supervisor, who then contacted the USPS Office of Inspector General. *Id.*

and inhales. Ex. 4 at 6:50–7:19, 10:56–12:15; Ex. 5 at 3:43–7:00; 12:21–14:50. Though not always, he often smokes bent over, near or beneath the height of the windows. *See, e.g.* Ex. 4 at 10:56–12:15; Ex. 5 at 15:07–52, 21:31–36; 22:20–25. In one of the videos, Ayala reaches to his side and picks up a handgun. Ex. 5 at 8:17–25. He bends over and racks the slide of the gun. *Id.* 8:26–30. He then sits up and looks out the window. *Id.* 8:30–36. Ayala eventually takes the truck out of park and starts to drive. Ex. 5 at 22:06, 26:49. He continues to smoke and, at times, bends over before he inhales, all while the truck is still in motion. *E.g.*, Ex. 5 at 26:27–42.

After observing Ayala, SA Cunningham decided to conduct an investigative interview. *See* Tr. at 99:25–100:18, 106:2–7. On September 14, 2022, he and a fellow OIG agent went to Ayala's worksite and waited for him in the USPS parking lot. Mot. at 2–3. The encounter led to an altercation, the facts of which are disputed and immaterial to this motion. *Compare* Mot. at 4–5, with Resp. at 8–10. The incident led to Ayala's arrest and this indictment for forcible resistance against an officer and employee of the United States in violation of 18 U.S.C. § 111.[3] Mot. at 6; Indict. (Doc. 1) at 1–2. Ayala moves to

---

[3] The indictment alleges that Ayala "did forcibly resist, oppose, impede, and interfere with an officer and employee of the United States, while that officer and employee of the United States was engaged in the performance of official duties." Indict. (Doc. 1) at 1. The grand jury also charged Ayala with possession of a firearm in a federal

suppress the video surveillance, and the government opposes the motion. Mot.; Resp. For the reasons below, I deny the motion.

## II.    LEGAL STANDARDS

The Fourth Amendment " 'guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government,' without regard to whether the government actor is investigating crime or performing another function," such as "act[ing] in its capacity as an employer." *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 755–56 (2010) (quoting *Skinner v. Ry. Labor Execs.' Ass'n.*, 489 U.S. 602, 613–614 (1989)). Searches that violate the Fourth Amendment may result in the suppression of evidence recovered as a result of the search. *See, e.g., Davis v. United States*, 564 U.S. 229, 236–38 (2011).

"[F]or Fourth Amendment protections to apply, the person invoking the protection must have an objectively reasonable expectation of privacy in the place searched or item seized." *Rehberg v. Paulk*, 611 F.3d 828, 842 (11th Cir. 2010). And "as a general matter, warrantless searches are *per se* unreasonable under the Fourth Amendment." *Quon*, 560 U.S. at 760–61 (citation modified).

---

facility in violation of 18 U.S.C. § 930. *Id.* I dismissed that count, (Doc. 57), and the government appealed, (Doc. 62). Since then, the government successfully moved the Eleventh Circuit to dismiss the appeal, (Doc. 75) at 2.

"But not always: The warrant requirement is subject to certain exceptions." *Case v. Montana*, 607 U.S. \_\_\_\_, No. 24-624, 2026 WL 96690, at \*4 (U.S. Jan. 14, 2026) (citation modified). One such exception is a government employer's search for employee misconduct. *See Quon*, 560 U.S. at 760–61 (first citing *O'Connor v. Ortega*, 480 U.S. 709, 725 (1987) (plurality opinion); then citing *id.* at 732 (Scalia, J., concurring in judgment)) (citation modified).

In other words, although "[i]ndividuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer," the standard for suppression of a warrantless search changes. *Quon*, 560 U.S. at 756. Unlike in an ordinary criminal investigation, "a government employer's warrantless search" does not violate the Fourth Amendment as long as it concerns "work-related misconduct" and is "reasonable[] under all the circumstances." *See id.* at 757 (describing the *O'Connor* plurality's approach) (citation modified); *see also Friedenberg v. Sch. Bd. of Palm Beach Cnty.*, 911 F.3d 1084, 1093 (11th Cir. 2018) ("If a public employer intrude[s] on an employee's protected privacy interest through a 'legitimate work-related' search or an 'investigation[ ] of work related misconduct,' the employer's search '[will] be judged by the standard of reasonableness.' ") (quoting *O'Connor*, 480 U.S. at 725).

5

## III. ANALYSIS

Ayala argues that SA Cunningham's warrantless surveillance violated his Fourth Amendment rights. He contends that he had a reasonable expectation of privacy in the postal truck. Mot. at 9–10. And Ayala argues that the warrant exception for government employers does not apply because the surveillance began as a criminal investigation rather than a workplace one. *Id.* The government responds that Ayala had no privacy interest in the shared postal truck, and, even if he did, a warrant was unnecessary because the surveillance was a reasonable measure taken as part of an employment-related investigation. Resp. at 12–15.

Suppression is not justified. Ayala did not have a reasonable expectation of privacy by virtue of USPS policies on surveillance, his lack of exclusive control over the truck, and the nature of his job as a driver. But even if he did, the warrant exception applies because the investigation originated as one into employee misconduct, even if there were parallel criminal elements of the probe. Finally, because the surveillance was reasonable, it did not violate the Fourth Amendment.

### A. Ayala Did Not Have a Reasonable Expectation of Privacy in the Postal Truck

To evaluate the propriety of a search in a government workplace, a court "must balance the invasion of the employees' legitimate expectations of privacy

against the government's need for supervision, control, and the efficient operation of the workplace." *Friedenberg*, 911 F.3d at 1105 (citation modified). Considerations include whether the employee had notice of the possibility of a search, maintained exclusive control or use of the place or item searched, and the nature of the job. *See id.* (evaluating an employee's notice, consent, and exclusivity over her purse); *Quon*, 560 U.S. at 762 (in considering that the law enforcement plaintiff "would or should have known that his actions were likely to come under legal scrutiny, and that this might entail an analysis of his on-the-job communications"); *cf. Friedenberg*, 911 F.3d at 1095 (noting that "employees ha[ve] diminished privacy expectations" when they "participat[e] in an industry that is regulated pervasively to ensure safety," including employees who "could cause great human loss if impaired by drug or alcohol use") (citation modified).

All these considerations weigh against a reasonable expectation of privacy here: Ayala had notice of the possibility of surveillance, Ayala lacked exclusive control over the postal truck, and Ayala's duties included operating a postal truck with windows on his daytime shift. Accordingly, Ayala did not have a reasonable expectation of privacy in the truck. Moreover, even if Ayala had a subjective expectation of privacy, that expectation was unreasonable because he shared the vehicle with others, and his job required safely operating a postal truck and thus carried related litigation risks.

### i.    Ayala Had Notice of the Possibility of Surveillance

The parties dispute whether Ayala had actual notice of the possibility of surveillance. The government offered testimony that Ayala's onboarding to the postal service included this warning. Ayala testified that it did not. Because I find Ayala not credible on this point (and others), and because I find Tiffany Bell's testimony credible and corroborated by Ayala's transcript report, I find that Ayala had actual notice. That finding weighs strongly against a reasonable expectation of privacy. But even if I accept Ayala's testimony as true—that he does not recall that warning as part of his training, whether by his inattention to the presentations or oversight by the postal service trainers—the government presents evidence showing that a reasonable employee would have known about the prospect of surveillance.

Notice of a government employer's policy permitting workplace searches reduces an employee's expectation of privacy. *See Smith v. Pelham*, No. 20-13210, 2021 WL 5863412, at *4 (11th Cir. Dec. 10, 2021) (no subjective expectation of privacy when the city's computer use policy "made it clear that" the employee's city computer could be monitored). Some courts even hold that an employee consents to a search by continuing his activity notwithstanding notice of the risk. For example, in *Esser*, an employee "did not have a reasonable expectation of privacy in her purse" when signs on postal property warned "that purses are subject to inspection," and the office rules "required

employees to read all posted regulations." 284 F. App'x at 759. Moreover, the employee "consented to [the] search" "by virtue of her voluntary employment and her decision to bring her purse on postal property." *Id.; see also United States v. Broadus*, 7 F.3d 460, 463–64 (6th Cir. 1993) (holding that a postal employee consented to warrantless search of a locker for drugs by the Postal Inspector by signing a waiver that said the locker was "subject to inspection at any time by authorized personnel").

The mere existence of a surveillance policy is not dispositive, of course. "[T]he government (even the government-as-employer) may [not] take away one's Fourth Amendment rights simply by announcing in advance an intention to do so." *See* 5 W. LaFave, SEARCH AND SEIZURE § 10.3(d) (6th ed.). The question is whether the policy's existence, promotion, and application diminish an employee's reasonable expectation of privacy. In Ayala's case, the answer is yes.

Like many employers, USPS has formal policies that govern workplace conduct, property, and disputes. For example, the USPS Employee & Labor Relations Manual proscribes "the use of illegal drugs . . . while on duty or on postal premises." (Doc. 95-2) at 751; *see also* Resp. ¶ 12. And the Administrative Support Manual (ASM) makes clear that postal property, "including that individually assigned to postal personnel, is for official use only." Resp. ¶ 13 (quoting ASM (Doc. 91-1) § 271.5).

9

Postal policy explicitly permits inspection and video surveillance of postal property. Per the ASM, "[postal] property and its contents are at all times subject to examination and inspection by duly authorized postal officials in the discharge of their official duties." ASM § 271.5 ; Resp. ¶ 13. The ASM permits not only inspection in real time by officials, but also through "monitoring" and "video recording." ASM § 271.5 (authorizing officials "to examine and inspect, as their duties require, such Postal Service-owned or - furnished property and its contents" and providing notice that "law enforcement examination and inspection include searching, monitoring, and video recording").[4]

The parties dispute whether Ayala had notice that USPS policies allowed surveillance. The government alleges that Ayala was informed about the chance of surveillance and inspection during new employee orientation. *See* Resp. at 5. It offers Ayala's "transcript report" showing that he completed the training in 2014. *See* Ex. 3 (Doc. 91). Tiffany Bell, a USPS Manager of Employee Development who oversees training in Florida, testified that the trainings were (and are) standardized across the country. Tr. 10:15–11:7. Bell

---

[4] Additionally, the OIG "conducts GPS tracking . . . in situations that do not require a court order, such as tracking postal-owned vehicles." Resp. ¶ 14 (noting authority under the Inspector General Act). Indeed, the OIG has "unrestricted access to all Postal Service operations, programs, records, and documents." ASM § 111.323(a).

supports her testimony with seventeen years of training experience at USPS. *See id.* 10:8–9. Though Bell did not attend Ayala's orientation in New Jersey, she explained that facilitators are instructed not to deviate from pre-set topics, including ones such as these. *Id.* 25:24–26:4.

Bell described what orientation would have looked like when Ayala attended in 2014. The training lasted two and a half days, and it covered topics such as safety, bans on drugs and firearms, and—most importantly—postal property, surveillance, and inspection. *See, e.g., id.* 12:4–22, 13:18–14:8; 21:21– 23:7, 24:17–20 35:20–36:8. Personnel from the OIG gave a presentation in which they warned employees that USPS property was subject to inspection. *Id.* 22:8–13. According to Bell, employees were informed that USPS trucks belonged to the Postal Service and that they might be surveilled. *Id.* 22:22–24; 35:20–36:8.

Ayala disputes Bell's account. He testified that his orientation did *not* cover surveillance—indeed, Ayala alleges that he learned about the surveillance policy for the first time at the suppression hearing in January 2026. *Id.* 140:13–141:19. During the hearing, Ayala's counsel questioned whether Bell, who was not present at his training, could reliably testify to Ayala's training content. *See id.* 24:12–26:8. Bell responded that she can reliably infer what Ayala's training contained because it is nationally standardized content. *Id.*

First, a few findings of fact. I find that the orientation was ordinarily standardized across the country and included postal service policies about inspection and surveillance. Bell's testimony directly supports this finding, and Ayala's "transcript report" corroborates it. I also find Ayala not credible on this issue. His testimony that he had never heard of the surveillance policy until the January 2026 hearing is implausible in the light of his arrest, loss of job due to the surveillance evidence, indictment predicated on it, and his own motion to suppress the surveillance video. The government also quoted directly from the policy in its response to Ayala's own motion in 2023. *See* Resp. ¶ 13. Moreover, Ayala undermined his own credibility based on his responses to cross examination concerning notices on postal property that banned firearms.[5]

In the light of Bell's experience and testimony, Ayala's "transcript report," and Ayala's lack of credibility, I find that USPS's orientation is likely

---

[5] At the hearing, the government presented evidence that USPS had signs banning guns throughout its Tampa facility. Tr. 159:14–160:1, 163:2–164:15. Ayala testified that he had never seen the sign before. *Id.* 160:2–5; 163:2–164:15. Upon viewing a photograph of the sign near the front employee entrance, Ayala testified that he never used that entrance (and thus it was plausible that he had not seen the sign). *Id.* In response, the government offered video evidence of Ayala walking through the same entrance, directly past the signs. *Id.* 164:16–166:7. Ayala explained that the video was not representative of his routine because—on that particular day—he changed his route to assist a colleague. *Id.* 166:13–167:8. Based on this evidence, I likewise find Ayala not credible on this matter.

standardized across the country, and that, more likely than not, Ayala was informed of the policy on surveillance during his orientation.

In any event, even if I believed that Ayala did not actually know about the policy, a reasonable postal employee would or should have known about the prospect of surveillance. *See Quon*, 560 U.S. at 762. This was not a novel investigation. SA Cunningham testified that surveillance is a common investigative tool for USPS OIG. *See* Tr. 77:18–78:12. And at the time of the surveillance, Ayala had worked at USPS for several years. *See* Resp. at 6; Tr. 141:11, 153:23–24. According to his own testimony, Ayala was well-connected and involved in employee matters through his participation in the union. Tr. 151:22–153:18. Thus, it is reasonable to expect that a USPS employee, especially one as seasoned as Ayala, would have known that USPS might use surveillance of postal property to investigate misconduct.

**ii.    Ayala Did Not Have Exclusive Access to the Truck**

Turning to the next factor, I conclude that "the amount of access [to the truck] enjoyed by co-workers, supervisors, or the public" cuts against a reasonable expectation of privacy. *See Walker v. Darby*, 911 F.2d 1573, 1578 n.7 (11th Cir. 1990). Though Ayala presents evidence that he *felt* like the truck was his own, this showing does not render his expectation of privacy reasonable. *See, e.g.*, Tr. 149:8 ("[The truck is] my personal space.").

Unlike a private office or desk drawer, Ayala did not have exclusive use or control of the truck. *See O'Connor*, 480 U.S. at 718 (evaluating privacy by asking whether the employee "share[d] his desk or file cabinets with any other employees"). Ayala admits that he had to check the keys in and out each day for his shift and was assigned a designated route. *See* Tr. 113:1–15. Ayala also admits that other drivers used the vehicle, at least weekly. *Id.* 144:3–10. Nonetheless, Ayala suggests that "he had exclusive control" of the truck because nobody else was inside during the periods when he was surveilled. *See* Tr. at 107:19–20. Of course, this is not the only relevant consideration. Indeed, the OIG began the investigation because another postal employee complained of the smell of marijuana in the truck. The mere non-exclusivity of the shared, daily assigned truck distinguishes it from an employee's permanent office or desk drawer.

Additionally, unlike a closed container or private office space, the truck and part of its cab were visible to "co-workers, supervisors, or the public." *Walker*, 911 F.2d at 1578 n.7. The truck had windows, and the surveillance videos depict Ayala in a USPS parking lot in broad daylight. *See* Exs. 4–5. A coworker or supervisor could have approached the truck and peered in at any point. Ayala tries to minimize this risk by emphasizing that the truck was high off the ground. *See* Tr. 115:16–116:1. But his own behavior suggests otherwise. In the videos, Ayala repeatedly bends over to smoke, presumably to shield

himself from others' sight. *See, e.g.* Ex. 4 at 10:56–12:15; Ex. 5 at 15:07–52, 21:31–36; 22:20–25. The most plausible explanation for Ayala's behavior is that he was aware of the possibility that he was visible.

Thus, in the light of the truck's shared use and visibility to others, Ayala did not have a reasonable expectation of privacy inside of the truck. *See O'Connor*, 480 U.S. at 709 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967))).

### iii.   The Nature of Ayala's Job Diminishes His Privacy

Lastly, the nature of Ayala's position as a driver eliminates any reasonable expectation of privacy inside of the truck. When an employee's "actions [are] likely to come under legal scrutiny" due to the nature of the job, privacy is diminished. *Quon*, 560 U.S. at 762 (holding that a police officer had no reasonable expectation of privacy in his work communications when "his actions were likely to come under legal scrutiny," and "sound management principles" might require "an analysis of his on-the-job communications"). It is reasonable to expect that "sound management principles" might require monitoring of USPS trucks given the litigation and safety risks posed by driving. *See* Tr. 71:1–3 (explaining that there is "a liability factor if an incident were to occur while an employee was under the influence of a narcotic"); *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 672 (1989) (holding that U.S.

Customs employees who carried firearms in the line of duty had no reasonable expectation of privacy from suspicionless urine tests because "their duties depend[ed] uniquely on their judgment and dexterity"). A court may use common sense when evaluating reasonableness. *Cf. Friedenberg*, 911 F.3d at 1101 (holding, in a different warrant-exception context, that "[c]ommon sense yields [the] conclusion" that the government's interest in safety justifies testing schoolteachers for drug use). I do so here. Because Ayala's driving duties could incur significant liability for USPS, it was reasonable to expect his employer would monitor his conduct while on duty.

### B. The Surveillance Was Reasonable

But even if Ayala had a reasonable expectation of privacy, the outcome would not change. The warrant exception for employer searches applies because the surveillance was reasonable in purpose and scope.

### i.    The Investigation Was Employment Related

Ayala argues that the surveillance was part of a criminal investigation requiring a warrant. Mot. at 9–10. In his view, "postal management recruited a law enforcement agency to conduct a criminal investigation on its own behalf." *Id.* at 9. For support, he notes that possession of a controlled substance is a federal crime and that criminal investigations were within the scope of SA Cunningham's duties "as a law enforcement agent." *Id.* at 11.

16

The government responds that surveillance "was not to further a criminal investigation, but to further a work-related employee misconduct investigation."[6] Resp. at 14–15. "SA Cunningham became involved in the situation solely to sift out any employee misconduct for the safety of the USPS workplace." *Id.* at 15. "Just because the investigation into Ayala later led to criminal charges . . . does not mean that all investigative action leading up to that date is automatically criminal." *Id.*

I disagree somewhat with both parties. Based on SA Cunningham's testimony at the hearing and the duties of USPS OIG, I find that the investigation, at its initiation, concerned *both* employee misconduct and criminal activity. This is how SA Cunningham conceived of what he was doing: testifying that the criminal and administrative sides of an investigation "tend to overlap," Tr. 70:19–20, and that his practice is to report his findings to the respective authorities, whether internally to USPS Labor Relations or the U.S. Attorney's Office, *id.* 80:20–81:2. To be clear, though, employee misconduct was a significant motivating purpose of the search here. And because an investigation with potential criminal liability does not negate that the

---

[6] The government, during the hearing, suggested that it views SA Cunningham's investigation as having both criminal and administrative components. *See* Tr. 75:2–7.

17

investigation also aimed at uncovering employee misconduct, the warrant exception applies.

To determine whether a search was criminal or employer related in nature, courts look to "the purpose behind the search." *Lowe v. City of Macon*, 720 F. Supp. 994, 998 (M.D. Ga. 1989), *aff'd*, 925 F.2d 1475 (11th Cir. 1991) (table). If the goal is to uncover employment-related misconduct, then the search is employment related in nature. The Supreme Court has not clarified what happens when an investigation has a "criminal dimension," such as when the misconduct is also criminal. *See O'Connor*, 480 U.S. at 729; *United States v. Slanina*, 283 F.3d 670, 677 (5th Cir. 2002) (describing *O'Connor*'s self-imposed limitations), *vacated on other grounds*, 537 U.S. 802 (2002), *on appeal after remand*, 359 F.3d 356 (5th Cir. 2004) (per curiam). But multiple circuits have found that the "goal of ensuring an efficient workplace should not be frustrated simply because the same misconduct that violates a government employer's policy also happens to be illegal." *Id.* at 677–78 (citing *United States v. Simons*, 206 F.3d 392, 398–400 (4th Cir. 2000). Common sense suggests that the two might overlap much of the time. Thus, even if suspected misconduct is criminal—and even if the investigation takes on a prosecutorial dimension— the search will nonetheless qualify for the government-employer standard as long as one of its goals was employment-related. *See O'Connor*, 480 U.S. at 732 (Scalia, J., concurring in the judgment) (reasoning that the warrant exception

18

applies because of "the government's status as employer[] and the employment-related character of the search"); *see also Slanina*, 283 F.3d at 679 (holding no warrant was required for investigation "by an employer who [was] also a law enforcement officer" into an employee's possession of child pornography because the search "remained at least partly an investigation into employee misconduct").

SA Cunningham's investigation concerned employment-related misconduct. To begin, USPS management did not call upon an outside police force. The USPS OIG is part of the postal organization. *See* ASM § 111.32. The fact that SA Cunningham also had law enforcement powers to conduct a criminal investigation does not make this investigation exclusively criminal. *Cf. Quon*, 560 U.S. at 764 (holding that a police chief's audit of employee device usage was "motivated by a legitimate work-related purpose"); *United States v. Esser*, 284 F. App'x 757, 759 (11th Cir. 2008) (affirming the constitutionality under the *O'Connor* framework of a warrantless search by a postal inspector who "interrogated [the employee] concerning their investigation into pieces of allegedly stolen mail" in a criminal case for mail theft). Nor does the fact that possession of marijuana is a federal crime make every investigation concerning marijuana exclusively criminal. Marijuana possession also violated USPS policy. *See* Resp. at 5. As Ayala's employer, USPS "ha[d] a business interest in preventing intoxicated individuals from operating USPS vehicles." *Id.* at 14.

19

Ayala's reliance on *United States v. Taketa*, *see* Mot. at 10, is misplaced. In *Taketa*, the agent "testified that the investigation had changed from an internal affairs investigation into a criminal investigation once confirmation of an illegal wiretap was made."[7] 923 F.2d 665, 675 (9th Cir. 1991). SA Cunningham was questioned extensively on how a "criminal" investigation at USPS OIG differs from an "administrative" one. *See, e.g. id.* 79:25–81:2, 86:7–87:24, 92:4–21. Unlike the agent in *Taketa*, SA Cunningham's difficulty articulating an answer confirms that the investigations are intertwined from his perspective. For example, when Ayala's counsel asked SA Cunningham whether he had used video surveillance in a truck for "solely criminal [investigative] purposes," he indicated that he does not separate the two:

> Q: Now, solely criminal purposes, have you done that before?
>
> A: I can't really answer that because, again, when conducting a criminal investigation we take the facts that we gathered and we provide them to both Labor Relations -- we present them first to -- for prosecution and then the facts that we gather, whether it's accepted or declined, ultimately we will then provide that information to -- administratively. So it's never -- I don't -- it wouldn't necessarily ever be solely criminal.

*Id.* 80:18–81:2.

---

[7] Further distinguishing *Taketa*, Ayala has not offered any evidence that he was at risk of being charged with marijuana possession, and SA Cunningham did not observe Ayala with the firearm until after surveillance began. Resp. ¶ 18; Mot. at 3.

Thus, notwithstanding any criminal elements, SA Cunningham's surveillance of Ayala was employment related, and the *O'Connor* standards apply.

### ii.     The Investigation Was Reasonable

Because the surveillance was imminently reasonable, it survives *O'Connor*. Suppression is unwarranted.

The Supreme Court has not decided which *O'Connor* test governs an employer's warrantless search. Most recently, the Court analyzed a search under both the tests set forth by the *O'Connor* plurality and by Justice Scalia. *See Quon*, 560 U.S. at 757.

Under the *O'Connor* plurality's approach, "a government employer's warrantless search" for "work-related misconduct" is permissible if it is justified at its inception and reasonable in its scope. *See id.* at 761; *O'Connor*, 480 U.S. at 725–26. A search is justified at inception if the investigator had "reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct." *O'Connor*, 480 U.S. at 726. Likewise, the scope of a search is reasonable when the tactics "are reasonably related to the objectives of the search and not excessively intrusive in light of the nature of the misconduct." *Id.* (citation modified).

The surveillance here was justified at its inception and reasonable in its scope. Given the report that the truck smelled of marijuana, SA Cunningham

had reasonable grounds to suspect that surveillance would yield evidence of marijuana use, possession, or distribution. *See* Mot. at 3; Tr. 106:2–7. As to scope, video surveillance was an unobtrusive, "efficient[,] and expedient way to determine" the source of the marijuana smell. *Quon*, 560 U.S. at 761. SA Cunningham testified that when he received the tip, he did not know the source of the odor. *See* Tr. 106:2–7. One can imagine multiple possibilities such as an employee smoking inside the truck or the smell emanating from a package or someone's clothing. *See id.* Thus, a video camera was not overly invasive in the light of the serious safety risks posed by impaired driving. *See* Tr. 101:3–7 (explaining the usefulness of video surveillance); Resp. at 16; *cf. Friedenberg*, 911 F.3d at 1106 ("[W]here employees have safety-related reasons to inquire into their employees' physical wellbeing, the [Supreme] Court has upheld intrusions on even [bodily privacy].").

Ayala contends that surveillance was unreasonable because other investigative measures were not initially pursued. For example, Ayala's counsel questioned why SA Cunningham did not test Ayala for drugs instead of using video surveillance. Tr. 84:25–86:2. But SA Cunningham explained that USPS OIG is not permitted to order drug tests on postal employees. *Id.* In any event, it is unclear why a drug test would be a lesser invasion of privacy than surveillance during work hours in a work vehicle. But even if it were, the Supreme Court "has repeatedly refused to declare that only the least intrusive

22

search practicable can be reasonable under the Fourth Amendment." *Quon*, 560 U.S. at 763 (warning that "judges engaged in *post hoc* evaluations of government conduct can almost always imagine some alternative means by which the objectives of the government might have been accomplished") (citation modified). What's more, a drug test might not have accomplished the goal: a drug test would not have confirmed the source of marijuana if the smell came from a package or an employee distributing marijuana out of the truck.

Even if Ayala had a reasonable expectation of privacy in the postal truck, the search was reasonable and did not violate the Fourth Amendment under the *O'Connor* plurality's standard. The search likewise passed Justice Scalia's test, which merely asks whether the investigation was employment related. *See Quon*, 560 U.S. at 757. Suppression is not warranted.

## IV.   CONCLUSION

I deny Ayala's motion to suppress the video surveillance of him in a postal truck. Ayala had no reasonable expectation of privacy in the truck, and, even if he did, the search was a reasonable investigation of employee misconduct. Accordingly:

1. Defendant's motion to suppress (Doc. 44) is **DENIED**.

**ORDERED** in Tampa, Florida, on February 5, 2026.

Kathryn Kimball Mizelle
United States District Judge